## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## COLUMBIA DIVISION

| | | |
|---|---|---|
| ANTHONY E. GOOCH, individually and<br>on behalf of all similarly situated individuals, | ) <br> ) <br> ) | |
| **Plaintiff,** | ) <br> ) | **CLASS ACTION** |
| v. | ) <br> ) | **Civil Action No: 1:07-0016** <br> **JUDGE HAYNES** |
| LIFE INVESTORS INSURANCE<br>COMPANY OF AMERICA, et al., | ) <br> ) <br> ) | |
| **Defendants.** | ) | |

## MEMORANDUM IN SUPPORT PLAINTIFF'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT AND RESPONSE TO LIFE INVESTORS'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

COMES NOW the Plaintiff, Anthony E. Gooch ("Gooch"), individually and on behalf of others similarly situated, and hereby files this Memorandum in Support of Plaintiff's Cross-Motion for Summary Judgment and Response in Opposition to Life Investors' Motion to Dismiss or Alternative Motion for Summary Judgment. In support of this Memorandum, Plaintiff incorporates the exhibits filed with the Plaintiff's Consolidated Evidentiary Submission.

### INTRODUCTION

This class action arises out of the breach of a common and uniform insurance policy (hereafter "the Policy") issued to Plaintiff Anthony Gooch ("Gooch") and similarly situated insureds by Defendant Life Investors Insurance Company of America ("Life Investors") and AEGON USA Inc. ("AEGON") (hereafter "Defendants"). A true and correct copy of this Policy, filed with the Complaint, is separately filed as Exhibit 1. The overarching issue in this

case, and particularly in these summary judgment proceedings, concerns the Defendants' promise to pay benefits equal to the "actual charges" of treatments such as the radiation and chemotherapy benefits identified in Parts 11 and 12, respectively, under Part 2, Section E of the Policy. Due to the Defendants' delays, Plaintiff is forced to file this pleading now to allow the Defendants the full amount of time under the parties agreed briefing schedule and the rules to respond. Plaintiff will file the additional discovery gathered over the coming weeks when Plaintiff provides his Responses to Defendants' Motions on August 3, 2007, thus allowing the Court to address these issues in their entirety in one setting.

For the reasons set forth in greater detail below, Gooch is entitled to a partial summary judgment as to Count I for declaratory and injunctive relief based on (1) the plain language of the Policy using well-established rules of contractual interpretation, or alternatively (2) Life Investors' long-standing course of conduct involving the payment of "actual charges" benefits based on the amounts of medical bills. It is clear based on the express terms of the Cancer Only Policy that it unambiguously indexes the amount of "actual charges" benefits to the amounts healthcare providers actually billed (i.e, "charged") for their services, not the amount third party payors ultimately expensed when they tendered payment as Life Investors argues here. Alternatively, should the Court conclude that the Policy's usage of the term "Actual charges" in conjunction with other terms found throughout the policy gives rise to an ambiguity, undisputed evidence concerning Life Investors' conduct and its "Instructions for Submitting a Claim on the Cancer Only Policy" (Exhibit 12) conclusively establish the parties' understanding that "actual charges" benefits were to paid in amounts equal to healthcare provider bills.

Life Investors has similarly filed a summary judgment motion, albeit one that seeks resolution across the board as to all claims. In that motion, Live Investors mainly contends

Gooch's claims fail because its unilateral change of the index for "actual charges" benefits is permitted under the Policy.  In support of that view, Life Investors contends that "actual charges" refers either (a) to amounts established in the industry as normal and reasonable or (b) to the amount a third party payor ultimately recorded as an expense for the services provided. Life Investors reasons that because continuation of its performance under the old index (medical bills) has become too expensive since the issuance of the Policy, the index is subject to whatever "claims procedure" they choose to designate.  Life Investors cites *Claybrook v. Central United Life Ins. Co.*, 387 F.Supp.2d 1199 (M.D. Ala. 2005) as the main support for this argument.

The problem with Life Investors' heavy reliance upon *Claybrook* is that the policy at issue in that case (hereafter "the *Claybrook* policy", Exhibit 8) is sharply different from the Policy here.  The *Claybrook* policy did not use separate terms to describe other indexes according to which various benefits were paid; instead, it used exclusively the term "actual charges" to set benefits.  *See* Exhibit 8.  Based on that set of unique facts, the *Claybrook* Court held the usage of "actual charges" in the "context of the policy" favored a construction referring to the normal, reasonable charges that third party payors expensed. *Claybrook*, 387 F.Supp.2d at 1204.

The current Policy, however, does not lend itself to the same construction.  Unlike the *Claybrook* policy, the Policy at issue here uses a number of different terms to set benefits.  The terms with this Policy relevant to the instant issue are (1) "usual and customary", which, under the express terms of the Policy, indexes certain benefits to the "normal" and "reasonable" charges customarily assessed in the geographic area where the medical service was rendered; and (2) "actual expenses", which on its face refers to the amount the amount a third-party payor expensed.  As discussed in greater detail herein, the *Claybrook* Court did not have before it a

3

Policy that included indexes for benefits that, by either express definition (as in the case of "usual and customary") or by plain language and usage ("actual expenses"), claim the exact same definitions Life Investors seeks to impose upon "actual charges" here. Life Investors' argument, therefore, ignores the problem created by the closely-related terms "usual and customary charges" and "actual expenses"

Gooch respectfully requests that this Court enter a partial summary judgment as to Count I for declaratory and injunctive relief on behalf of the Class defined in the Motion For Class Certification under Rule 23(b)(2). Gooch further requests that this Court deny Life Investors' motion as to all claims.

