# EXHIBIT

## "2"

EXHIBIT "2"

# EXHIBIT

## "3"

EXHIBIT "3"

# FREEDOM COURT REPORTING

**Page 3**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION

ANTHONY E. GOOCH,                )
                                 )
        Plaintiff,               )
vs.                              ) CASE NO.
                                 ) 1:07-0016
LIFE INVESTORS INSURANCE COMPANY OF)
AMERICA, et al.,                 )
                                 )
        Defendants.              )
                                 )


VIDEOTAPED DEPOSITION OF
ANTHONY E. GOOCH
Taken on Behalf of the Plaintiff
June 13, 2007

## INDEX
WITNESS: ANTHONY E. GOOCH

### INDEX OF EXAMINATIONS

| | Page/Line |
|---|---|
| By Mr. Sinclair | 6   6 |
| By Mr. Leventhal | 69   19 |
| By Mr. Sinclair | 218   5 |
| By Mr. Leventhal | 227   9 |

### INDEX OF EXHIBITS

| | Page/Line |
|---|---|
| No. 1 | 7   13 |
| No. 2 | 11   2 |
| No. 3 | 47   19 |
| No. 4 | 69   25 |
| No. 5 | 83   1 |
| No. 6 | 121   3 |
| No. 7 | 123   11 |
| No. 8 | 157   4 |
| No. 9 | 169   7 |
| No. 10 | 181   17 |
| No. 11 | 189   9 |
| No. 12 | 199   3 |

**Page 2**

APPEARANCES:
For the Plaintiff:
        THOMAS O. SINCLAIR
        Campbell, Waller & Poer
        2100-A Southbridge Parkway, Suite 450
        Birmingham, Alabama 35209
        205.803.0051
        tsinclair@cwp-law.com

For the Defendants:
        MARKHAM R. LEVENTHAL
        Jorden Burt
        777 Brickell Avenue, Suite 500
        Miami, Florida 33131-2803
        305.371.2600
        ml@jordenusa.com

        GERALD LAX
        Inhouse Counsel AEGON USA

Also Present: Robert Jongema, Videographer

**Page 4**

The videotaped deposition of
ANTHONY E. GOOCH, taken on behalf of the
Plaintiff, on the 13th day of June, 2007, in the
conference room of the Spring Hill Best Western,
104 Kedron Parkway, Spring Hill, Tennessee, for
all purposes under the Federal Rules of Civil
Procedure.

The formalities as to notice,
caption, certificate, et cetera, are waived. All
objections, except as to the form of the
questions, are reserved to the hearing.

It is agreed that Elisabeth A.
Miller, being a Notary Public and Court Reporter
for the State of Tennessee, may swear the witness,
and that the reading and signing of the completed
deposition by the witness are reserved.

* * *

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

Case 1:07-cv-00016   Document 69-2   Filed 07/12/07   Page 3 of 28 PageID #: 1271

## Page 5

1       PROCEEDINGS
2       THE VIDEOGRAPHER: This begins
3  Tape No. 1 in the deposition of Anthony Gooch in
4  the matter of Anthony E. Gooch versus
5  Life Investors Insurance Company of America,
6  et al.; Case No. 1:07-0016; in the Court of the
7  United States District Court for the
8  Middle Tennessee -- Middle District of Tennessee,
9  Columbia division.
10       We are on the record at 9:01 a.m. on
11  Wednesday, 13 June, 2007.
12       This deposition is taking place at
13  104 Kedron Parkway, Spring Hill, Tennessee.
14  My name is Robert Jongema
15  representing Freedom Court Reporting.
16       Would counsel identify yourselves and
17  state whom you represent.
18       MR. SINCLAIR: Tom Sinclair on behalf
19  of the plaintiffs.
20       MR. LEVENTHAL: Markham Leventhal
21  from Jorden Burt, LLP, on behalf of the
22  defendants.
23       MR. LAX: Gerald Lax, I'm in-house
24  counsel for the defendants.
25       THE VIDEOGRAPHER: Would the court

## Page 6

1  reporter please swear the witness.
2       ANTHONY E. GOOCH,
3  was called as a witness, and after having been
4  first duly sworn, testified as follows:
5       E X A M I N A T I O N
6  BY MR. SINCLAIR:
7  Q.   Good morning.
8  A.   Good morning.
9  Q.   Would you please state your name for the
10  record.
11  A.   Anthony E. Gooch.
12  Q.   What's the middle initial?
13  A.   Eugene.
14  Q.   Eugene? Anthony Eugene Gooch. Have you
15  ever gone by any other name?
16  A.   Most everyone that I know -- all my
17  friends call me Tony.
18  Q.   Tony? Okay. Do you mind if I call you
19  Tony?
20  A.   Not at all.
21  Q.   Okay. Tony, I want to ask you some
22  questions. We're here to preserve your testimony,
23  and I want to ask you some questions of you. I would
24  ask that if you get tired or feel a need to take a
25  break, whether it's me or the defense counsel, you

## Page 7

1  let us know.
2  A.   I certainly will.
3  Q.   We're aware of your medical condition, and
4  we're going to do what we can to minimize the
5  impact this has on you.
6       Let me ask you first off, I saw that you
7  brought something folded up there with you. Can I
8  take a look at that, please?
9  A.   Certainly.
10       MR. SINCLAIR: I'm going to go ahead
11  and mark the notice of video deposition as
12  Exhibit 1.
13       (Marked Exhibit No. 1.)
14  BY MR. SINCLAIR:
15  Q.   And I believe that's the same one we
16  provided to the defendants. You received that
17  from my office; is that correct?
18  A.   Yes, sir, I did.
19  Q.   You understand what we're here for today,
20  don't you?
21  A.   Yes, sir, I do.
22  Q.   Okay. Let me begin, if I can, by asking
23  you for your address. Where do you live?
24  A.   It's 18493 Sewell Road. It's in Athens,
25  Alabama.

## Page 8

1  Q.   You know, one of the first questions I
2  have for you is -- is related to the mask you're
3  wearing.
4  A.   Yeah.
5  Q.   You know, there's a possibility we may
6  play this tape for the jury at some point. Please
7  tell the jury, if you would, why it is you're
8  wearing a mask.
9  A.   I am currently neutropenic, which is a
10  medical term indicating that my white blood cells
11  are very low. I have recently taken shots to
12  increase this. And if I'm exposed to anyone who
13  has had a severe cold or anything like that that I
14  could be affected by the bacteria, it would put me
15  in a very serious condition.
16  Q.   As a matter of fact, has that recently
17  happened in the last couple of weeks?
18  A.   Yes, it has. I was hospitalized a couple
19  weeks ago for about five days. I had received an
20  infection from eating raw fruits and vegetables,
21  they believe. Temperature was excess of 103, and
22  I was, say, hospitalized and getting a lot of
23  antibiotics and so forth.
24  Q.   Let me ask you -- let me step back, if I
25  can, for a moment and ask you, do you recall

Case 1:07-cv-00016   Document 69-2   Filed 07/12/07   Page 4 of 28 PageID #: 1272

## Page 9

1 purchasing an insurance policy, a cancer policy, I
2 should say, from the defendants in this case?
3 A.    Yes, sir, I do.
4 Q.    Do you recall about what time that
5 happened?
6 A.    Year-wise, it was like, I believe, 1997.
7 It could have been as early as '96, but I do
8 believe it was around '97, 1997.
9 Q.    Okay. And did you maintain records
10 regarding the purchase of this policy?
11 A.    Yes, I did.
12 Q.    Okay. I'm going to go ahead and show you
13 what has been produced to the defendants and Bates
14 numbered GOOCH 0001 through 810 and ask you to
15 take a look at these, if I can, please, and see if
16 you have seen these documents before?
17 A.    Yes, sir. As a matter of fact, the top
18 one has my handwriting on it indicating how much
19 the policy was going to cost me and so forth.
20 Q.    Just take a moment, and my question to you
21 is this, is the documents before you Bates
22 numbered 1 through 810 your documents that you
23 maintained in your files at your home?
24 A.    ·Yes, sir.
25 Q.    Okay. You've reviewed those before you

## Page 10

1 came in here today, correct?
2 A.    Yes, sir, I did.
3         MR. SINCLAIR: Okay. Without
4 objection, I would like to consider those
5 submitted as Mr. Gooch's records and offer them
6 into evidence.
7         MR. LEVENTHAL: You can mark them as
8 an exhibit. I'm not sure that we're going to
9 agree that that entire stack of 800 pages is
10 admissible, but that's fine with me.
11         MR. SINCLAIR: Okay. Well, my
12 concern is if he -- if he is the foundation for
13 admission and we're preserving his testimony
14 without the usual stipulations, offering that into
15 evidence at this point would be the only
16 opportunity we would have.
17         MR. LEVENTHAL: If he is testifying
18 those are his records he kept at home, we'll --
19 we'll agree to admission.
20         MR. SINCLAIR: Okay. All right. And
21 I don't see any reason to attach them to this
22 transcript, unless you would like to.
23         MR. LEVENTHAL: Yes, we would like
24 to.
25         MR. SINCLAIR: Okay. We'll mark

## Page 11

1 those as Exhibit 2 then.
2         (Marked Exhibit No. 2.)
3         MR. SINCLAIR: There's a documents
4 produced summary. Would you like that excluded
5 from the production set we are going to mark here?
6         MR. LEVENTHAL: You can mark that
7 with it.
8         MR. SINCLAIR: Okay.
9 BY MR. SINCLAIR:
10 Q.    All right. Mr. Gooch, let's step back to
11 that time period when you purchased the policy at
12 issue -- first off, if you would, take a look
13 again at the documents labeled as Exhibit 2 here.
14 Have those in front of you, if you can. If you
15 would, turn in those set of documents to the
16 policy at issue in this case.
17 A.    I believe this is the -- I believe this is
18 a copy of the policy. I believe it is a copy of
19 the original -- yes, I am -- I'm -- I'm sure it's
20 a copy of the original because it has my
21 handwriting on it.
22 Q.    Okay. If I can, let's go ahead -- is it
23 your understanding the defendants have claimed
24 that you didn't receive the policy in Tennessee?
25 Are you aware of that?

## Page 12

1 A.    Yes, sir, I am aware of that.
2 Q.    Okay. Did you originally the first time
3 you received this policy receive it while you were
4 standing within the state of Tennessee?
5 A.    Yes, sir, I did.
6 Q.    Okay. The defendants have pointed in
7 their production set and in their motions to --
8 and I'm going to point to this for you -- what's
9 been part of Exhibit 2 labeled GOOCH 36. Do you
10 see that?
11 A.    Yes, sir.
12 Q.    Do you see how it's stamped duplicate
13 here?
14 A.    Yes, sir, I do.
15 Q.    Okay. And when you had indicated earlier
16 that you had found this policy, you weren't
17 pointing to GOOCH 36, were you?
18 A.    No, I was not.
19 Q.    Okay. Point to the particular document
20 that you were pointing to in this production set
21 that you said was the original policy that you
22 received in Tennessee.
23 A.    This would be the original here.
24 Q.    Well, you're pointing to GOOCH 3,
25 which is actually a letter. Point to the

Page 13

1  particular page and tell us by Bates number, if
2  you would, where that original policy begins.
3  A.    I believe it would begin at this point
4  here.
5  Q.    Okay. That's GOOCH 9.
6        Now, if I can direct your attention down
7  to the bottom of GOOCH 36, do you see that word
8  that's stamped there?
9  A.    Yes, sir.
10 Q.    What does that say?
11 A.    Duplicate.
12 Q.    Is there a similar stamp over here on
13 GOOCH 9?
14 A.    No, sir, there is not.
15 Q.    Okay. And is it your testimony that
16 GOOCH 9, that document is the beginning of the
17 original policy?
18 A.    Yes, sir, it is.
19 Q.    Okay. Let me put these back in order so I
20 don't get in trouble.
21        Let's step back, if we can, to the 1996-97
22 time period when you first purchased this policy.
23 Tell me how that was set up. Who -- who
24 approached you? Did you go to an insurance agent,
25 or did one come to you?