## RELEVANT FACTS

Under Section C of the Policy, an insured becomes entitled to benefits after being "Positively Diagnosed"[1] with "Cancer"[2] while the policy is in force. These benefits are paid according to provisions appearing throughout the Policy, provided that "(a) The Cancer is first diagnosed after the 30-day 'waiting period'; and (b) The loss is incurred (e.g., treatment is received or the service is performed) while this policy is in force, and (c) All other provisions of this policy apply." Policy, Section C, p. 5. Absent an assignment, these benefits are payable directly to the policyholder, regardless of whether the insured has other health insurance coverage in place. Id.

The Policy uses various indexes for the different coverages offered. For instance, coverage for different forms of surgical care is expressly indexed to the Policy's Schedule of

---

[1] The term "Positively Diagnosed" is specifically defined in the Policy, Section A, p. 4.

[2] The term "Cancer" is specifically defined in the Cancer Only Policy, Section A, p. 3.

Operations[3]; coverages for "usual and customary" charges[4] are indexed to the "normal" and "reasonable" charges in "the geographic area where provided"; and coverages for "actual expenses"[5] are indexed to the amount actually paid. Relevant to the instant case, the Policy also has a number of coverages based on "actual charges." Example of such benefits include those for radiation therapy and chemotherapy in Section E, Part 2, Items 11 and 12, p. 7, where Life Investors promises to "pay the actual charges up to the calendar year maximum shown in the Policy Schedule" in paragraph (a) for each Item.

On or around November 1997, Gooch purchased the Policy in Pulaski, Tennessee, where he was employed as a mechanic. Deposition of Anthony Gooch ("Gooch Dep.") at 13-16. He received his physical there, completed his application there, and signed, executed and received his original copy of the Policy there. Id. In 1999, Gooch was diagnosed with non-Hodgkins Lymphoma. Gooch Dep. at 25. After his diagnosis, Gooch and his wife asked Life Investors about the process for submitting claims under the Policy. Affidavit of Anthony Gooch at ¶ 7. (Exhibit 6). Life Investors and AEGON USA instructed him as follows:

> **Cancer Specified Disease, Hospital & Heart**. Submit the completed [claim] form along with your itemized hospital bills, doctor bills (surgery, anesthesia, in-patient attending physician bills), chemotherapy and radiation therapy bills. On claims for cancer and specified disease, submit the first pathology report diagnosing your condition.

Se Exhibit 6; Gooch Aff. at ¶ 7 and Exhibit B thereto.

---

[3] *See* Policy, Section E, pp. 10-11 ("Schedule of Operations").

[4] *See* Policy, Section A, p. 3 (defining "USUAL AND CUSTOMARY" as "The normal and reasonable charge for a service, an apparatus, or medicine in the geographic area where provided.").

[5] *See, e.g.,* Policy, Section E, Part 2, pp. 7-8 (Alopecia benefits under Chemotherapy and Radiation Therapy and transportation and lodging benefits under Bone Marrow Donor Expenses).

In accordance with that letter, Gooch submitted medical bills for each of his chemotherapy treatments showing his "actual charges" over the course of eight years between 1999 and 2006, inclusive. Gooch Aff. at ¶ 8. For these eight years, the Defendants regularly paid benefits to Gooch using this index. Id.; Gooch Dep. at 45, 138-140.

Defendants repudiated this index on or about May 2006, when they sent a computer-generated form letter ("Form Letter") to Gooch advising that payment of benefits "for certain kinds of medical services, such as radiation therapy and chemotherapy" would no longer be indexed to medical bills effective July 1, 2006. Form Letter Included in Life Investors' Initial Disclosures (Exhibit 4) and Gooch Form Letter (Exhibit 5). On or about October 2006 after the receipt of this letter, Gooch submitted another claim to the Defendants for chemotherapy treatment. Gooch Dep. at 58, 69, 215. As he had done for the previous eight years since his cancer diagnosis, Gooch submitted his physician's bill for chemotherapy treatments and demanded the Defendants honor the terms of the Policy by providing full benefits equal to the bill. Id at 58. The Defendants refused. Id. The Defendants processed the claim on November 1, 2006, and thereafter informed Gooch through a computerized notice that he had improperly submitted his "proof of loss." Gooch Aff. at ¶ 11 and Exhibit F thereto (the Defendants' computerized notice). The statement said he must re-file his proof of loss attaching either (1) a summary notice from Medicare or Medicaid; (2) an Explanation of Benefits (EOB) from whatever other medical care coverage he may have had in place; or (3) a statement from his healthcare provider showing the amount actually paid for the services rendered, irrespective of the actual charges indicated in the medical provider billing statement. Id.; Gooch Dep. at 58.

On November 10, 2006, Gooch re-submitted his claim, and attached an EOB provided by Blue Cross/Blue Shield showing Blue Cross/Blue Shield had paid only a portion of the amount

6

charged. Gooch Aff. at ¶ 12. Gooch has since submitted numerous additional claims for further chemotherapy he has had to endure. Id. at ¶ 16. Defendants continue to cut his benefits in accordance with the May 2006 Form Letter. Gooch Dep. at 58.

## STANDARD OF REVIEW

Under Fed. R. Civ. P. 56(c), summary judgment is proper if "the pleadings, depositions, answers to interrogatories, admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." The burden of establishing that there is no genuine issue of material fact lies upon the moving party. *Celotex Corp. v. Catrett,* 477 U.S. 317, 330 n. 2, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court must view the facts and all inferences to be drawn therefrom in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). To establish a genuine issue as to the existence of a particular element, the non-moving party must point to evidence in the record upon which a reasonable jury could find in its favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.*

For the reasons below, Gooch and the class are entitled to partial summary judgment as to Count I seeking declaratory and injunctive relief. Additionally, Life Investors' motion for summary judgment as to all claims should be denied in its entirety.