Page 14

1  A.    Actually, he came to my employment. I was
2  working at an automotive dealership. He came in
3  there, and we discussed the policy. I had been
4  interested in getting a cancer policy to not only
5  protect myself in the future should I get cancer
6  but to protect my family as well.
7  Q.    Well, first off, let me ask you, why were
8  you, in your words, interested in getting a cancer
9  policy?
10 A.    My father died in 1963 of cancer, and I
11 saw what my father went through. And it
12 devastated not only himself, but financially it
13 really caused him serious problems. And I had
14 hoped if I should ever get cancer, never expected
15 to, but if I did to have something that would
16 cover for me and take care of me and my family
17 should I -- ever needed it.
18 Q.    Was the first time that you actually were
19 in contact with the agent, was that when he came
20 to you?
21 A.    Yes, sir.
22 Q.    Okay. Did he just come one time to meet
23 you in Pulas- -- well, first off, what dealership
24 was it you were working at?
25 A.    I was working at Elliott Popham

Page 15

1  Pontiac/Olds/Buick dealership.
2  Q.    What were you doing there?
3  A.    I'm an automotive technician, mechanic.
4  Q.    Mechanic? Okay. Have you been a mechanic
5  all your life?
6  A.    Yes, sir, since I was 16 years old.
7  Q.    Okay. Were you a mechanic in the service?
8  A.    No. I just had been around cars all my
9  life, and it was just a natural progression. My
10 father had worked on cars throughout most of his
11 life, and it just kind of fell to me. That's what
12 I wanted to do, and that's what I continued doing.
13 Q.    Okay. You actually were telling me before
14 this deposition began that you did something on
15 the side that was related to being a mechanic?
16 A.    Yes. I drag raced semipro for 13 years
17 and built engines and built cars as well.
18 Q.    Okay.
19 A.    So that all kind of fell into the -- the
20 same situation.
21 Q.    Well -- and I'm sorry, it's interesting to
22 me. I'm -- I'm interested stepping back to 1997.
23 How often -- or how many times did this -- do you
24 recall the agent's name?
25 A.    I believe it was Jerry. I can't be 100

Page 16

1  percent sure, but I believe it was Jerry, and the
2  last name is -- I just can't remember that, but I
3  do believe it was Jerry.
4  Q.    Let me direct your attention, if I can, to
5  part of Exhibit 2, which is GOOCH 33, and direct
6  your attention down to the bottom here. Can you
7  see that handwriting there?
8  A.    Yes.
9  Q.    Do you recognize either one of those
10 names?
11 A.    I believe this one is Jerry; the other one
12 I'm not real familiar with. But the -- the
13 gentleman, Jerry, I had met him a few times, and
14 even prior to and following the policy, I had met
15 him several times. And he was a customer as well,
16 so --
17 Q.    Okay. Did he -- did he tell you who he
18 was representing that day?
19 A.    Yes, I believe -- and I want to say it was
20 Life Investors. If I remember correctly, that was
21 the original policy.
22 Q.    Okay. Did he just hand you a policy that
23 first meeting, or were there subsequent meetings
24 where you discussed this?
25 A.    Yes, we did discuss it. I was very

4  (Pages 13 to 16)

## Page 17

1  interested. He went over the policy the very
2  first time we talked. And it seemed very good to
3  me with the coverage and what they were going to
4  pay and how they would pay it. And, again, God
5  forbid if I ever got cancer, you -- I guess we all
6  want to go through life being healthy.
7      But he did explain it into quite a bit of
8  details, and I was very -- very pleased with it,
9  and -- because of the price, the price was very
10  nominal. It was something I could afford, and it
11  was something that I felt that I would probably
12  need.
13  Q.   I want to know some specifics, if we can,
14  about that first meeting. You said he went over a
15  policy. Did he bring a policy with him?
16  A.    Yeah, he brought a -- and I -- I don't
17  completely recall if it was a policy. But he had
18  papers with him that explained what they would
19  pay, how they would pay it, and a lot of the stuff
20  that they -- the items that they covered.
21  Q.    Okay. If you can, tell me in as much
22  detail as possible what it is he told you about
23  the items they would pay.
24  A.    They -- at that point, he explained to me
25  that chemotherapy would be paid at 100 percent,

## Page 18

1  and that there were some other thing -- I believe
2  if you were hospitalized it was $100 per day if it
3  was related to your cancer. There were other
4  items in there that had limited amounts that --
5  the maximum amount that they would pay for certain
6  things such as a transplant or other things of
7  that nature.
8      But the thing I liked the most was it paid
9  100 percent on chemotherapy.
10  Q.   When you say 100 percent, 100 percent of
11  what?
12  A.    Of what the doctors would charge. He said
13  he -- what you do is get your statements from the
14  doctor and you just file all of that. And
15  whatever their charges are, that's what will be
16  paid.
17  Q.   Now, these were -- these were something
18  that you recall him saying in that first meeting?
19  A.    Yes.
20  Q.    Okay.
21  A.    He said -- and he specifically stated they
22  would pay 100 percent of the charges, and that was
23  a really -- to me that was a very good deal.
24      MR. LEVENTHAL: Objection to all the
25  line of questioning about what the agent said, but

## Page 19

1  go ahead.
2      MR. SINCLAIR: On the grounds of
3  relevancy?
4      MR. LEVENTHAL: Grounds of hearsay,
5  grounds of -- not on grounds of relevancy.
6      MR. SINCLAIR: Okay.
7  BY MR. SINCLAIR:
8  Q.   Now, stepping back again to that first
9  meeting, do you recall the exact date this took
10  place?
11  A.    Not exactly. According to this, I can see
12  here it was November 24 when I signed this, and it
13  was prior to that we had discussed it, I believe.
14  Q.    Okay. Did you fill out an application
15  that first time that he sat down with you?
16  A.    I do believe I did.
17  Q.    And did you hand him a check that first
18  time that he sat down with you?
19  A.    If I recall correctly, I believe I did.
20  Q.    And have you told us everything that he
21  told you, this Jerry told you, at that first
22  meeting?
23  A.    To the best of my recollection, yes, sir.
24  Q.    Okay. When was the next meeting you had
25  regarding this policy?

## Page 20

1  A.    There was a short time later of -- there
2  was -- a lady came in to do kind of a basic, I
3  guess, exam. She did basic blood pressure, things
4  of that nature. I answered several questions for
5  her regarding family history and my medical
6  history, just basic type questions.
7  Q.   Okay.
8  A.    And Jerry did come back at a later date
9  and brought me all -- brought me the policy and
10  everything else. And I -- I remember that because
11  the original policy has greasy fingerprints on it.
12      My wife is a neat freak, so she got after
13  me about getting fingerprints on it.
14      And we had subsequently lost or misplaced
15  the original.
16  Q.   And did you ask for a replacement at that
17  point?
18  A.    Yes, sir, we did. When I was diagnosed
19  with cancer, I did not realize I had misplaced the
20  policy. When I was diagnosed with cancer, then we
21  requested a duplicate so that we would have it in
22  our hands so we would know what we -- would be
23  covered.
24  Q.    And where did you receive that duplicate?
25  A.    The duplicate was mailed to my home in

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

1 Alabama.
2 Q. Okay. Well, stepping back to 1997 now,
3 are you certain as you sit here today under oath
4 that you received the original policy while you
5 were standing in Pulaski, Tennessee?
6 A. Yes, sir, 100 percent certain of that.
7 Q. Okay. And the greasy fingerprints?
8 A. Yeah, that was -- any time I brought
9 paperwork home, it always had greasy fingerprints
10 on it.
11 Q. Okay. Let me -- let me step back for a
12 minute, if I can, to the mask.
13     It -- it's difficult for the jury to see
14 you behind that mask.
15 A. Yes.
16 Q. I want them to try to understand, if they
17 can, what you're going through right now. So let
18 me ask you, first off, did your doctor say it was
19 okay for you to be here today?
20 A. Yes, he did. He said the only problem I
21 could have is exposure if anyone has -- currently
22 has or has recently had a severe cold or an
23 infection.
24 Q. Or been around kids with colds?
25 A. Right. Anyone -- any way -- anything like

1 that could transfer to me. He said as long as
2 that has not happened, you can go without the
3 mask. I frequently am out in crowds, and a lot of
4 times I have to wear the mask to be on the safe
5 side.
6 Q. Okay.
7 A. I don't like it, but --
8 Q. I haven't been exposed. I don't know
9 about the rest of these people. I think some of
10 them have been on airplanes, so you do what you
11 think's best and your doctor told you. Okay? I
12 I'll leave that up to you.
13 A. I would like to remove the mask because it
14 is uncomfortable. And as long as everyone -- and
15 I think everyone seems to be healthy, so . . .
16 Q. Has anybody been exposed to any colds,
17 children with colds, been around a cold, had a
18 cold recently?
19     MR. LAX: I had a cold two weeks ago,
20 so -- and I'm recovering from one, so I -- I'm
21 okay now, but you can tell, I'm still nasal, so I
22 want to caution you.
23     THE WITNESS: It probably would be
24 okay.
25

1 BY MR. SINCLAIR:
2 Q. That's up to you. Listen --
3 A. I would like to remove it as long as I'm
4 okay. And I don't think -- I don't see any real
5 problem. I don't --
6     MR. LAX: That's up to you.
7 BY MR. SINCLAIR:
8 Q. Okay.
9 A. I would because, like I say, it -- it
10 muffles my voice for one thing, and it's just
11 uncomfortable.
12 Q. Okay.
13 A. One of those things I have to endure.
14 Q. All right. Let me ask you, did your
15 doctor help you prepare for today's testimony?
16 A. Yes, they have postponed my chemo because
17 of my weakness, was the main reason. But being
18 neutropenic, I received a shot -- what's today,
19 Tuesday, Wednesday? I received a shot Monday
20 evening of Neupogen, which increases my white
21 blood cell counts, gives me bone pain and joint
22 aches, but brings my white cell counts up to a
23 level where I'm okay.
24 Q. You know, you say it brings your white
25 cell level counts up. And I'm not sure -- I don't

1 understand really, and the jury might not. Does
2 that mean you have more energy, or does that mean
3 you're just less of a risk to exposure or --
4 A. Actually both. It brings my energy level
5 up. My white cells Monday were 2.1. 4 to 6 is
6 normal. Any time you get below 4, you're
7 susceptible to infections. And the Neupogen will
8 increase that and bring it up to about 6 or 7,
9 which helps my immune system, helps me to fight
10 infections and fight off bacteria that could
11 affect me. Simple bacteria could be fatal to me
12 in some cases.
13 Q. I want to make sure that the court and the
14 jury understand your doctor's instructions with
15 regard to your ability to participate here today.
16 Is there any risk we're running of having you
17 become sick by spending a great deal of time here
18 today?
19 A. Probably not, but -- hopefully my counts
20 are up today. I'm sure they are because I'm
21 feeling a little -- a little more energetic today
22 than I normally feel. And this is the way -- the
23 white cells coming up tends to help me feel a
24 little better.
25 Q. Okay. You -- you need to let us know, all

Page 25

1 of us, if it's -- if it's time to take a break or
2 if you need some rest. Okay?
3 A. I certainly will. The one main thing is,
4 I only have one kidney functioning now, so
5 periodically I have to use the restroom a little
6 more frequently than average, so . . .
7 Q. We call that a Rule 101 break. You just
8 call it any time you want. Okay?
9 A. I certainly will.
10 Q. I -- you know, I guess we ought to go
11 ahead and finish the discussion about being in
12 Pulaski when you purchased this. Have you told us
13 of all the conversations you had with the agent,
14 Jerry, in relation to your purchase of this
15 policy?
16 A. To the best of my recollection, yes, sir.
17 Q. Okay. Let's talk, if we can, a little bit
18 about your diagnosis. Okay?
19 A. Okay.
20 Q. When were you first diagnosed with cancer,
21 and what type of cancer is it?
22 A. My first official diagnosis was in October
23 of '99. I had non-Hodgkin's lymphoma, large cell
24 and small cell at the same time. One is very fast
25 moving; one is very slow moving.