## ARGUMENT

I. **TENNESSEE LAW GOVERNS PLAINTIFF'S CONTRACT CLAIMS IN THE EVENT OF A CONFLICT BECAUSE THE PURCHASE AND DELIVERY OF THE POLICY OCCURRED IN PULASKI, TENNESSEE.**

Life Investors entire argument is premised upon the erroneous proposition that Alabama contract law applies. In making this argument, Life Investors asserts that *Claybrook v. Central United Life Insurance Co.*, 387 F. Supp. 2d 1199 (M.D. Ala. 2005) is dispositive, notwithstanding the fact that the *Claybrook* Policy's usage of actual charges is materially different from the usage of that term in Gooch's Policy (discussed *infra* in Part II). However, even if *Claybrook* was decided based upon a novel proposition of Alabama law in conflict with Tennessee law, it does not apply here because Tennessee law governs in the event of any conflict.

"Under Tennessee conflict of laws rules … the liability of an insurance company under a policy of insurance is determined by the law of the state where the contract for insurance was made." *Stakem v. Randolph*, 431 F. Supp. 2d 782, 785 (E.D. Tenn. 2006). Notwithstanding Life Investors' unsupported assertions to the contrary, the Gooch Policy was formed and delivered to him at his place of employment in Pulaski, Tennessee. Gooch Dep. at 13-16. That location is where the Gooch completed the application, tendered payment, received his physical, and executed the Policy. Under *Stakem*, Tennessee law governs any potential conflicts of law governing Gooch's contract claims.[6]

---

[6] Life Investors enthusiastically interprets a preemption clause in its Policy to mean that Alabama law governs based on Gooch's residency. However, careful review of the provision cited by Life Investors shows that it is not a choice of law provision at all, but rather a clause providing that the law of the place where the Policy was formed (which is usually, but not always, the policyholder's place of residence) trumps any contrary Policy terms by amending them "to conform to the minimum requirements of such laws." Policy, Section K, ¶ 13, p. 15. Here, that term merely conforms the Policy to the laws of Tennessee, the place where the Policy was formed. Indeed, the Policy is replete with references to Tennessee law to conform to its requirements. *See* Policy, "Notice Concerning Coverage Limitations And Exclusions Under The Tennessee Life And Health Insurance Guaranty Association Act" (the third, fourth and fifth unnumbered pages of the Policy).

Importantly, Life Investors' Memorandum and evidentiary submissions do not contradict the Gooch's testimony, notwithstanding its over-reaching assertion that delivery occurred in Alabama. Rather, Life Investors simply makes the logically suspect argument that because it sent a *duplicate* (or *second*) policy to Gooch at his Athens, Alabama, address, "delivery" must have occurred there instead. Callen Decl. at ¶¶ 7-8. However, "delivery" is determined by the place where the policy was *first* given to the Plaintiff and where the Policy was executed, not where duplicates of that policy may have been delivered at a later date. *Kustoff v. Stuyvesant Ins. Co.*, 22 S.W.2d 356, 358 (Tenn. 1929) (holding that Arkansas law applied where Arkansas was where the agent countersigned and delivered the policy).

Because Gooch's policy was formed and delivered in Tennessee, Tennessee law governs in the event of a conflict. Thus, any novel aspects of Alabama law followed in *Claybrook* do not apply here.

## II. GOOCH AND THE CLASS ARE ENTITLED TO PARTIAL SUMMARY JUDGMENT ON COUNT I SEEKING DECLARATORY AND INJUNCTIVE RELIEF.

The Life Investors Policy obligates Life Investors to use medical bills as its contractual index for paying "actual charges" benefits because of (1) the manner in which the term "actual charges" is used and (2) Life Investors' eight-year course of dealing. In its Memorandum, however, Life Investors seeks to divert the Court's attention from these basic facts by editorializing on the alleged market conditions that caused its decision to change the "actual charges" index. It then attempts to cast "actual charges" as a term of art susceptible only to one industry definition, an argument that ignores the fact that each contract stands on its own due to different linguistic choices made in the drafting process.

Life Investors, however, is unable to escape from the Policy it drafted. It also cannot escape the stubborn fact of its performance notwithstanding its familiarity with the same "market

9

conditions" it now purports to assert. The plain language of *these* Policies, as well as Life Investors' multi-year course of dealing for the same, supports partial summary judgment for Gooch as to Count I.

    **A.    The Four Corners Of The Policy Establish That Gooch And Other Insureds Are Entitled To Benefits In The Amount Of The Healthcare Providers' Bills Showing "Actual Charges."**

When "resolving disputes concerning contract interpretation, [the court's] task is to ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the contractual language." *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999). As an initial matter, the court must determine whether the language of the contract is ambiguous. *Planter's Gin Co. v. Federal Compress & Warehouse Co., Inc.*, 78 S.W.3d 885, 889 (Tenn. 2002). "[I]n reviewing a contract for ambiguities, the court should consider the contract as a whole." *Vencor, Inc. v. Standard Life and Accident Ins. Co.*, 317 F.3d 629, 635 (6th Cir. 2003).

The key to defining "actual charges" lies in how that term is used in connection with others that similarly establish indexes for certain Policy benefits. For "actual charges" to have substantive effect in the policy, it must necessarily have a different meaning than both "usual and customary" charges and "actual expenses." [7] *See, e.g., United States v. Pielago*, 135 F.3d 703, 715 (11th Cir. 1998) ("It is a time-honored principle of contract construction that contracts should be interpreted so as to give meaning to each and every word.").

    *1.    Inclusion of the term "Usual and Customary" precludes a definition of "actual charges" based on purported pricing norms within the healthcare industry.*

---

[7] Importantly, this billed amount, if charged to Gooch or the policyholder directly, would likewise be the amount of money the healthcare provider received, because neither Gooch nor any other private individual, as a practical matter, is able to negotiate a partial payment because they lack the bargaining power exerted by entities such as BlueCross/Blue Shield and other private insurers or the force of law of Medicaid or Medicare regulations.