Page 26

1 Q. And that was -- do you recall when in '99
2 that was that you were diagnosed and --
3 A. I want to say it was October -- either
4 late -- probably late October. And then shortly
5 thereafter, I began my chemo treatments.
6 Q. Who diagnosed you? Who was the first
7 physician?
8 A. The very first physician was a workman's
9 comp doctor from Lawrenceburg, Tennessee, and it
10 was a misdiagnosis. He stated I had cancer of the
11 spine, which the doctors were looking for cancer
12 of the spine, and they couldn't find it.
13 They then subsequently sent me to Dr. Mahn
14 Dang in Huntsville at the Center for Cancer Care,
15 and he did several studies, and they ended up
16 doing surgery and took a biopsy of the tumor that
17 was in my abdomen, upper abdomen, and the tests
18 came back as positives, cancer.
19 So they knew very quickly as soon as they
20 had done the biopsy -- I was still in recovery
21 when they told my wife.
22 Q. And -- you know, you said non-Hodgkin's.
23 I've -- do you understand the difference between
24 Hodgkin's and non-Hodgkin's lymphoma?
25 A. Not really. I guess I'm like a lot of

Page 27

1 layman. Cancer is cancer.
2 Q. It's the big C?
3 A. Yeah. It's -- it's -- I call it a dragon
4 because it's always biting at you. And sometimes
5 it gets big bites; sometimes it gets little bites.
6 Q. Okay. Let's -- let's walk through, if we
7 can, the dragon that you've dealt with. Okay?
8 A. Certainly.
9 Q. We started in Lawrenceburg, Tennessee,
10 with the doctor saying you had cancer of the
11 spine. You said that that was corrected in
12 Huntsville. Where was particularly the tumors
13 that they found in Huntsville in your body? Where
14 in your body were they?
15 A. The very first tumor was found in my upper
16 abdomen. It was the size of a medium-sized
17 grapefruit. And it was attached to the aorta in
18 my heart, and that's why it was not operable.
19 Q. It was attached to the aorta in your
20 heart?
21 A. Yes. And that's -- the doctor said there
22 was no possibility of surgery. It would expose me
23 to too much risk, and at that point, we began
24 doing chemotherapy.
25 Q. When you were first told that you -- you

Page 28

1 had cancer of the spine or the aorta -- the tumor
2 was on the aorta, were they -- did they tell you
3 what your prognosis was?
4 MR. LEVENTHAL: I'm going to state a
5 continuing objection on the record as to the
6 relevancy of his medical conditions with respect
7 to this case. But of course, we have objections
8 to the relevancy of this entire deposition. But
9 you can continue.
10 MR. SINCLAIR: I'm sorry, you have a
11 running objection as to the relevancy of the
12 entire deposition?
13 MR. LEVENTHAL: Correct.
14 MR. SINCLAIR: I'm not sure I can
15 address relevancy questions in a running fashion.
16 MR. LEVENTHAL: Well, I mean, that's
17 fine. I think it's the same issue that we
18 discussed in court, that the issues before the
19 court are legal in nature, and extrinsic evidence
20 is not relevant. So that's all I mean by that.
21 MR. SINCLAIR: Okay. I'm sorry. I
22 do understand that.
23 BY MR. SINCLAIR:
24 Q. All right. Did they tell you what your
25 prognosis was there in 1999?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## Page 29

1  A.    Yes, they said I had a very high
2  percentage of successful treatment.
3  Q.    And were they ultimately successful in
4  treating those tumors?
5  A.    In -- those particular tumors, yes.
6  Q.    Okay. All right. Now, that wasn't the
7  last time you fought with a tumor, was it?
8  A.    Correct.
9  Q.    Okay. I need you, if you can, to run me
10  through where you've had tumors in your body. Can
11  you tell us that?
12  A.    I certainly can. I remember every one of
13  them, something that you -- you never forget.
14  During the end of the treatment for my
15  large cell and small cell non-Hodgkin's lymphoma,
16  they discovered I had involvement -- cancer
17  involvement in my bone marrow. I was then sent to
18  Vanderbilt Hospital --
19  Q.    Is that here in Tennessee?
20  A.    Yes, sir, it's in Nashville. And at that
21  point, I was accepted into the transplant program
22  to do an autologous stem cell transplant, and that
23  means I donated my own cells.
24  Q.    Okay.
25  A.    Which eliminated the possibility of me

## Page 30

1  running into a problem getting cells from someone
2  else and having to take antirejection drugs.
3  Subsequently they removed me from the
4  program because they felt that it would not be
5  successful.
6  Q.    What -- I'm sorry. What do you mean they
7  removed you from the program at Vanderbilt -- is
8  this -- are we still at Vanderbilt?
9  A.    Yes.
10  Q.    And when was this?
11  A.    I want to say it was in, like, May of --
12  April/May of 2001.
13  Q.    Okay. That was the next set of -- of --
14  that was the next set of lesions or -- or tumors
15  that you had?
16  A.    That's correct.
17  Q.    Okay. So the tumors in '99 were resolved
18  through chemo?
19  A.    That's correct.
20  Q.    All right. Well, let me ask you, did you
21  file a claim with the defendants at that point?
22  A.    Yes, we did.
23  Q.    And did you have any problems with them
24  paying?
25  A.    None whatsoever.

## Page 31

1  Q.    Did you have -- did you have medical
2  coverage at that point?
3  A.    Yes, I did.
4  Q.    Who did you have medical coverage with?
5  A.    It was through BlueCross -- I want to say
6  it was from where I worked and as well as I was
7  covered with my wife's policy at the same time
8  where she was employed as well.
9  Q.    Did you -- did you have to send the
10  defendants any EOBs or explanation of benefit
11  forms from BlueCross to receive benefits?
12  A.    No, sir.
13  Q.    And did they pay you the actual charges on
14  the doctors' bills that you sent them?
15  A.    Yes.
16      MR. LEVENTHAL: Object to the form.
17      Go ahead.
18  BY MR. SINCLAIR:
19  Q.    When you sent them the doctors' bills, did
20  they pay the amount stated on the doctors' bill?
21  A.    Yes, they did.
22  Q.    Any problem with them up until the second
23  set of tumors showed up?
24  A.    No, no problem. Normally we would file
25  the statements from the doctor, and within two to

## Page 32

1  three weeks, I would get a check.
2  Q.    In May of 2001, you indicated that -- I
3  believe you said that your doctors told you your
4  bone marrow was involved?
5  A.    It was actually earlier in the spring, and
6  they had set me up at Vanderbilt, and it was April
7  or May that I went up there. At that point, I
8  received another port in my right chest, which was
9  an open port.
10  Q.    What -- what is a port?
11  A.    A port is an access point. I have one in
12  my left chest now. It's an access point where
13  they don't have to stick you in the arm or the
14  back of your hand. They can take the needle and
15  stick it right into the port, and you can receive
16  your chemo; they can do your blood analysis,
17  various things so that they don't have to go back
18  sticking you in the arm and --
19  Q.    You're talking about a port just like on a
20  computer?
21  A.    Pretty much, yeah.
22  Q.    Okay.
23  A.    They use a very small fishhook looking
24  needle that just snaps into the -- into the port.
25  Now, the one that I had at that time -- I had the

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## Page 33

1  one in the left, but the one they put in at
2  Vanderbilt was three open hoses that came out of
3  my chest and hung down about four to five inches
4  onto my chest, so there were three actual open
5  hoses there.
6  Q.  This was in May of 2001. Now, you gotten
7  me to the point where you had said Vandy said that
8  they were going to kick you out of the study.
9  A.  That's correct.
10  Q.  Why were they going to do that?
11  A.  They did not feel that it would be
12  successful. They felt that at that point even if
13  they gave me the transplant that I wouldn't live
14  anyway.
15  Q.  Did --
16  A.  And --
17  Q.  I'm sorry. What do you mean you wouldn't
18  live anyway? Did someone tell you you were
19  terminal at that point?
20  A.  At that point, they didn't bring it up to
21  me. They did tell my doctor that they felt they
22  couldn't help me, that I was probably going to be
23  terminal, and they would not put me into the
24  program. Dr. Dang wrote several letters.
25  Q.  Who is Dr. Dang?

## Page 34

1  A.  Dr. Mahn Dang is my oncologist in
2  Huntsville and --
3  Q.  Would you -- would you for the court
4  reporter please spell his name?
5  A.  His first name is M-A-H-N, and his last
6  name is D-A-N-G.
7  Q.  Now, is he Vietnamese or --
8  A.  He is Vietnamese. And in my personal
9  opinion -- I know this doesn't mean a lot to other
10  folks, he saved my life, and he's a wonderful,
11  wonderful man.
12  Q.  And you're a Vietnam vet, aren't you?
13  A.  I was not in Vietnam, no, sir.
14  Q.  Okay. But you were a veteran during
15  Vietnam?
16  A.  Afterwards, yes.
17  Q.  Okay. Dr. Dang called Vandy?
18  A.  Yes, he wrote several letters to
19  Dr. Stein, who's chief of hematology, and it was
20  his ultimate decision. I was not aware of this
21  until later on when Dr. Stein told me I should
22  thank Dr. Dang because they had removed me from
23  the program because they couldn't help me. He
24  said Dr. Dang literally begged me. He said, we
25  did put you back in the program, and we're so very

## Page 35

1  happy we did.
2      MR. LEVENTHAL: I'm going to state an
3  objection for the record based on hearsay grounds
4  as to what other doctors told him or told other
5  doctors.
6      MR. SINCLAIR: Okay.
7  BY MR. SINCLAIR:
8  Q.  Did Dr. Dang tell you that he had called
9  and asked them to remove -- or put you back in the
10  study?
11  A.  Yes, he did.
12  Q.  Okay. Did they ultimately put you back in
13  the study?
14  A.  Yes, sir, they did.
15  Q.  Okay. Let me ask you, was the stem cell
16  transplant successful?
17  A.  Yes, sir, it was. I spent 29 days in
18  isolation, had my transplant. I spent 7 days with
19  no white cells. The family had been told I might
20  not make it through the night. I did. And
21  Dr. Stein subsequently and to this day calls me
22  the miracle guy. He said, you weren't supposed to
23  live, and everything worked perfect.
24      And at this point, I just recently had my
25  five-year checkup, and I have no living cancer

## Page 36

1  cells in my bone marrow whatsoever.
2  Q.  But you have them elsewhere?
3  A.  Oh, yes.
4  Q.  But they chased them out of your bone
5  marrow?
6  A.  They got -- they got rid of the bone
7  marrow.
8  Q.  Dr. Stein refers to you as what?
9  A.  He calls me the miracle guy or the miracle
10  man. And it's a strange feeling at 62 years old
11  to be hugged by another man that's pretty close to
12  your age. And he literally hugs you because he's
13  glad to see you.
14  Q.  This is up in -- this is up in Nashville
15  that you're going to see this doctor?
16  A.  Yes, sir, at Vanderbilt --
17  Q.  Okay.
18  A.  -- Hospital.
19  Q.  And his name is Dr. Stein?
20  A.  That's correct.
21  Q.  Okay. Is he a good fellow too?
22  A.  Oh, he's a great guy.
23  Q.  Okay. All right. Have we gone through
24  the bone marrow in 2001?
25  A.  Yes. Of course, I had my transplant in

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## Page 37

1  2002.
2  **Q.   Okay.**
3  A.   I was in a wheelchair for about eight or
4  ten weeks after that. It took me some time to get
5  over it. After that, I thought I was doing great,
6  had a PET scan. They discovered tumors in my
7  lungs and began treating me for that.
8  **Q.   In both lungs?**
9  A.   That's correct.
10 **Q.   Well, let me ask you, as far as the -- I'm**
11 **trying to group these by year.**
12     **But as far as the 2001 bone marrow cancer**
13 **treatments, did you submit claims to the**
14 **defendants?**
15 A.   Yes, I did.
16 **Q.   Did you have any problem with the claims**
17 **processing at that point?**
18 A.   None whatsoever. There was a ceiling on
19 that, and they explained it to me, and I accepted
20 that.
21 **Q.   What -- what do you mean they explained it**
22 **to you?**
23 A.   When we called them in reference to that,
24 whether the coverage would be -- how the coverage
25 would work, the individual that we spoke with

## Page 38

1  indicated that -- and I think it was a $35,000
2  ceiling. And that was the rules and the
3  regulations, and I -- okay, I'm -- I understood
4  that.
5  **Q.   Is that your understanding from looking at**
6  **the policy?**
7  A.   Yes.
8  **Q.   Okay.**
9  A.   I had -- this had been explained to me
10 that there were several procedures that had
11 ceilings on them, and I understood that going in.
12 **Q.   Do you have any problem with that**
13 **particular provision of the policy?**
14 A.   None whatsoever.
15 **Q.   Okay. And that was something you agreed**
16 **to when you entered into this contract?**
17 A.   That's correct.
18 **Q.   Okay. And you'll live by that?**
19 A.   Yes, sir.
20 **Q.   Now, let me ask you, when you went and**
21 **filed your claims related to the 2001 bone marrow**
22 **treatments, did the defendants ask you for**
23 **statements from your medical care provider --**
24 **medical coverage provider?**
25 A.   No. All we submitted was the doctors'

## Page 39

1  itemized statements.
2  **Q.   And did they pay the full amount reflected**
3  **on those itemized statements?**
4  A.   Yes.
5  **Q.   Subject to those caps you pointed out**
6  **earlier?**
7  A.   Yes, sir, they did.
8  **Q.   Okay. No problem with them up to that**
9  **point?**
10 A.   No, sir.
11 **Q.   As a matter of fact, under this policy, do**
12 **they give you incidental charges as well?**
13 A.   There were some incidental charges that
14 were covered and some that weren't. Some of them
15 have a -- an annual cap, again, which I do
16 understand, and I accepted that.
17 **Q.   Okay. Let's -- let's go ahead and move on**
18 **to the 2002 fighting the dragon, I guess. You**
19 **had -- you had tumors in your lungs diagnosed in**
20 **2002?**
21 A.   It was late 2002, early 2003 maybe, they
22 diagnosed me with tumors in my lungs. I began
23 treatment for that. And I want to say it was at
24 that time I began receiving Rituxan, which is a
25 new -- at that time was a brand-new cancer drug.