One of Life Investors' arguments is that its decision to change the index for "actual charges" benefits was in response to alleged fraudulent billing practices within the healthcare industry going back to the late 1990s. Def's Mem. at 3-5. Life Investors then argues that, as a result of these practices, it should not have to pay anything more than the normal or reasonable charge doctors and hospitals customarily accept as payment from Medicare and large health insurers who were able to negotiate their payments. The problem with this definition is that it has already been expressly claimed by the term "usual and customary," which is separately defined in the Policy.

The Policy draws a clear distinction between an "actual charge" as reflected in medical bills and a "usual and customary" charge that is "[t]he normal and reasonable charge for a service, an apparatus, or medicine in the geographic area where provided." Policy, Section A, p. 3 (defining "USUAL AND CUSTOMARY"). Here, Life Investors essentially is arguing for the definition of "usual and customary" to mean the same thing as "actual charges", and contends that medical bills do not reflect either "normal" or "reasonable" charges based on its allegation that these bills are inflated. Def's Mem. at 10. However, this argument is foreclosed by the well-established principle that all words and phrases in a contract must be given effect whenever possible. *See Vantage Technology*, 17 S.W.3d at 650. "Actual charges" and "usual and customary" charges cannot have the same meaning.

> ### 2. Inclusion of the term *"actual expenses"* precludes a definition of *"actual charges"* based on post-negotiation amounts expensed by third-party payors like Medicare and Blue Cross/Blue Shield.

The Policy likewise forecloses Life Investors' argument for any definition of "actual charges" based on the amount another party expensed when making payment, because that definition has been claimed by "actual expenses." In drafting the Policy, Life Investors uses the

term "actual expenses" side by side with "actual charges" in several places in the Benefits section. For example, for both Radiation Therapy and Chemotherapy, the Policy index for treatments and related services under sub-parts (a) and (b) is "actual charges", but the index for Alopecia benefits under sub-part (c) is "actual expenses." Policy, Section E, Part 2, pp. 7-8. The section dealing with Bone Marrow Donor benefits draws a similar distinction, using "actual expenses" to describe the applicable index under sub-sections (a) and (c), while using "actual charges" to index medical benefits under subjection (b).[8] *Id.* Therefore, "actual charges" and "actual expenses" cannot mean the same thing either.

**B.    At A Minimum, The Context In Which "Actual Charges" Is Used Gives Rise To An Ambiguity That, As A Matter Of Law, Resolves In Favor Of Gooch And The Class.**

Even if the Court was to look beyond the four corners of the Policy, undisputed evidence of matters outside of the Policy *still* support partial summary judgment for Gooch and the class. When a contract is determined to be ambiguous, "a court is permitted to use parol evidence, including the contracting parties' conduct and statements regarding the disputed provision, to guide the court in construing and enforcing the contract." *Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 612 (Tenn. 2006). As a matter of law, an ambiguity as to the meaning of "actual charges" entitles Gooch and the class to partial summary judgment as to Count I because (1) Life Investors instructed Gooch and other claimants to submit medical bills to establish the amount of

---

[8] It is also telling that although "actual charges" is the touchstone for several other benefit categories, *see* Item 14, "BLOOD PLASMA, AND BLOOD COMPONENTS" ("We will pay the actual charges up to the calendar year maximum shown in the Policy Schedule …") and Item 23 "AMBULANCE" ("We will pay the actual charges by a licensed professional ambulance service up to $2,000 per trip…"), the term "actual expenses" is not. Id. at pp. 8-9.

12

benefits to which they were entitled, and (2) Life Investors' undisputed eight-year practice of paying "actual charges" benefits to Gooch equal to his medical bills.[9]

Here, Life Investors' sustained course of conduct eight years into Gooch's claim (and likely the claims of many others) involved paying "actual charges" benefits indexed to medical bills, *not* to EOBs or similar statements reflecting what Life Investors considers to be "normal" or "reasonable" charges or charges that a third-party payor actually expensed. Gooch Dep. at 45, 138-140. When Gooch first notified Life Investors of his cancer diagnosis, Life Investors instructed him to submit "itemized hospital bills, doctor bills…[and] chemotherapy and radiation therapy bills." *See* Exhibit 6.

Gooch thereafter submitted his medical bills as requested for eight years and received benefits equal to the amount charged by his healthcare providers for chemotherapy. Gooch Dep. at 45, 138-140. During this time, Life Investors *never* based payment on whatever amount Gooch's third party payor expensed for the treatments as reflected in his EOBs. Id. Nor did Life Investors ask for the submission of such statements in connection with determining the amount of benefits payable. Id.

If Life Investors had thought its Policies allowed the restriction of amounts payable on the materially lower amount paid by Blue Cross/Blue Shield and similar payors, it would have construed their policies in that manner from the beginning. Life Investors' original interpretation, to which it adhered for over eight years, reveals its true belief in the actual bargain it struck with policyholders. That course of conduct entitles Gooch and the class to partial summary judgment in the event the Court determines that "actual charges" is an ambiguous term.

_____

[9] Indeed, Life Investors appears to recognize through its exclusion of any contrary argument that, should the Court concludes an ambiguity exists, Gooch and the class prevail.

### III. LIFE INVESTORS' ARGUMENTS FOR SUMMARY JUDGMENT IN ITS FAVOR ARE WITHOUT MERIT AND IGNORE BOTH THE PLAIN MEANING OF THE POLICY AND THE PARTIES' COURSE OF DEALING.