## Page 40

1  **Q.   Okay. And -- and if you can -- I mean,**
2  **the jury is not going to know what Rituxan is or**
3  **what it does, and I know you're not a doctor. But**
4  **if you can tell them what your understanding is**
5  **since you're taking it. What is Rituxan?**
6  A.   I was -- it was explained to me that it is
7  gene cell therapy. It was the -- at that time, it
8  was the leading edge -- and still is. It's even
9  more widely accepted now. At that time, it was at
10 the leading edge of the technology they were
11 using. At that time, the doctor told me I was the
12 second individual in the state of Alabama to get
13 it. It had already been approved a few days prior
14 to that for use.
15 **Q.   This Rituxan, is it a form of chemotherapy**
16 **or is it --**
17 A.   Yes.
18 **Q.   Okay. All right. Is it a pretty**
19 **expensive treatment?**
20 A.   Very expensive.
21 **Q.   You have seen the doctors' bills?**
22 A.   Yes.
23 **Q.   Do you recall generally how much of one**
24 **treatment -- well, what is a treatment in your**
25 **terms?**

## Page 41

1  A.    It would take approximately seven hours
2  for me to get this treatment. The first treatment
3  you get is really bad. They -- the medical
4  profession refers to it as shake and bake. You
5  get an extremely high fever, and every muscle in
6  your body begins to quiver and contract. And I
7  haven't been that sore in my entire life after I
8  had that first treatment, and I did get all of the
9  symptoms that they said possible to get, and I did
10 get them.
11     But after the first treatment, it didn't
12 occur again, and they said that was again normal.
13     And you had asked -- the treatment at that
14 point was around $6,000, give or take a couple
15 hundred dollars. And I -- I want to say 6400, but
16 I can't swear to that.
17 Q.    Okay. When you sent the bill for Rituxan
18 in to the defendants, did you send the doctor's
19 statement, or did you send the statement for
20 BlueCross?
21 A.    We sent in the doctor's itemized
22 statement.
23 Q.    Okay. And did they pay the full amount of
24 that Rituxan treatment?
25 A.    Yes, they did. There were some subsequent

## Page 42

1  items that were not covered, which I understood
2  that from the past dealings, and -- but they did
3  pay 100 percent on the Rituxan treatment itself.
4  Q.    And when you say 100 percent, you're
5  referring to what bill?
6  A.    The -- the -- the bills -- the itemized
7  bill that we received from the doctor.
8  Q.    Okay. All right. Tumors in lung in late
9  '02, early '03, another treatment of chemo. Did
10 they resolve?
11 A.    Yes, they began going down. Following
12 that, I did some -- I did a PET scan, and things
13 were doing well. The next PET scan came up, they
14 discovered tumors in my -- excuse me, in my upper
15 abdomen, and we continued with the chemo at that
16 time.
17 Q.    When was that that they discovered tumors
18 in your abdomen?
19 A.    I want to say maybe 2004.
20 Q.    And all the records you have relating to
21 the billing of that treatment, those are sitting
22 in front of you in Exhibit 2?
23 A.    That's correct.
24 Q.    Okay.
25 A.    I've looked through these, and from what

## Page 43

1  I've seen, it appears as though they're all here.
2  Q.    Okay. Well -- all right. We had tumors
3  in the lung in late '02, early '03. Now they're
4  in the abdomen in '04. Are you undergoing chemo
5  this entire period of time between '02 and '04?
6  A.    Yes, I was getting breaks periodically. I
7  would get two, three, four months of chemo, then I
8  would get a break for a while.
9  Q.    Okay.
10 A.    Again, now, we have come another circle.
11 Christmas morning, which was a Monday -- Sunday my
12 wife and I had gone to church, and having had so
13 many tumors and being aware of cancer, I
14 constantly when I'm showering, I check myself all
15 over for any tumors or anything or any lumps that
16 I don't think should be there. I was fine.
17     Monday morning I got up, I had had a pain
18 in my right breast. At that point, I was taking a
19 shower, and I noticed a small lump just to the
20 left of my nipple, called the doctor on Tuesday,
21 went to see him on Thursday. At that point, the
22 lump had grown considerably larger to about the
23 size of half a lemon. At that point, they began
24 doing some tests.
25     The following weekend -- it seems that

## Page 44

1  holidays are the times I have my problems. The
2  following weekend was New Year's. I had gotten up
3  on the 2nd of January and couldn't walk on my own,
4  couldn't breathe, and the doctor sent me to the
5  emergency room. And they discovered that my
6  kidneys had totally failed. I had complete renal
7  failure.
8  Q.    When was this?
9  A.    That was January 2 of 2007.
10 Q.    Okay. All right. Now, I want to make
11 sure, for the period between '02 and '04, did you
12 have tumors anywhere else besides the lung and
13 abdomen?
14 A.    No, sir.
15 Q.    Not -- okay. You're -- you're looking up
16 at the sky. Are you -- am I -- are you getting
17 tired because I can -- I can -- you're not --
18 you're not focused on me. Do you need to take a
19 break?
20 A.    I think right now I'm okay.
21 Q.    Okay.
22 A.    What I -- I roll my eyes up because I'm
23 trying to see where my brain is at, see if it's
24 functioning.
25 Q.    Okay. Between '02 and '04, have you told

## Page 45

1  me about all the tumors and all the treatments
2  that you can recall at this time?
3  A.    To the best of my recollection, yes, sir.
4  Q.    Okay. Did you submit claims to the
5  defendants for this time period?
6  A.    Yes.
7  Q.    And did they pay you the amount reflected
8  on your doctor's bill or the amount reflected on
9  the amount BlueCross paid?
10  A.    They paid on the itemized doctor's bill,
11  the statement directly from the doctor.
12  Q.    And did they pay 100 percent of that
13  itemized doctor's statement?
14  A.    They -- they paid the -- the chemo, there
15  were a few shots that I get in there that there is
16  a ceiling on.
17  Q.    You know what, I see what you're saying.
18  You've -- you're saying that under the terms of
19  the policy, there's some things that don't get
20  paid?
21  A.    That's correct.
22  Q.    Okay. All right. So let me say it
23  another way. Let me not say 100 percent. Let me
24  say for the -- for example, the chemo treatment,
25  did they pay 100 percent of what the doctor's

## Page 46

1  statement reflected the charges were?
2  A.    Yes, sir.
3         MR. LEVENTHAL: Objection.
4         Go ahead.
5         THE WITNESS: They did.
6  BY MR. SINCLAIR:
7  Q.    I'm sorry, what?
8  A.    Yes, sir, they did.
9         MR. SINCLAIR: Okay. Grounds?
10         MR. LEVENTHAL: Form of the question.
11  BY MR. SINCLAIR:
12  Q.    Okay. Did you have any problem with them
13  up until the end of '04?
14  A.    No.
15  Q.    Did -- did the defendants do anything to
16  reduce your benefits?
17  A.    No, sir.
18  Q.    Okay. Up until '04?
19  A.    That's correct.
20  Q.    Okay. Stepping into '05, '06 now, I hate
21  to ask this, but do we have more tumors in '05,
22  '06?
23  A.    Yes, sir.
24  Q.    Where else?
25  A.    I now have a tumor on each kidney. My

## Page 47

1  left kidney is working at approximately 5 percent.
2  My right kidney is working at 100 percent. I have
3  four tumors across the top of my abdomen. I have
4  a 4 mill- -- a .4-millimeter tumor in my right
5  lung. And the lump from my right breast was
6  removed, and it was cancerous. So now I'm dealing
7  with breast cancer, which is not that common in
8  men, but it does happen.
9         Of course, I have the one tumor in my
10  right lung, which is going down, and the tumors on
11  my kidneys and the other tumors I will find out
12  next month how they're doing.
13  Q.    You're currently undergoing chemotherapy?
14  A.    Yes, sir, I am.
15  Q.    Okay. Are those treatments -- I mean --
16  let me do it this way. Let me show you what I'm
17  going to mark as Exhibit 3, which is his affidavit
18  that was submitted earlier to the defendants.
19         (Marked Exhibit No. 3.)
20  BY MR. SINCLAIR:
21  Q.    And ask you if you can identify that
22  document for us. Have you seen that before today?
23  A.    Yes, sir, I have.
24  Q.    Okay. Take a look through, flip back to
25  the last page, and tell me if that is, in fact,

## Page 48

1  your signature on the last page?
2         MR. LEVENTHAL: Do you have a copy of
3  that?
4         MR. SINCLAIR: I do, but I marked it
5  up, and I -- I didn't bring an extra one. I tell
6  you what, we'll let him hand you his, and he can
7  look at this one. It's just got little
8  scratches on it where I -- you know what, that's
9  not that big of a -- here, you can take a look at
10  that.
11         THE WITNESS: Yes, it is. Getting
12  back to your question, yes, that is my signature.
13  BY MR. SINCLAIR:
14  Q.    Okay. Let me ask it again, because
15  playing the video for the jury, we have to chop it
16  up anyway, but I want to make sure that we -- we
17  don't have to do it for that question.
18  A.    Okay.
19  Q.    Take a look at what I've marked as
20  Exhibit 3. Do you recognize that document?
21  A.    Yes, sir, I do.
22  Q.    Okay. If you would, please tell the jury
23  what that document is.
24  A.    Let me make sure I read it, make sure I
25  know what it is.

1  Q.    Sure.

2  A.    But it's basically describing what I have

3  gone through, kind of a history of -- of my cancer

4  and my tumors and my treatment.

5  Q.    Okay. Is that your signature on the last

6  page of Exhibit 3?

7  A.    Yes, sir, it is.

8  Q.    Okay.

9         MR. SINCLAIR: Move to admit

10 Exhibit 3.

11        MR. LEVENTHAL: Objection.

12        MR. SINCLAIR: On grounds?

13        MR. LEVENTHAL: This is just -- it

14 looks like a recitation of all kinds of testimony,

15 so I have an objection to -- to admissibility.

16 You can't go through this and dissect everything

17 in here. If you want to admit it subject to my

18 objections, that's fine.

19        MR. SINCLAIR: Well, I'm -- I'm

20 moving to admit it. And as I understand your

21 objections, it's -- okay. I understand your

22 objection. We'll argue about it later.

23 BY MR. SINCLAIR:

24 Q.    All right. Mr. Gooch, let me ask you,

25 does Exhibit 3 accurately and truthfully reflect

1  your course of dealings with the defendants and

2  your cancer treatments?

3  A.    Yes, sir.

4  Q.    Okay. I had initially asked you, I

5  believe, earlier that -- if you were currently

6  undergoing chemo. Let me ask you -- I hear the

7  word chemo, and I'm a layman, I don't have any

8  understanding of it. Can you tell the jury what

9  it's like for you in your current chemo

10 treatments?

11 A.    Well, the chemo, to kind of answer that

12 first question as best I can, you're given, if

13 you're receiving chemo, it is chemicals. They are

14 deadly. They are technically poison. They give

15 you just enough not to kill you in the hopes that

16 they can keep you alive as the patient and kill

17 the cancer cells. In many cases, it's quite

18 successful; in some cases, it's not.

19        Having -- this next Monday -- excuse me.

20 This next Monday I get my next chemo treatment,

21 and he's going to back off a little bit because

22 the one they gave me last time was -- put me in

23 the hospital.

24        But this chemo has been very, very

25 difficult on me. Things that I normally have been

1  able to do I can't do at all now. And as much as

2  I enjoy going places and doing things, I'm pretty

3  much stuck at home.

4         Relay For Life, which is a cancer

5  fundraiser nationwide, I was not able to

6  participate this year because I was very ill, and

7  that's something that I look forward to all the

8  time.

9  Q.    Let me ask you, Exhibit 3 reflects a

10 statement from you that you actually go blind

11 after some of these treatments?

12 A.    Yes. When I'm -- the current series that

13 I'm taking was six treatments. And the first four

14 treatments they were giving me high steroids,

15 which would cause me to not be able to see where I

16 could safely drive. I couldn't watch TV because I

17 couldn't see the details on the screen.

18        My son, my wife, my friends had to end up

19 driving me places if I wanted to go somewhere. In

20 low light conditions, I could see okay, but I

21 stopped driving because I felt it was unsafe, not

22 for me alone but for anybody else out there. I

23 couldn't judge speed of cars; I couldn't judge

24 distance. I couldn't see it well enough to safely

25 negotiate.

1  Q.    Okay. Well, let's -- let's take the

2  period from '04 to January of '06. You're still

3  submitting claims to the defendants in that time

4  period?