Life Investors' argument for summary judgment as to Counts I through IV respectively for declaratory judgment (I), breach of contract (II), breach of implied duty of good faith and fair dealing (III), and bad faith (IV) is that its change of index for "actual charges" benefits was lawful under the Policy. Specifically, with respect to each Count, Life Investors contends that it did not breach a legal duty when it switched its "actual charges" index from medical bills to "reasonable" and "normal" charges or amounts third parties actually expensed. Life Investors' purported justifications for its position are three-fold. First, it argues that "actual charges" is essentially a term of art under *Claybrook* and similar cases that, by itself and without relation to other terms in the policy, establishes that benefits are payable in the amount of either "normal" and "reasonable" charges or in the amount a third party payor actually expensed on the insured's behalf. Second, Life Investors contends that current conditions in the healthcare industry excuse it from continuing to index "actual charges" benefits to medical bills. Finally, Life Investors asserts that its basis for paying "actual charges" benefits is not a contractually established index, but rather a "claims procedure" subject to change at any time.

None of these arguments have merit under the facts or the law. As set forth in Part I, Life Investors' arguments are entirely without merit given both the plain language of the Policy and Life Investors' eight-year interpretation of the same. Its arguments are also faulty for other reasons discussed below. Life Investors' motion for summary judgment as to Counts I, II, III and IV should therefore be denied.

### A. "Actual charges" Is Not A Term Of Art Having Independent Significance From The Context In Which It Is Used To Describe Policy Benefits.

Life Investors first appears to argue through its extensive discussion of *Claybrook, Ward*, and several other cases, cases that "actual charges" is a term of art that, notwithstanding its use in conjunction with other terms, permits its current indexing of "actual charges" benefits to EOBs and similar third-party statements. However, Tennessee courts traditionally eschew ascribing to the reader the peculiar knowledge necessary to designate an insurance term to be a "term of art" in favor of a rule of construction looking to the meaning of a term as it is used in a particular policy. *See, e.g., CBL & Assocs. Mgmt., Inc. v. Lumbermens Mut. Cas. Co.*, 2006 WL 2087625, *8 (E.D. Tenn., June 25, 2006). By incorrectly suggesting its interpretation of "actual charges" is a "majority rule," Life Investors asks this Court to depart from well-established law holding that the legal definition of a term, as it applies to a contract, will vary within the context in which it is used. *See Huskey v. Crisp,* 865 S.W.2d 451, 454 (Tenn.1993).

In support of its term-of-art argument, Life Investors refers the Court to *Claybrook* and *Ward* and ignores the context in which "actual charges" was used in comparison to the context at issue in the instant Policy. The fundamental premise of both *Claybrook* and *Ward* was that "actual charges", <u>when used in isolation</u>, took on its dictionary meaning. *Claybrook*, 387 F. Supp. 2d at 1203-04 (discussing actual charges in the context of a policy [Exhibit 8] that did not use any other term to describe other forms of benefits); *Ward v. Dixie Nat. Life Ins. Co.*, 2006 WL 1529398, *4 (D.S.C. May 10, 2006)("Nowhere within the four corners of the Policy [Exhibit 9] is the term "actual charges" used inconsistently or in a special or technical sense."). Neither policy used other terms in <u>conjunction</u> with "actual charges"; rather, each policy used exclusively the term "actual charges" to refer to benefits payable. *See generally* Exhibit 8 (the *Claybrook* policy) and Exhibit 9 (the *Ward* policy). And in particular, neither policy based any benefits upon "usual and customary charges" or "actual expenses." *Id.* Accordingly, neither

15

Court needed to apply the rule (discussed in Part II-A, *supra*) that each term must be given meaning when interpreting a contract.

The present case involves a far different situation. Unlike the *Claybrook* and *Ward* policies, the Life Investors Policy uses separate index terms (i.e., "usual and customary charges" and "actual expenses") already encompassing other potential definitions for "actual charges." *Compare* Exhibit 8 (the *Claybrook* policy) and Exhibit 9 (the *Ward* policy) with Exhibit 1 (the Life Investors Policy). The respective definitions of "usual and customary" charges and "actual expenses" based on (1) the amount another party expensed for the item or service and (2) the normalcy or reasonableness of the charge, respectively, usurp and preempt Life Investors' proffered definition of "actual charges." As discussed *supra*, for "usual and customary charges", "actual expenses" and "actual charges" to each have separate meanings, "actual charges" cannot mean anything other than the amount medical providers originally billed for their services. To the extent the Court concludes instead that these other terms render the meaning of "actual charges" unclear or capable of more than one construction, an ambiguity arises. *See Hollis*, 137 S.W.3d at 629. In either event, the unique wordsmithing of the Life Investors Policy instantly distinguishes it from the *Claybrook* and *Ward* policies.[10]

In arguing against the existence of an ambiguity, Life Investors also contends that the insuring clause somehow compels construction in its favor. Life Investors points to the inclusion of the word "incurred" in that clause, and argues this term removes all doubt that "actual

---

[10] *Guidry v. American Public Life Ins.*, 2006 WL 2356032 (W.D. La., June 29, 2006) and *Jarreau v. Central United Life Ins. Co.*, 2006 WL 2086011 (M.D. La., May 16, 2006) do not offer any meaningful analysis and should therefore be entirely disregarded. However, to the extent *Jarreau* adopts the rationales of *Claybrook* and *Ward*, that decision does not govern because of the inapposite reasoning of those Courts involving entirely different policies.

charges" refers to the amount the healthcare provider eventually accepted from the policyholder's other insurance providers.  That same argument has been rejected by other Courts.