5  A.    Yes, we did.

6  Q.    And are they still paying for chemo and

7  for the other benefits for which there isn't a

8  cap? Are they still paying 100 percent of what's

9  reflected on your doctor's bill for that specific

10 treatment?

11 A.    Yes, sir, they were.

12 Q.    Okay. Now, did something happen in 2006

13 that changed the amount of benefits you were

14 receiving?

15 A.    Yes, it did. I -- I received a letter,

16 and I want to say it was in May, informing me that

17 they were going to pay on actual charges. And I

18 had called the company to find out what that was,

19 and they told me that that was what the actual

20 charges would be.

21 Q.    Let me -- let me back up. Let me ask you

22 a question. You just said actual charges twice,

23 and I'm not sure I understood.

24        In your opinion -- well, have you reviewed

25 this policy?

1 A. Yes, I have.
2 Q. Okay. Did you review it before you
3 purchased it?
4 A. Yes, I did.
5 Q. And in your review of this policy, you
6 understand that certain terms are within the
7 policy. I'm not asking -- you're not a lawyer,
8 are you?
9 A. No, sir.
10 Q. Okay. I'm asking you for your
11 understanding as a layman of these terms. Okay?
12 A. Uh-huh.
13 Q. There's a term within that policy that
14 says they'll pay actual expenses. Did you see
15 that term?
16 A. Yes.
17 Q. Okay. And for certain things they'll pay
18 actual expenses, right?
19 A. That's correct.
20 Q. What's your understanding of what actual
21 expenses were, in your course of dealing with them
22 and your understanding as a layman?
23 A. My understanding of it was at that point
24 and -- and still is that whatever the doctor bills
25 you for, that's the actual charge.

1 Q. Well, I'm saying actual expenses. If --
2 A. Well, the actual expense.
3 Q. Okay. There's an actual charge provision
4 in there that talks about actual charges. Are you
5 telling me that -- okay. I think you just got two
6 terms confused.
7 A. That's very possible.
8 Q. And -- and we've been going 55 minutes.
9 A. Okay.
10 Q. Why don't we take a break. Okay?
11 A. Okay.
12 Q. Do you need -- would it help you to close
13 your eyes for a few minutes and sit quietly?
14 A. It probably would, just kind of relax.
15 Q. Okay. What don't you -- if you need --
16 I'm sure with one kidney -- we'll take a break, go
17 off the record, if we can, you go take a break.
18 Okay?
19 THE VIDEOGRAPHER: We're going off
20 the record. The time is 9:54 a.m.
21 (Brief recess observed.)
22 THE VIDEOGRAPHER: We're back on the
23 record. The time is 10:07 a.m.
24 BY MR. SINCLAIR:
25 Q. All right. Mr. Gooch, do you feel a

1 little bit better?
2 A. Yeah, I got to take a few moment's break
3 and --
4 Q. Okay. You let us know if we have to take
5 a break again. Okay?
6 A. Okay.
7 Q. The last questions we were talking about,
8 what happened in 2006. Do you recall receiving
9 correspondence from the defendants in 2006?
10 A. Yes.
11 Q. Okay. Do you -- well, let me just ask
12 you, do you recall what they -- you obviously had
13 been submitting claims up through 2006, hadn't
14 you?
15 A. That's correct.
16 Q. Okay. When was the last course of
17 treatment you received that you submitted a claim
18 to the defendants for?
19 A. In 2006? I'm trying to think. It was
20 after the -- I had received a letter in May
21 explaining to me that they would have to have the
22 EOBs, that that's what they were going to pay
23 from.
24 Q. What is an EOB?
25 A. The explanation of benefits.

1 Q. From?
2 A. BlueCross BlueShield, and as well as --
3 I'm covered under Medicare as well.
4 Q. Okay.
5 A. That's what they were going to pay from.
6 Q. Let's -- let's step back a minute so the
7 jury understands. Does this policy pay your
8 medical providers for your treatment?
9 A. No, it pays me directly.
10 Q. Okay. Is this policy, in your
11 understanding when you bought it, intended to pay
12 medical benefits?
13 A. To me only, not -- not to the doctor. It
14 was -- my understanding was it was money that was
15 coming to me that would pay me for the expenses
16 that were incurred for my chemo and a few other
17 incidental expenses.
18 Q. Okay. And were those expenses set at
19 different levels in your understanding and under
20 the policy?
21 A. The chemo, the -- he explained it to me --
22 this Jerry explained it to me it was 100 percent.
23 And subsequently, again, he also explained that
24 there were other items they paid that had a set
25 amount.

## Page 57

1  Q.    Okay. And let's make sure the
2  jury under -- that I understand and the jury
3  understands what you mean when you keep saying 100
4  percent. What do you mean 100 percent? When you
5  say that, what do you mean?
6  A.    Well, my understanding at the time and the
7  subsequent claims that we started in '99, that
8  they would pay the actual charge that was coming
9  from the doctor. If the doctor's expense -- or
10 the doctor's chemo charge was 6,000, that was the
11 check I received, and it was like that all along,
12 never changed.
13 Q.    Up until when?
14 A.    Up until we had filed in -- several claims
15 in June. They paid the full rate at that point.
16 After June, beginning July 1, I believe it was of
17 206 -- or 2006, they were paying on the EOBs and
18 said they would do -- they would no longer pay
19 from the doctor's statement, just from the EOB of
20 the -- BlueCross BlueShield.
21 Q.    Okay. And let me ask you, the -- the
22 defendants have -- have said to the court that
23 what they did was just change the claims handling
24 process. Did they change the claims handling
25 process? Did they start requiring different

## Page 58

1  proofs?
2  A.    Yes.
3  Q.    Okay. Did that subsequently have a
4  change -- or create a change to your benefits?
5  A.    Yes.
6  Q.    Okay. Tell me how this new process that
7  they put in place in 2006 changed the amount of
8  benefits. And if you can be specific, let's talk
9  about Rituxan, if we can. That's a drug you're
10 still getting, correct?
11 A.    That's correct.
12 Q.    And you submitted a claim in 2007 for
13 that?
14 A.    Yes, we have.
15 Q.    Okay. And have the defendants paid the
16 amount on your doctor's bill for that?
17 A.    The doctor's statement, no.
18 Q.    Okay. What did they pay?
19 A.    They paid from the EOB, the explanation of
20 benefits from the insurance company, which the
21 doctor had chosen -- they had made an offer
22 apparently, the way I understand it, and the
23 doctor was willing to give them a discount or take
24 a lesser amount.
25 Q.    Let -- and that's -- that's what I'm

## Page 59

1  trying to understand. The EOBs -- let's say
2  BlueCross statements. BlueCross statements --
3  BlueCross pays less than the doctor bills --
4  A.    That's correct.
5  Q.    -- for your Rituxan --
6       MR. LEVENTHAL: Objection to the form
7  of the question.
8       Go ahead.
9  BY MR. SINCLAIR:
10 Q.    I'm sorry. Does BlueCross pay less to
11 your doctor for Rituxan treatments than your
12 doctor sends you a bill for?
13 A.    Yes.
14 Q.    Okay. Do you -- when you took out this
15 policy, when you sat down with Jerry and during
16 the first eight years you were submitting these
17 chemo treatments, was it ever your understanding
18 you had to have BlueCross statements submitted in
19 order to be paid from these defendants?
20 A.    No. As a matter of fact, we -- we
21 received a letter, I want to say it was November
22 of '99 or December, explaining -- because we had
23 called and asked, how do we apply for the
24 benefits. And they -- in the letter, it details
25 that we must send in an itemized statement from

## Page 60

1  the doctor.
2  Q.    When you took out this policy, did Jerry
3  ask you if you had BlueCross BlueShield or some
4  medical coverage?
5  A.    No, he did not.
6  Q.    Did he say that the only way they would
7  issue this policy to you would be if you had
8  BlueCross or -- or Medicaid or something?
9  A.    No.
10 Q.    Okay. Was this policy in any way, shape,
11 or form, in your understanding, your conversation
12 with Jerry, ever intended to pay your doctors for
13 the treatments?
14 A.    No.
15 Q.    Okay. Was it ever intended to be a
16 supplemental medical coverage policy, in your
17 understanding?
18 A.    No.
19 Q.    Okay. When we talk about the amount
20 BlueCross pays, you know this, how do you know
21 that BlueCross pays less for Rituxan than your
22 doctor sends you a charge for?
23 A.    The EOB, which is explanation of benefits,
24 lists the price, the cost that the doctor has
25 billed BlueCross BlueShield or the -- the medical

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

Page 61

1  provider, the insurance provider. And then they
2  have a column there that says, your doctor has
3  agreed to accept this amount in payment in full.
4  And that amount is always lower than what the
5  doctor actually charged.
6  Q.  So it's your understanding that BlueCross
7  gets a discount?
8  A.  That's correct.
9  Q.  Okay. Let me back up. You mentioned
10 before that you had conversations with some of the
11 defendants' employees?
12 A.  That's correct.
13 Q.  If you can, let's -- let's go back to the
14 first conversation you had with the defendants'
15 employees. Was that in '99?
16 A.  The very first contact we made, yes, was
17 in '99.
18 Q.  Okay.
19 A.  Because at that point I had been diagnosed
20 with cancer, and we just wanted to find out what
21 the procedures were, what we had to do to file a
22 claim, how we had to do it, just getting a
23 guideline.
24 Q.  At that point, did they tell you they
25 would only pay you whatever your medical care

Page 62

1  provider paid your doctor?
2  A.  No.
3  Q.  Did they tell you they would pay whatever
4  your doctor was charging on his bill?
5  A.  My -- yes. To the best of my
6  recollection, they said you send in the itemized
7  doctor's statement and that's what we will pay
8  from.
9  Q.  And did you subsequently receive an
10 instruction letter from them on the same thing?
11 A.  Yes, we did.
12 Q.  Okay. When was the next conversation that
13 you had with the defendants' employees that you
14 can recall?
15 A.  We had a few conversations over the period
16 of time, various coverages, especially when I went
17 to my -- for my transplant. And we called them to
18 find out -- because we had gotten a letter telling
19 us that there was a ceiling, that there was a
20 maximum they would pay on that procedure, and we
21 called to find out what we had to do, what the
22 maximum amount was, and how to go about it. And
23 that's what -- we followed their instructions.
24 Q.  Did -- did you actually talk to the
25 defendants' employees about the amount that they

Page 63

1  were willing to pay for stem cell transplants?
2  A.  Yes, we did. And, again, it was one of
3  those things that I had been explained by Jerry
4  that there were some ceilings or maximum limits,
5  which, again, I accepted that, and I understood
6  that, and they explained to us that, hey, this is
7  one of those items that there is a maximum benefit
8  that we will pay. And I understood that at the
9  time and had no objection to it.
10 Q.  When -- when you talked to the defendants'
11 employees before going to the stem cell treatment
12 at Vandy, that's where you had the stem cell
13 treatment, right?
14 A.  That's correct.
15 Q.  Okay. When you talked to them, did they
16 tell you that they were still issuing and selling
17 these policies?
18 A.  At one point, one of the ladies I spoke
19 with informed me that they no longer sold that
20 type of policy because folks were living much
21 longer due to the new medical advancements, and
22 they no longer sold that policy because it cost
23 too much money --
24 Q.  What cost --
25 A.  -- from the company. The company had to

Page 64

1  pay out a lot of money because -- the policy, the
2  way it was configured, the way it was paid out.
3  Apparently when that policy was written, when you
4  had cancer, it was a death sentence.
5      And at that point, I believe that's when
6  they changed the policy. I've never seen a policy
7  following that, so I just went by what the -- the
8  individual told me.
9  Q.  Okay. And this is somebody you contacted
10 at the defendants' phone numbers that they gave --
11 A.  That is correct.
12 Q.  Okay. After you received the letter in
13 around May of 2006 informing you that the benefits
14 were going to be reduced, did you have a
15 conversation with the defendants' employees?
16 A.  Yes, I did.
17 Q.  Okay. Please tell me about the first
18 conversation you had with the defendants'
19 employees.
20 A.  Well, I had spoken to them and objected to
21 what this meant to me. I said, this is going to
22 cut my benefits. And we spoke about that, and I
23 told the lady, I said, I don't understand how I
24 have a contract, an open contract and an open
25 claim. She said, oh, well, if you have an open

16 (Pages 61 to 64)

Page 65

1 claim, this letter is not going to affect you, as
2 long as you have an open claim.
3 But once you have been declared in
4 remission or whatever and you no longer have an
5 open claim, the next claim you make will be
6 on the -- the reduced list paid on the EOB. But
7 as long as you have an open claim, it will still
8 continue like it always has.
9 Q. Okay.
10 A. And I -- I never got the lady's name. I
11 wish I had. I just didn't do that.
12 Q. Okay. Did she express regret at the
13 change?
14 MR. LEVENTHAL: Objection.
15 THE WITNESS: Not openly.
16 MR. LEVENTHAL: Go ahead.
17 BY MR. SINCLAIR:
18 Q. What do you mean not openly?
19 A. It just felt -- I kind of got the feeling
20 that she was trying to explain to me that my
21 benefits weren't going to change, that others who
22 haven't filed a claim as yet, theirs would change
23 but mine would not because of the fact I already
24 had an open claim.
25 Q. Did your benefits subsequently change?