*Connor v. American Public Life Ins. Co.*, 448 F. Supp. 2d 462 (N.D. Miss. 2006) and *Metzger v. American Fidelity Assurance Co.*, 2006 WL 2792435 (W.D. Okla. Sept. 26, 2006) squarely discredit Life Investors' insuring-clause argument.  In *Connor*, the insurer made the same argument Life Investors makes here, which is that "actually charges", when read in conjunction with "expenses incurred", unambiguously refers to the negotiated amount the policyholder's other insurer paid.  *Connor*, 448 F. Supp. 2d at 765.  However, the Court rejected that contention, concluding "this argument does not defeat or assuage the inherent ambiguity in the undefined term 'actual charges.'"  *Id.* at 766.[11]  In *Metzger*, the insurer likewise asserted Life Investors' position that the phrase "actual charges", when read in conjunction with the term "expenses incurred", referred to the post-negotiation amount actually paid.  *Metzger*, 2006 WL 2792435, at *4.  The *Metzger* Court rejected this argument as well, and entered a summary judgment for the <u>Plaintiff</u> pursuant to her cross-motion based on the fact the insurer had previously paid "actual charges" benefits equal to the Plaintiff's medical bills.  *Id.* at *5.

In the context of the present case, *Connor* and *Metzger* represent an even stronger rejection of Life Investors' "loss incurred" argument.  Here, the phrases "usual and customary charges" and "actual expenses" clarify the naked ambiguity resulting from the definitional tension between "loss incurred" and "actual charges" by laying claim to all possible alternative definitions.  Accordingly, the inclusion of these terms together in the same policy – something

---

[11] In holding that "actual charges" was an ambiguous term in the *Connor* Policy, the Court noted its "thorough consideration" of *Claybrook* and other unnamed cases, but stated that the particular policy before it compelled its conclusion that an ambiguity existed.  *Connor*, 448 F. Supp. 2d at 765.

that was not before the Courts in *Connor*[12] or *Metzger*[13] – establish on the face of the Policy that "actual charges" means the pre-negotiation amount billed. At a minimum, however, these terms further confuse the meaning of "actual charges" in light of the already-existing ambiguity created by the word "incurred" in the insuring clause.

In the event of an ambiguity, Life Investors' conduct outside of the four corners of the Policy -- a subject Life Investors clearly wants to avoid discussing, except in the context of irrelevant allegations against the healthcare industry -- becomes dispositive. It is hornbook law that, as a matter of contract interpretation, courts may determine the parties' intentions "by the construction placed on the agreement by the parties in carrying out its terms." *Frizzell Const. Co., Inc. v. Gatlinburg, LLC*, 9 S.W.3d 79, 85 (Tenn. 1999). It is similarly axiomatic that contracts are construed against the drafter, *see Marshall v. Jackson & Jones Oils, Inc.*, 20 S.W.3d 678, 682 (Tenn. App. 1999). As discussed above, Life Investors not only instructed Gooch to submit medical bills to establish his amount of loss, it also paid benefits in those amounts to Gooch for an extensive length of time. These acts prove Life Investors, as the drafter of the Policy, intended at the time of contracting to pay "actual charges" equal to amounts billed.

**B.     Life Investors' Recitation Of Purported Industry Conditions Does Not Support An "Economic Impossibility" Argument Excusing Its Failure To Pay Full "Actual Charges" Benefits.**

By devoting much of its brief to recent industry conditions, Life Investors essentially contends that it should be excused from having to index "actual charges" benefits to medical

---

[12] While the *Connor* Policy (Exhibit 10) includes the term "actual expenses", it does not include the term "usual and customary". Therefore, the *Connor* Policy, on its face, left open the possibility for "actual charges" to refer to normal and reasonable charges, unlike the Life Investors Policy here.

[13] The *Metzger* Policy (Exhibit 11) has neither "actual expenses" nor "usual and customary" charges as separate indexes, unlike the Life Investors Policy,

bills because of increased costs.[14]  The most Life Investors can say about the effect of changes in market conditions over the past ten years is that those changes gradually caused its pre-July 2006 course of performance to become more difficult, more expensive, and less profitable.[15]  It has no other argument that could possibly relate to something as tenuous as alleged market conditions arising *years* after the Policy was sold.  However, "[i]t is a settled rule that where a person by his contract or agreement charges himself with an obligation possible to be performed, he must perform it, and he will not be excused therefrom because of unforeseen difficulties, unusual or unexpected expense, or because it is unprofitable or impracticable."  *Wilson v. Page*, 45 Tenn. App. 475, 481, 325 S.W.2d 294, 298 (1958).  Accordingly, Life Investors' argument raising the difficulty of continued performance is without merit.

C.      **Life Investors' So-Called "Claims Procedures" Cannot Conflict With Material Contractual Terms Establishing Its Duty To Pay "Actual Charges" Benefits Based On Medical Bills.**

Finally, Life Investors contends that its change in the "actual charges" index is not a change in policy terms, but rather is merely a change in "claims procedure." Stated differently, Life Investors argues that a material Policy term – indeed, a term that establishes the amount of the insured's benefits – is essentially undefined at the time of contracting, but subject to Life Investors' purported right to set (and re-set) that term at any time through various announcements about its "claims procedures."

_____

[14] Indeed, there is no other explanation for discussion of market conditions, because this purported "evidence" describes conditions that occurred after the policy was formed.  This "evidence" has no bearing upon its "no ambiguity" argument and, further, has no bearing whatsoever upon the manner in which Life Investors performed under the policy.

[15] In a Life Investors internal memorandum dated July 22, 2005, Connie Whitlock, the author of the May 2006 Form Letter, made this precise observation in arguing for a change in the Policy index for "actual charges" benefits.  *See* Exhibit 2.

19

The significant flaw in this argument is that it discards an essential term, rendering the Policy illusory at the time of contracting with respect to "actual charges" benefits. One of the mandatory elements to an insurance contract is the inclusion of a "promise to pay or indemnify in a fixed or ascertainable amount." 44 C.J.S *Insurance* § 261. If one were to accept Life Investors' argument that the term for benefit amounts payable is open-ended and subject at any time to the company's un-negotiated unilateral designation of various "claims procedures", the Policy becomes illusory due to the failure of this essential term. *See Four Eights, LLC v. Salem*, 194 S.W.3d 484, 487 (Tenn. App. 2005) ("In order for a contract to be binding it must spell out the obligation of the parties with sufficient definiteness that it can be performed. All the essential terms of a contract must be finally and definitely settled.") (quoting *United American Bank of Memphis v. Walker*, 1986 WL 11250, *2 (Tenn. App. 1986)). By arguing that it was free to alter the amount of benefits payable through manipulation of "claims procedures", Life Investors basically contends that its "promise to pay or indemnify in a fixed or ascertainable amount" was *unsettled* at the time of contracting. Indeed, Life Investors' argument is that it is free to establish whatever basis it wanted for paying "actual charges" benefits by amending its "claims procedures", even if the effect of that post-sale amendment insulated it from liability across the board.