Page 66

1 A. Yes, they did.
2 Q. Okay. Let me ask you, when did you stop
3 working as a mechanic in Pulaski?
4 A. It was late July, early August of '99.
5 Q. Have you worked for pay since?
6 A. No.
7 Q. Do you occasionally do volunteer work when
8 you can?
9 A. Yes, I do.
10 Q. Okay. Do you have any compensation --
11 paid compensation for work that you've received
12 since you've stopped working in Pulaski?
13 A. No.
14 Q. Okay. Do you -- this policy, is this your
15 personal source of income at this point?
16 A. Yes, it is. I -- of course, I'm on
17 disability, SSI, and I get approximately one-third
18 maybe of what I used to make, and it doesn't cover
19 my bills.
20 Q. Okay. Did you in conversation with the
21 defendants' employees ever tell them that you
22 wanted them to continue paying 100 percent of the
23 doctors' bills?
24 A. Yes.
25 Q. Did you send them a letter stating such?

Page 67

1 A. We have -- to my knowledge, every time
2 there was a claim following this letter, we had
3 sent along the EOB along with the doctor's
4 statement. And most of the time I believe my wife
5 would put on there that we were -- we protested or
6 were disappointed or did not like or agree with the
7 reduction.
8 Q. When you were talking to the defendants'
9 employees those first two conversations you recall
10 there, did you tell them you wanted them to keep
11 paying 100 percent of the doctor's statement?
12 A. Yes, I told them that. I said, I'm not
13 giving anybody a discount; I didn't contract for a
14 discount. And the lady explained to me that this
15 is across the board, that everybody is being done
16 this way, and it is a change in the policy.
17 Q. Did she tell you everybody who had a
18 Life Investors cancer only policy was getting done
19 this way?
20 A. She didn't really -- she inferred that.
21 Q. Okay.
22 A. She didn't actually say that, but she
23 inferred that everyone in this situation has
24 received this letter and will be -- that's how
25 they'll be paid, so . . .

Page 68

1 Q. Do you -- well, and let me ask you, do you
2 feel as though -- I had asked you previously for
3 different time periods if you felt like the
4 defendants had lived up to their promises. Do you
5 remember me asking those questions?
6 A. Yes.
7 Q. As you sit here today, do you feel like
8 they've lived up to the promises they made you
9 when you bought that policy?
10 A. Not at this point, no.
11 Q. Okay. Are you aware that this is, in
12 fact, filed as a class action?
13 A. Yes, sir, I am.
14 Q. Okay. Do you understand that you sit here
15 today for potentially thousands of other people?
16 A. Yes, sir, I understand that.
17 Q. Are you willing to do that?
18 A. Yes, sir.
19 Q. Why?
20 A. I think it's unfair. When I bought the
21 policy, my understanding was they would pay me 100
22 percent. That's the way it was explained to me.
23 And over the years, I've always thought that when
24 you make an explanation, you make an agreement, and
25 it's your word, and you should stand by it.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## Page 69

1       MR. SINCLAIR: Mr. Gooch, at this
2 point, I can't think of any other questions. I'm
3 going to turn it over to the insurance company's
4 counsel and allow them to ask you some questions
5 subject to my right to redirect if I can come up
6 with some more questions. Okay?
7       THE WITNESS: Okay. Understand.
8       MR. SINCLAIR: Thank you for your
9 time.
10       MR. LEVENTHAL: Mr. Gooch, we are
11 going to take a break before we start. Let's take
12 ten minutes.
13       THE VIDEOGRAPHER: We're going off
14 the record. The time is 10:22 a.m.
15       (Brief recess observed.)
16       THE VIDEOGRAPHER: We're back on the
17 record. The time is 10:40 a.m.
18       E X A M I N A T I O N
19 BY MR. LEVENTHAL:
20 Q.     Mr. Gooch, my name is Markham Leventhal.
21 I represent the defendants in this case.
22      I'm going to introduce a document, and we
23 could label this Exhibit 4. Exhibit 4. It's a
24 copy of an affidavit that was filed in this case.
25       (Marked Exhibit No. 4.)

## Page 70

1 BY MR. LEVENTHAL:
2 Q.     Can you take a look at that and tell me if
3 that's your affidavit?
4       MR. SINCLAIR: Mr. Gooch, you're
5 looking beyond the affidavit. If you want to just
6 identify what he's labeled on top there as the
7 affidavit, that would be fine.
8       THE WITNESS: Yes, it -- it appears
9 to be an affidavit, yes, sir, that I -- I signed.
10 BY MR. LEVENTHAL:
11 Q.     Do you see in the footer of this document
12 it refers to the page numbers for the -- instance,
13 the cover page says Page 2 of 38. Do you see that
14 in the lower right-hand corner of the document on
15 the first page?
16 A.    Yes, sir, I do.
17 Q.     I'm going to refer to those page numbers
18 from time to time. Can you turn to Page 6 of 38,
19 and tell me if that's your signature?
20 A.    Yes, sir.
21 Q.     And what date did you sign this affidavit?
22 A.    It would have been the -- it appears to be
23 the 22nd of May, 2007.
24 Q.     And you had that notarized?
25 A.    Yes, it was.

## Page 71

1 Q.     And where were you when you signed that
2 affidavit?
3 A.    I believe this was signed at the bank
4 where I -- at -- where I bank at. I use their
5 notary frequently.
6 Q.     And where is that bank?
7 A.    The bank is the Compass Bank in Athens,
8 Alabama, on Green Street.
9 Q.     Compass Bank, Athens, Alabama?
10 A.    Yes, sir.
11 Q.     Is that your personal bank?
12 A.    Yes, sir, it is.
13 Q.     Do you have any accounts at other banks?
14 A.    I do have one other account at a credit
15 union.
16 Q.     And what credit union is that?
17 A.    It's Family Security.
18 Q.     Where is that located?
19 A.    That's also in Athens on Highway 31.
20 Q.     Family Security Credit Union; is that
21 right?
22 A.    Yes, sir.
23 Q.     Earlier in your deposition, we referred to
24 another affidavit, which had been introduced as
25 Exhibit 3. Do you see this Exhibit 3?

## Page 72

1 A.    Yes, sir.
2 Q.     And that's also your affidavit, correct?
3 A.    Yes, sir, it is.
4 Q.     When was that affidavit executed?
5 A.    22 May of this year.
6 Q.     Was it executed at the same place?
7 A.    Yes, I believe it was.
8 Q.     At a bank in -- at Compass Bank in Athens,
9 Alabama?
10 A.    Yes, sir, I believe it was.
11 Q.     Why did you execute two different copies
12 of an affidavit on the same day?
13       MR. SINCLAIR: Objection. To the
14 extent that your only response would be from
15 instructions we have given you, I instruct you not
16 to respond to that question. Otherwise, you can
17 respond to the gentleman's question.
18 BY MR. LEVENTHAL:
19 Q.     Any idea?
20 A.    No, sir.
21 Q.     Did you read these affidavits before you
22 signed them?
23 A.    Yes.
24 Q.     Did you make any changes before you signed
25 them?

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

Case 1:07-cv-00016    Document 69-2    Filed 07/12/07    Page 20 of 28 PageID #: 1288

Page 73

1  A.     I do not believe I did, no.
2  Q.     Did you compare the documents? Can you
3  tell me sitting here today whether these two
4  affidavits are identical other than the pagination
5  and format?
6  A.     They appear to be.
7  Q.     Do you know for a fact?
8  A.     Other than -- what I can see here, they
9  appear to be the same.
10 Q.     Do you recall executing two affidavits on
11 May 22 of this year?
12 A.     I honestly don't recall.
13 Q.     You don't recall that?
14 A.     No.
15 Q.     Do you recall Lisa Williams notarizing
16 them?
17 A.     Yes.
18 Q.     And who is Lisa Williams?
19 A.     She's an employee of Compass Bank. I --
20 I'm assuming it's Lisa. I know her as Lisa.
21 Q.     So you don't have any recollection of
22 executing these on the 22nd?
23 A.     My wife and I had gone up there, and we
24 may have executed two. I'm guessing. I was going
25 through chemo at that time. As a matter of fact,

Page 74

1  my wife has driven me to the bank and drove me
2  straight back home.
3  Q.     All right. Well, let's refer to what I've
4  introduced as Exhibit 4, that affidavit. And can
5  you take a look at -- take a look at Paragraph 16,
6  please, on Page 5 of 38. Do you see the
7  references in Paragraph 16 to how the policy has
8  created a financial burden?
9  A.     Yes, sir.
10 Q.     And that's your testimony; is that
11 accurate, the statements in Paragraph 16 regarding
12 financial burden?
13 A.     Yes, it is.
14 Q.     Did you testify earlier that your only
15 sources of income were Social Security disability
16 and benefits under the policy at issue here?
17 A.     That's correct.
18 Q.     Is your -- is your wife currently working?
19 A.     Yes, she is.
20 Q.     And what does she do?
21 A.     She is a chemical operator.
22 Q.     For what company?
23 A.     BP Chemicals.
24 Q.     BP Chemicals?
25 A.     Yes, sir.

Page 75

1  Q.     BP Chemicals. Now, where is that?
2  A.     That's in Decatur, Alabama.
3  Q.     Where?
4  A.     Decatur, Alabama.
5  Q.     And how long has she worked there?
6  A.     I want to say she's worked there about
7  nine years.
8  Q.     Nine years? And she has an income from
9  that job, correct?
10 A.     Yes, she does.
11         MR. SINCLAIR: Objection as to
12 relevancy.
13 BY MR. LEVENTHAL:
14 Q.     And does she have --
15         MR. LEVENTHAL: Objection to
16 relevancy? Paragraph 16 says that the defendant's
17 decision has substantially decreased my income and
18 as a result has financially burdened me and my
19 wife.
20         MR. SINCLAIR: Right.
21         MR. LEVENTHAL: What's the objection?
22         MR. SINCLAIR: It --
23         MR. LEVENTHAL: I'm asking about his
24 wife's income.
25         MR. SINCLAIR: Right. And he's

Page 76

1  talking about his income, my income. My previous
2  question to him was, has it decreased your
3  personal income.
4          MR. LEVENTHAL: Okay. Right.
5  BY MR. LEVENTHAL:
6  Q.     Okay. I understand that.
7         You testified earlier your income was
8  Social Security and benefits under the policy,
9  right?
10 A.     That's correct.
11 Q.     And -- and you didn't testify to your
12 wife's income before, correct?
13 A.     That is correct.
14 Q.     All right. I'll ask you about that now.
15 So your wife was employed at, what did you say,
16 BP Chemicals?
17 A.     Yes.
18 Q.     And she has income from that?
19 A.     Yes.
20         MR. SINCLAIR: Objection as to
21 relevancy.
22 BY MR. LEVENTHAL:
23 Q.     And how much does she make a year?
24         MR. SINCLAIR: Objection as to
25 relevancy.