Fortunately for consumers, Life Investors' "claims procedure" argument is a dead letter under established law, which holds that all policies are to be construed in favor of coverage in the event of an ambiguity. *Neifeh v. Valley Forge Life Ins. Co.*, 204 S.W.3d 758, 768 (Tenn. 2006) ("Where there is doubt or ambiguity as to its meaning, an insurance contract must be construed favorably to provide coverage to the insured."). Because amounts of "actual charges" benefits are not linked to a schedule like other Policy benefits, the only way they become

ascertainable at the time of loss is by reference to an index. To avoid failure of an essential term, the index to which benefits are tied at the time of contracting must be *fixed*, not floating, so that benefits are definite and ascertainable upon purchase of the Policy. *See* 44 C.J.S *Insurance* § 261. Here, that fixed index is a policyholder's medical bill, and Life Investors is powerless to change this index no matter how expensive honoring this obligation has become. *See* Part II, *supra.*

> **D.**   **The Failure Of The Foregoing Arguments By Life Investors Should Result In The Denial Of Its Motion For Summary Judgment As To Count I (Declaratory Judgment), Count II (Breach of Contract), Count III (Breach Of Duty Of Good Faith And Fair Dealing), And Count IV (Bad Faith).**

Life Investors' begins its argument section with a thorough discussion of its purported view that it has done no wrong under the Policy and that Gooch's claim for breach of contract (Count II) should be dismissed. Def's Mem. at 10-18. Life Investors then incorporates that same argument in response to Gooch's claim for declaratory relief (Count I), claim for breach of duty of good faith and fair dealing (Count III), and claim for bad faith (Count IV). Id. at 13. As set forth both in Part II and in Part III-A though C, the argument that Life Investors had no contractual duty to pay "actual charges" benefits in the amount of medical bills is without merit. However, Life Investors make a handful of extraneous arguments with respect to these other claims that Gooch will address here and show to be equally faulty.

For instance, Life Investors argues with respect to Gooch's claim for declaratory relief that "no actual controversy and no threat of future injury" exists. This is false because the Policy clearly requires Life Investors to pay "actual charges" benefits according to the amount of medical bills serving as the fixed index for those benefits. Life Investors' May 2006 repudiation of that obligation is an anticipatory breach of that term with respect to future benefits, *see Wright v. Wright*, 832 S.W.2d 542, 545 (Tenn. App. 1991) ("In order to serve as an anticipatory breach

of contract or repudiation, the words and conduct of the contracting party must amount to a total and unqualified refusal to perform the contract."), while its underpayment of such benefits since that time is a <u>current</u> breach of that obligation. Summary judgment for Life Investors on Count I is therefore improper for this additional reason.

As to Count III for "Breach of Duty of Good Faith and Fair Dealing", Life Investors argues that Alabama law bars this claim. This position is wrong for two reasons. First, in the event of a conflict between Alabama and Tennessee law, Tennessee law governs Gooch's claims because his Policy was countersigned and delivered in Pulaski, Tennessee. *See Stakem,* 431 F. Supp. 2d at 785; *Kustoff,* 22 S.W.2d at 358. Second, the proposition that no claim exists under Alabama law is untrue. *See Lake Martin/Ala. Power Licensee Ass'n v. Ala. Power Co.*, 601 So. 2d 942, 944 (Ala. 1992) (The Court is "not prepared to extend the tort of bad faith beyond the area of insurance policy cases" and it "d[oes] not recognize a bad faith claim under contract law absent a breach of … contract.") *Lake Martin* is inapplicable because Gooch has successfully established breach of contract. Life Investors' motion as to Count III therefore should be denied.

Finally, with respect to Count IV for "Bad Faith", Life Investors argues separate and apart from the contractual-duty issue that Alabama law applies and that "bad faith" has not been established. Once again, Life Investors relies on the wrong state's law because of its delivery of the Gooch Policy in Tennessee. However, choice-of-law issues notwithstanding, Life Investors' assertion that "bad faith" has not been established is wrong under Tennessee <u>and</u> Alabama law, each of which incorporate this element, *compare Williamson v. Aetna Life Ins. Co.*, 481 F.3d 369, 378 (6th Cir. 2007) (citing *Palmer v. Nationwide Mut. Fire Ins. Co.*, 723 S.W.2d 124, 126 (Tenn. Ct. App. 1986) and Tenn. Code Ann. § 56-7-105) *with United Services Auto Ass'n v. Hobbs*, 858 So. 2d 966, 974 (Ala. Civ. App. 2003) (discussing the elements of bad faith under

Alabama law). Gooch has established that Life Investors intentionally breached the Policy. Life Investors' intentional refusal to pay Gooch and other cancer-stricken policyholders less money that that to which they are entitled for "actual charges" benefits is a clear example of bad faith. No legitimate or arguable reason exists as to why Life Investors would suddenly attempt to change its established index for payment of "actual charges" benefits in the face of clear Policy terms. The only reason why Life Investors would change the amount of benefits it pays to its insureds is to simply pay out less money, a clear example of bad faith under either Tennessee or Alabama law.