19 (Pages 73 to 76)

1 BY MR. LEVENTHAL:
2 **Q. You can go ahead and answer.**
3 A. I am not positive. My wife's paycheck is
4 deposited automatically. I very rarely see her
5 check. I never stick my nose into her bank
6 account. We both have separate bank accounts.
7 **Q. How long have you been married?**
8 A. It will be 30 years June 25.
9 **Q. 30 years? And you're telling me you have**
10 **no idea how much money your wife makes?**
11 A. No, sir, not for sure.
12 **Q. No idea?**
13 A. And if I -- if I gave you a number, I
14 couldn't swear to it as -- as truthful because I
15 honestly don't know.
16 **Q. And -- and she keeps a separate bank**
17 **account?**
18 A. Yes, we have always done that since day
19 one.
20 **Q. And you're telling me that you have no**
21 **idea how much money your in -- your wife makes?**
22 MR. SINCLAIR: Objection, asked and
23 answered and argumentative. I believe he's
24 already answered that twice or three times.
25 MR. LEVENTHAL: Well, I think he's

1 answered it maybe vaguely once.
2 BY MR. LEVENTHAL:
3 **Q. But I want to make sure for the record and**
4 **for the jury, if they see this, that you're**
5 **testifying you have no idea how much money your**
6 **wife makes?**
7 A. That's correct.
8 **Q. Okay. What other sources of income does**
9 **your wife have besides the job at --**
10 A. That's it.
11 **Q. That's it?**
12 A. Yes, sir.
13 **Q. Do you understand that -- that your**
14 **lawyers have asked the court for a preliminary**
15 **injunction in this case based in part upon your**
16 **financial wherewithal?**
17 MR. SINCLAIR: Objection. I'm going
18 to -- to the extent that you're only aware of this
19 from conversations you've had with me or other
20 attorneys in this matter, you're not to relay
21 those conversations in response to this question.
22 If you have information from that,
23 please respond to the best of your ability to this
24 gentleman's question.
25 THE WITNESS: I have no other

1 information other than what my attorneys and I
2 have discussed in reference to that.
3 BY MR. LEVENTHAL:
4 **Q. So you have no idea that -- that your**
5 **lawyers have asked the court to expedite the case,**
6 **so to speak, and to issue a preliminary**
7 **injunction?**
8 MR. SINCLAIR: Objection. To the
9 extent that the only information you have is
10 coming from your attorneys, you're not to relay
11 those conversations with us.
12 THE WITNESS: That's correct.
13 MR. LEVENTHAL: I'll -- I'll rephrase
14 the question.
15 BY MR. LEVENTHAL:
16 **Q. Are you aware that you have filed a motion**
17 **for a preliminary injunction in this case?**
18 A. Yes.
19 **Q. And are you aware that this affidavit was**
20 **filed in support of that?**
21 A. Yes.
22 **Q. And why are you asking for an injunction**
23 **in this case?**
24 MR. SINCLAIR: Okay. To the extent
25 that the only way you know that is something I've

1 told you or other attorneys have told you, I'm
2 going to instruct you not to answer. If you have
3 some reason outside of that that you're aware of
4 that you've asked for this immediate relief, you
5 can answer that gentleman's question.
6 THE WITNESS: Okay.
7 BY MR. LEVENTHAL:
8 **Q. Do you have any understanding, other than**
9 **what came from your lawyers, as to why you filed a**
10 **motion for a preliminary injunction in the case?**
11 A. No.
12 **Q. Have any doctors told you that you are**
13 **terminally ill as you sit here today?**
14 A. Yes.
15 **Q. And what doctors would that be?**
16 A. Dr. Stein.
17 **Q. When did he tell you that?**
18 A. He had informed my doctor, my oncologist,
19 and I want to say it was the summer of 2001, and
20 he did not tell me that until after I had had my
21 transplant.
22 **Q. Are you saying that Dr. Stein told you in**
23 **the summer of 2001 that you were terminally ill?**
24 A. No, sir, he told my doctor, my oncologist,
25 Dr. Mahn Dang.

Page 81

1  Q.  Well, let me rephrase the question.
2  Have -- have any doctors told you that you are
3  terminally ill?
4  A.  Dr. Stein did in the spring of 2002 after
5  I had completed my treatments.
6  Q.  In the spring of 2002? How about within
7  the last year?
8  A.  Not directly, no.
9  Q.  Not directly? Did any doctors tell you
10 within the last year you were terminally ill
11 indirectly?
12 A.  Insinuating that I was extremely ill and
13 that my treatment would -- my life would depend
14 upon my treatments.
15 Q.  Do you know what terminally ill means?
16 A.  Oh, yes.
17 Q.  It means you are dying, correct?
18 A.  That's correct.
19 Q.  And your death is imminent?
20 A.  That's correct.
21 Q.  Have any doctors told you within the last
22 year that your death is imminent?
23 A.  Not directly, no.
24 Q.  Have any doctors told you that indirectly?
25 A.  Yes.

Page 82

1  Q.  Who?
2  A.  Dr. Mahn Dang?
3  Q.  Dr. Mahn Dang? When did he tell you that?
4  A.  I can't recall the exact date. It was
5  prior to the beginning of this treatment that I'm
6  going through now, which is a series of treatments
7  that I have to take.
8  Q.  So when would that have been?
9  A.  That would have been the very early
10 beginning of 2007, late 2006 at some point.
11 Q.  Are you saying that Dr. Mahn Dang -- is
12 that how you pronounce it?
13 A.  That's correct.
14 Q.  -- told you that you were likely to die?
15 A.  That the likelihood -- the percentage was
16 very high.
17 Q.  What time frame?
18 A.  Again, as I just stated, late 2006, early
19 2007.
20 Q.  And where did he tell you that?
21 A.  It would have been in his office.
22 Q.  In his office? And where is his office?
23 A.  It's in Huntsville, Alabama.
24       MR. LEVENTHAL: I'm going to
25 introduce a document and mark it as Exhibit 5.

Page 83

1       (Marked Exhibit No. 5.)
2  BY MR. LEVENTHAL:
3  Q.  This is a document with some information
4  from the Alabama Secretary of State referring to a
5  company called Precision Defense Systems, Inc.
6  A.  Yes, sir.
7  Q.  Have you ever heard of that company?
8  A.  Yes, sir.
9  Q.  I haven't heard you mention that earlier
10 in your deposition. What is that company?
11 A.  I am a -- I have a license from the
12 Alcohol, Tobacco, Firearms and -- bureau explosive
13 division to manufacture weapons and firearms, and
14 this is a hobby of mine. You cannot do it legally
15 in the United States without a license from the
16 federal government.
17 Q.  So you have a license from who did you
18 say?
19 A.  It's the Alcohol, Tobacco, Firearms, and
20 Explosives division of bureau.
21 Q.  That's a federal agency, right?
22 A.  Yes, sir, it is.
23 Q.  Any licenses from the state of Alabama?
24 A.  At this point in time, we have not gotten
25 a license because I have suspended the operations

Page 84

1  due to my health.
2  Q.  And when did you suspend these operations?
3  A.  Approximately two years ago.
4  Q.  Okay. So you formed this company in
5  December of 2000, correct?
6  A.  Yes, sir.
7  Q.  And it says here that the incorporators
8  were Anthony Gooch and Denise Gooch; is that
9  correct?
10 A.  That's correct.
11 Q.  And who's Denise Gooch?
12 A.  That's my wife.
13 Q.  And why did you -- why did you decide to
14 form this company in December of 2000?
15 A.  So that I could experiment and play with
16 firearms which has been a hobby of mine the
17 majority of my life. I did not want to get in
18 trouble with the federal government, and to do
19 this, getting a license was the foremost thing you
20 have to do to avoid any problems or headaches with
21 the U.S. government.
22 Q.  And what did you say the license allows
23 you to do? To manufacture and do what else?
24 A.  It allows me to manufacture and sell
25 firearms if I choose to do so.

## Page 85

1  Q.    And did you sell any firearms since you
2  formed this company in December of 2000?
3  A.    Three or four maybe.
4  Q.    What kind of firearms did you sell?
5  A.    Rifles.
6  Q.    Were these machine guns?
7  A.    No, sir, not at that point.
8  Q.    You never sold a machine gun?
9  A.    I'm in the processes of running the
10 business -- starting the business back up, and I
11 will be selling machine guns, yes, sir.
12 Q.    And when will you be selling machine guns?
13 A.    As soon as I can get some inventory in.
14 Q.    Okay. Well, are you -- are you testifying
15 here under oath that you've never sold a machine
16 gun in your past?
17 A.    Let me think a second and make sure that
18 I'm answering -- I have sold one.
19 Q.    You've sold one machine gun. And who did
20 you sell that to?
21 A.    I would have to look at my records.
22 Q.    When did you sell that machine gun?
23 A.    Approximately four years ago, five years
24 ago maybe.
25 Q.    So your testimony under oath is you only

## Page 86

1  sold one machine gun in your life four or five
2  years ago; is that correct?
3  A.    To the best of my recollection, yes, sir.
4  Q.    But you're about to start this business
5  back up?
6  A.    Well, my son is operate -- is going to be
7  operating the business. I'm turning it over to
8  him.
9  Q.    What's your role in the business?
10 A.    Basically just guiding my son along,
11 showing him the ropes. I can no longer operate
12 the machinery.
13 Q.    Now, are you going to be using this same
14 company, Precision Defense Systems, Inc., or are
15 you going to form another company?
16 A.    I'm not going to be doing anything with
17 it; my son is going to be controlling it.
18 Q.    All right. My question was, is it going
19 to be this same company?
20 A.    It will be under the same name, yes, sir.
21 Q.    Who owns the stock to that company?
22 A.    My wife, my son, and I.
23 Q.    And how much stock do you own?
24 A.    I own 50 -- I think it's 50 percent. I
25 would have to look at the -- the records to be

## Page 87

1  sure.
2  Q.    What about your wife and son?
3  A.    My son owns -- I believe he has two or
4  three percent of it, and my wife has the balance.
5  My son is also an officer in the corporation.
6  Q.    What are the current -- who are the
7  current officers of Precision Defense
8  Systems, Inc.?
9  A.    Myself; my wife, Denise; and my son, Mike.
10 Q.    And what position do you hold?
11 A.    President of the corporation.
12 Q.    And what about your wife and son?
13 A.    She's -- my wife is vice president; my son
14 is secretary/treasurer.
15 Q.    Now, where are you going to get this
16 inventory from?
17 A.    Right now, the inventory is -- my son is
18 working with that to build the inventory up. As I
19 told him, he can't do anything unless he has the
20 inventory built up, and he is in the process of
21 manufacturing and building right now.
22 Q.    So is the inventory going to be purchased,
23 or is the inventory going to be manufactured?
24 A.    It will be manufactured. Some of the
25 items will be purchased because we cannot sell

## Page 88

1  automatic weapons that we manufacture to private
2  individuals. They have to go to military and law
3  enforcement only.
4  Q.    How long has this company owned the
5  machinery that it's going to use to manufacture
6  these firearms?
7  A.    Approximately three to four years, I
8  guess.
9  Q.    Do you have an accountant for this
10 company?
11 A.    My wife and I have been handling it
12 because we haven't been doing any business, so,
13 therefore, there's been nothing really
14 transpiring.
15 Q.    Well, you did purchase the equipment at
16 some point, didn't you?
17 A.    Yes, sir.
18 Q.    And when did you do that?
19 A.    Over a period of about a year and a half,
20 two years, and moved the equipment in about four
21 years ago.
22 Q.    So you purchased the equipment when?
23 A.    Some of it I purchased before I had my
24 license.
25 Q.    And what have you manufactured with the

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## Page 89

1 equipment since the purchase three or four years
2 ago?
3 A.    Very little. Manufactured a few
4 suppressors which are -- my son is working with
5 selling now.
6 Q.    So I want to know exactly what you
7 manufactured in the last three to four years. You
8 said one -- you said some suppressors?
9 A.    Yes, sir.
10 Q.    And what is a suppressor?
11 A.    The most common term is silencer, which is
12 incorrect because the -- the device does not
13 silence the weapon; it just reduces the signature
14 of the sound.
15 Q.    How many silencers or suppressors have you
16 manufactured?
17 A.    I want to say we probably have eight --
18 six or eight in stock at this point.
19 Q.    Six to eight models or six to eight total?
20 A.    Six to eight total.
21 Q.    And what kind of weapons do these
22 suppressors -- what kind of weapons are they
23 compatible with?  What are they made for?
24 A.    The ones we have right now are for .22
25 rifles, .22 long rifle.

## Page 90

1 Q.    When did you first start manufacturing
2 these?
3 A.    The first ones I made were about two or
4 three years ago. That's when I had gotten pretty
5 ill. We kept them in the safe and have not really
6 sold any until recently when my son began taking
7 over. He's starting to work to begin selling
8 those now.
9 Q.    Who are your customers?
10 A.    Various individuals.
11 Q.    And who are they?
12 A.    Those -- that is tax information that I am
13 not at liberty to discuss nor disclose under
14 federal law.
15 Q.    That is what did you say?  Tax --
16 A.    It's tax information.
17        MR. SINCLAIR: Wait a minute.
18        MR. LEVENTHAL: Tax information.
19        MR. SINCLAIR: Hang on a second. Was
20 the question who particularly are his customers?
21 You want the names of his customers?
22        MR. LEVENTHAL: Correct.
23        MR. SINCLAIR: Okay. We are going to
24 object to the relevancy. And I don't know ATF
25 regulations. How is that relevant to income? I

## Page 91

1 mean, I've been -- I understand the question is
2 leading up to, have you made any money off of the
3 sales of -- in this company. But how is that
4 relevant to his income?
5        MR. LEVENTHAL: I think that his
6 customers is relevant to determine the -- and also
7 to check out the -- the extent of his income and
8 the extent of his business.
9        MR. SINCLAIR: Well, wouldn't that
10 be -- we haven't asked him how much his income
11 is -- or how much the business generated. How
12 would that not be disclosed in a tax return or
13 just as easily in something that wouldn't require
14 disclosure of customers.
15        And I don't know the regulations
16 regarding the sale of firearms. But if there's a
17 regulation out there that says you can't disclose
18 this information that you put on file with the
19 ATF, I don't see any reason for us to even come
20 close to running a foul-up.  We can get
21 information from income if that's your concern
22 from tax returns.
23        Has -- have the -- this business,
24 Precision Defense Systems, Inc., has it filed tax
25 returns?