Life Investors' contention that no demand was made under Tennessee law is equally without merit. As set forth in the Complaint and established by Gooch during his deposition, Gooch requested full payment of his "actual charges" benefits in connection with his November 2006 claim. Compl. at ¶ 65; Gooch Dep. at 58. Life Investors refused to pay the full amount, which led to Gooch filing suit in March 29, 2007. Accordingly, prerequisites to relief under Tennessee law have been established.

## IV. LIFE INVESTOR'S MOTION FOR SUMMARY JUDGMENT AS TO COUNT V FOR VIOLATIONS OF THE T.C.P.A. SHOULD BE DENIED.

Count V of Gooch's complaint asserts a claim based on Life Investors' violation of T.C.A. § 47-18-101 and T.C.A. § 47-18-109, known as the Tennessee Consumers' Protection Act ("TCPA").

> In order to recover under the TCPA, the plaintiff must prove: (1) that the defendant engaged in an unfair or deceptive act or practice declared unlawful by the TCPA and (2) that the defendant's conduct caused an "ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or thing of value wherever situated …"

*Tucker v. Sierra Builders*, 180 S.W.3d 109, 115 (Tenn. Ct. App. 2005) (quoting Tenn. Code Ann. § 47-18-109(a)(1)). [T]he TCPA is explicitly remedial, and Tennessee Courts are therefore

23

required to construe it liberally to protect consumers[.]" *Tucker*, 180 S.W.3d at 115. Because the TCPA does not define "unfair" or "deceptive" acts or practices, "the standards to be used in determining whether a representation is 'unfair' or 'deceptive' under the TCPA are legal matters to be decided by the courts." *Id.* at 116. "[F]or the purposes of the TCPA … the essence of deception is misleading consumers by a merchant's statements, silence, or actions." *Id.* "The concept of unfairness is even broader than the concept of deceptiveness, and it applies to various abusive business practices that are not necessarily deceptive." *Id.*

Life Investors' principal contention is that the Complaint does not satisfy the heightened pleading requirement under Rule 9(b), notwithstanding its failure to cite to that rule. Rule 9(b) requires specificity in pleading for claims sounding in fraud and has been held in various instances to apply to statutory consumer fraud claims like the T.C.P.A. claims asserted here. *See e.g. McKee Foods Corp. v. Pitney Bowes, Inc.*, 2007 WL 896153, *5 (E.D. Tenn. March 22, 2007). "[T]he principal purpose for the [Rule 9(b)] particularity requirement, when considered in context with [Rule 8], is to ensure that the defendant receives fair notice of the alleged misconduct or fraudulent acts of which the plaintiff complains in order to prepare a responsive pleading." *Beard v. Worldwide Mortgage Corp., et al.,* 354 F.Supp.2d 789,799 (W.D.Tenn.2005).

The instant case satisfies this standard and sufficiently apprises the Defendants of the fraudulent misrepresentations and concealments alleged by Gooch.[16] Gooch alleges, for instance, that the Defendants' Policy promised to pay "actual charges" benefits equal to his medical bills. Compl. at ¶¶ 3 and 38. Even more specifically, Gooch alleges that "Defendants

---

[16] Importantly, the Defendants had enough notice to be able to take Gooch's deposition one month ago.

continuously represented to the Plaintiff and the class members throughout the Defendants prior course of conduct [described in paragraph 40, among other places], claim forms and the terms of the Policy, that Defendants had provided a Cancer Only Policy that would pay certain benefits, in the form of actual charges, in the event the Plaintiff and class members were to get cancer and require certain medical treatment." Compl. at ¶ 39. Accordingly, the Defendants have been sufficiently apprised of the "who, what, when, and where" of Gooch's T.C.P.A. claims.

Gooch has likewise alleged the falsity of these misstatements. Life Investors did not continue to pay benefits in the amount of "actual charges" but rather attempted to unilaterally change the measure by which benefits would be paid. Id. at ¶¶ 43 and 54-55. Thereafter, it refused to pay the proper amount of "actual charges" benefits due. Id. at ¶¶ 56-59.

For these reasons, Life Investors' Motion as to Count V alleging T.C.P.A. violations should be denied.

## CONCLUSION

This case is ripe to be decided on a class-wide basis based on the four corners of the Policy or on undisputed evidence concerning the Life Investors long-time practices in observance of its Policy obligations. For the foregoing reasons, Gooch respectfully requests that this Court enter a partial summary judgment against Life Investors as to Count I. Gooch further respectfully requests that this Court deny Life Investors' Motion for Summary Judgment as to each claim asserted in the Complaint.

Respectfully submitted,

/s/ M. Clayborn Williams

One of the Attorneys for Plaintiff

25

**OF COUNSEL:**
Eric L. Buchanan
TN State Bar No.: 018568
Eric Buchanan & Associates, PLLC
414 McCallie Avenue
Chattanooga, TN 37402
Phone: (423) 634-2506
Fax:    (423) 634-2505
ebuchanan@buchanandisability.com

Andrew P. Campbell
Thomas O. Sinclair
M. Clay Williams
Campbell, Gidiere, Lee, Sinclair & Williams, L.L.C.
2100-A SouthBridge Parkway, Suite 450
Birmingham, AL 35209
Phone: (205).803-0051
Fax:    (205).803-0053
tsinclair@cwp-law.com
cwilliams@cwp-law.com
acampbell@cwp-law.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served upon the following counsel

of record via the Court's electronic filing system, this the 12th day of July, 2007:

Thomas H. Dundon, Esq.
A. Scott Ross, Esq.
Neal & Harwell, PLC
2000 One Nashville Place
150 Fourth Avenue North
Nashville, TN 37219-2498
tdundon@nealharwell.com
sross@nealharwell.com

Markham R. Leventhal, Esq.
Jorden Burt LLP
777 Brickell Avenue, Suite 500
Miami, FL 33131
ml@jordenusa.com

/s/ M. Clayborn Williams

Of Counsel

26