## Page 92

1        THE WITNESS: No, we've made no
2 money.
3        MR. SINCLAIR: Okay. When's the last
4 time you've filed a tax return for this thing?
5        THE WITNESS: We have never made any
6 money, so --
7        MR. SINCLAIR: Okay.
8        THE WITNESS: We have not actually
9 been in business, and my accountant -- the
10 accountant that we were using for our family has
11 informed me that if your business isn't open and
12 you're not making sales --
13        MR. SINCLAIR: Have you ever taken a
14 paycheck home from Precision Defense
15 Systems, Inc.?
16        THE WITNESS: No, not a dime. Have you ever
17        MR. SINCLAIR: Okay. Have you ever
18 been paid in your role at Precision Defense
19 Systems, Inc. --
20        THE WITNESS: No.
21        MR. SINCLAIR: -- any sum of money?
22        MR. LEVENTHAL: You can -- you can,
23 you know, redirect.
24 BY MR. LEVENTHAL:
25 Q.    Do you know the names of your customers of

1 this company?
2         MR. SINCLAIR: Objection. I'm --
3 BY MR. LEVENTHAL:
4     Q.    Yes or no, do you know the names of the
5 customers?
6         MR. SINCLAIR: You can take a pause.
7 I get to speak. I'm going to object as to
8 relevancy.
9         And you know, if there's a federal
10 regulation out there that governs your disclosure,
11 I don't know it, but I'm going to instruct you to
12 follow the federal regulations. I don't see how
13 that's any way relevant. You can respond to the
14 best of your ability to the gentleman's question.
15         THE WITNESS: Again, there is a
16 federal regulation from the Alcohol, Tobacco,
17 Firearms, and Explosive division. Even the local
18 police cannot come in and get those names.
19 BY MR. LEVENTHAL:
20     Q.    My question is, do you know sitting here
21 today, yes or no, who the customers are of your
22 company?
23     A.    Today? No.
24     Q.    You don't know the names of any of your
25 customers?

1     A.    No.
2     Q.    You're the president of the company?
3     A.    That's correct.
4     Q.    And who is your accountant?
5     A.    At this point in time, we have no
6 accountant for the business because it's -- this
7 will be the first year that it's actually
8 functioned as a business.
9     Q.    Who is your personal accountant?
10     A.    H&R Block.
11     Q.    You just testified a few moments ago that
12 your accountant told you you didn't need to file
13 any tax returns for this company; is that correct?
14     A.    That's correct.
15     Q.    And what accountant told you that?
16     A.    The lady from H&R Block.
17     Q.    The lady from H&R Block? And H&R Block
18 where?
19     A.    It's in Athens, Alabama.
20     Q.    And what is her name?
21     A.    I couldn't begin to tell you. I honestly
22 don't know.
23     Q.    Did this lady help you with your personal
24 tax returns?
25     A.    Yes. My wife deals with her, and I'm not

1 even sure of her name.
2     Q.    Did you speak with her?
3     A.    I have spoken to her once or twice when I
4 go to pick up the returns. Generally I have to go
5 and sign them, and I pick them up, and my wife
6 generally pays the lady, the company, whatever. I
7 pick up the returns and sign them and hand them
8 over to the lady there. They file an electronic
9 filing.
10     Q.    Did this woman tell you directly that this
11 company didn't need to file tax returns?
12     A.    I asked her what I needed to do. I said,
13 we're not actually in business. I said, we have a
14 company name. I have a license. We're not in
15 business. We're not making any money. We're not
16 selling anything at this point.
17         She said, well, technically your business
18 is not in operation.
19         I said, well, we've suspended that because
20 of my illness, my inability to operate the
21 equipment and machinery.
22     Q.    And now you have some inventory, correct?
23     A.    We do now, that's correct.
24     Q.    And you are about to sell some of that
25 inventory?

1     A.    Yes.
2     Q.    And your plans are to -- what are your
3 plans for the business?
4     A.    Hoping that it will be successful and my
5 son can take it completely over and move forward
6 with it.
7     Q.    Okay. By the way, why didn't you mention
8 this business when your counsel was asking you
9 about your various sources of income and hobbies?
10     A.    Well, it's not an income producing --
11         MR. SINCLAIR: Objection. I don't
12 believe that's a correct characterization of my
13 question. I don't believe I asked him about
14 hobbies.
15         But you can go ahead and answer the
16 gentleman's question to the best of your ability.
17         THE WITNESS: Again, it's just a
18 hobby. It's -- to do it legally and without
19 repercussions and problems with the Alcohol,
20 Tobacco, and Firearms division, I have to have
21 licenses. And to have a license, you have to have
22 a corporate name or a company name, and I didn't
23 want to bump heads with the federal government.
24 BY MR. LEVENTHAL:
25     Q.    Okay. So your testimony is it's just a

1 hobby?
2 A.    Yes, sir, at this point, it has been a
3 hobby. I'm hoping that my son can now take it
4 over and make a living at it. I'm going to allow
5 him to have it, and -- I can't do it anymore; I
6 can't even as a hobby.
7 Q.    Right. What about -- you mentioned drag
8 racing earlier in your deposition?
9 A.    Yes, sir.
10 Q.    What was that? Was that a career or a
11 hobby?
12 A.    It was a hobby back in the '60s. I did it
13 beginning in about '65, '66, somewhere in that
14 neighborhood, and did it for about 13 years. And
15 I was getting divorced. My partner and I both
16 were getting divorced at the same time. We sold
17 all of the equipment with the exception of one
18 vehicle, and I never raced again.
19 Q.    What does M Gun Tony mean?
20 A.    That's my name on the Internet. It's
21 Machine Gun Tony.
22 Q.    Machine Gun Tony, is that a nickname
23 you've had?
24 A.    Yes, sir.
25 Q.    And how long have you had that nickname?

1 A.    Oh, gosh, since -- back in, I guess,
2 '90, '91, '92. I have had an interest in weaponry
3 all my life, especially automatic weaponry.
4 Q.    Now, did you get that nickname in
5 connection with this company we were discussing,
6 Precision Defense Systems?
7 A.    No, sir.
8 Q.    How did you get that nickname?
9 A.    The nickname was given to me by a member
10 of the Alabama state troopers.
11 Q.    Who was that?
12 A.    His name is Jay -- I can't remember his
13 last name. His first name is Jay.
14 Q.    Where is he based?
15 A.    He's in the north Alabama area.
16 Q.    Is he in Athens?
17 A.    He lives in the Athens area, yes, sir, he
18 and his wife do.
19 Q.    Now M Gun Tony is also your Internet
20 e-mail address?
21 A.    Yes, it is.
22 Q.    What is that e-mail address?
23 A.    It's Mguntony@yahoo.com.
24 Q.    And how long have you had that?
25 A.    Again, I think I have had that account

1 since back in the early/mid '90s.
2 Q.    Since the early to mid '90s? I thought
3 you just testified that the state trooper gave you
4 this nickname is 2000 or 2001?
5 A.    No, sir.
6 Q.    When did you say you first got the
7 Machine Gun Tony nickname?
8 A.    I can't remember the exact date or the
9 exact year. Jay and I had known each other for a
10 number of years, and he stopped me on the
11 inter- -- on the highway one afternoon, and we
12 were all laughing. And he said, if it's not
13 Machine Gun Tony. He stopped me to chitchat.
14 Q.    And when was that? What year
15 approximately?
16 A.    I honestly don't recall.
17 Q.    Was this in the '90s or --
18 A.    It was in the '90s, yes.
19 Q.    And it was after that that you adopted the
20 Internet --
21 A.    That's correct.
22 Q.    -- mguntony.com -- or at Yahoo.com, right?
23 A.    Many folks referred to me as Machine Gun
24 Tony prior to that, and that's -- I just went
25 ahead and went with the M Gun Tony because that's

1 what everybody across the country and around the
2 world knew me as.
3 Q.    Now, have you had any other businesses
4 relating to firearms?
5 A.    I at one time had a federal firearms
6 license. Again, it was a hobby. And to buy and
7 sell guns, trade, I have had to have a federal
8 license, and that was back in the '80s.
9 Q.    Since 1999, have you earned any income
10 from the sale of handguns or firearms?
11 A.    No.
12 Q.    What was the name of the car dealership
13 that you said you worked at in -- was it Pulaski,
14 Tennessee?
15 A.    Yes. It was Elliott Popham. He has
16 subsequently gone bankrupt.
17 Q.    When did he go bankrupt?
18 A.    About one or two years ago.
19 Q.    Who was your supervisor there?
20 A.    Oh, we had so many. During the time frame
21 that I was there, there were four or five
22 different service managers.
23 Q.    Let me ask you about this policy. Did an
24 agent come on to the business premises to sell the
25 policy?

## Page 101

1 A.    Yes, he came to my place of employment and
2 spoke to me.
3 Q.    And who -- who authorized that?
4 A.    To my knowledge, no one did. He didn't
5 have to have it. He came in and talked to me. We
6 had talked before because I had met him before.
7 And he said he had this policy, and I said I would
8 like to look at it.
9       And he came in at some point, and I took a
10 break, and we talked about it.
11 Q.   So you're saying that none of the
12 supervisors had to authorize him to come onto the
13 premises?
14 A.    No.
15 Q.   And did he talk to any of the other
16 employees, or was it just to you?
17 A.    I'm sure he talked to some of the others
18 as well. There were six or eight of us employees
19 there.
20 Q.   And who else bought one of these cancer
21 policies?
22 A.    That, I do not. I couldn't begin to
23 remember to tell you.
24 Q.   Do you remember talking about the policy
25 with any of the other employees there?

## Page 102

1 A.    Yes.
2 Q.    Who?
3 A.    The -- the other fellows that were there,
4 there was a young man that was -- that worked next
5 to me, we discussed it. And he felt that being a
6 young guy he didn't need that.
7       And I'm trying to remember his name. I
8 want to say his name was Chris. Several of the
9 others that were there -- and, again, like I said,
10 there were only five, maybe six employees that
11 were actually in the technician end of the service
12 department.
13 Q.   And what was the name of the agent you
14 talked to?
15 A.    Jerry -- and I honestly don't remember his
16 last name.
17 Q.   Now, let's take a look at this Exhibit 4,
18 Page 36 of 38.
19 A.    Okay.
20 Q.   Is your signature at the bottom
21 portion of that page?
22 A.    Signature of owner/applicant? Yes, sir,
23 it is.
24 Q.   Okay. Now, do you see below that it says,
25 "Signature of licensed representative"?

## Page 103

1 A.    Yes.
2 Q.    And there seem to be two different people
3 listed there.
4 A.    Uh-huh.
5 Q.    The second one seems to be a Gene. Do you
6 recall a Gene?
7 A.    No, I don't recall ever meeting Gene.
8 Q.    And you believe the person you spoke to
9 was Jerry?
10 A.    That is correct.
11 Q.   Any idea why it says 50 percent to the
12 first and 50 percent to a second representative?
13 A.    No idea whatsoever.
14 Q.   When's the last time you spoke to Jerry?
15 A.    It's been a few years ago. I would say
16 probably 2000.
17 Q.   And what did you talk about in 2000?
18 A.    We were discussing the -- my claims and
19 the policy and so forth. He had come to work --
20 at that point, he was working for Mr. Popham as a
21 sales rep as well.
22 Q.   Was he selling cars?
23 A.    Yes, he was.
24 Q.   So that was approximately seven years ago?
25 A.    Yes, sir.

## Page 104

1 Q.    And how did that conversation come about?
2 A.    If I recall correctly, I had gone up there
3 to visit after I had started my chemo, and he was
4 there. And I told him that -- he asked how things
5 were going, and I told him that things were going
6 fine, and the policy was paying. It had been an
7 excellent investment.
8 Q.    Where is Jerry today?
9 A.    I have no idea. I know when the
10 dealership went bankrupt, everybody went different
11 directions.
12 Q.    What else can you tell me about that
13 conversation with Jerry in the year 2000?
14 A.    I think that was about it. It was just
15 a -- a short and brief conversation.
16 Q.    Let's go back to the year 1997 when you
17 purchased this policy. First of all, tell me,
18 when was the first time that you had any
19 discussion with an agent or sales representative
20 of Life Investors about this cancer insurance
21 policy?
22 A.    It was approximately this time listed
23 here, November -- I would say October/November
24 of '97.
25 Q.    And that conversation was -- was with who?

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660