# EXHIBIT

# "14"
# (1 of 2)

EXHIBIT "14"

# EXHIBIT

# "14"

EXHIBIT "14"

2803

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION

ANTHONY E. GOOCH

Plaintiff

VS.     Civil Action No.: 1:07-0016

LIFE INVESTORS INSURANCE
COMPANY OF AMERICA, et al.

Defendants

\* \* \* \* \* \*

ORAL DEPOSITION OF CONNIE WHITLOCK
[Taken July 14, 2007]

\* \* \* \* \* \*

APPEARANCES:

MESSRS. THOMAS O. SINCLAIR & M. CLAY WILLIAMS,
Esq., Campbell, Gidiere, Lee, Sinclair &
Williams, LLC, 2100-A SouthBridge Parkway,
Suite 450, Birmingham, Alabama 35209
\*\*\* For the Plaintiff \*\*\*

MR. MARKHAM R. LEVENTHAL, Esq., Jorden Burt, Suite
500, 777 Brickell Avenue, Miami, Florida

\*\*\* For the Defendants \*\*\*

MESSRS. MARK EDWARDS & CLAY SIMPSON, Esq.,
Transamerica Worksite Marketing, P.O. Box 8063,
Little Rock, Arkansas 72203-8063
\*\*\* For Transamerica \*\*\*

\* \* \* \* \* \*

I N D E X

| TOPIC | PAGE |
|---|---|
| STIPULATIONS | 3 |
| WITNESS SWORN: CONNIE WHITLOCK | 3 |
| Examination by Mr. Sinclair | 4 |
| Examination by Mr. Leventhal | 136 |

E X H I B I T S*

| Exhibit 1 | 6 |
|---|---|
| Exhibit 2 | 69 |
| Exhibit 3 | 81 |
| Exhibit 4 | 94 |
| Exhibit 5 | 96 |
| Exhibit 6 | 110 |
| Exhibit 7 | 109 |
| Exhibit 8 | 110 |
| Exhibit 9 | 120 |

[*Attached to transcript.]

| REPORTER'S CERTIFICATE | 139 |
|---|---|
| WITNESS' SIGNATURE | 140 |

THE ORAL DEPOSITION OF CONNIE WHITLOCK, a

witness produced pursuant to the Federal Rules of Civil

Procedure in the above-styled and numbered cause on the

14th day of July, 2007, before Jeff Bennett, CCR, LS

#19, a Notary Public in and for White County, Arkansas, at

the Hilton Little Rock Metro Center, 925 South University,

Little Rock, Arkansas beginning at 8:30 a.m..

* * * * * * * * * *

CONNIE WHITLOCK

the witness, being first duly cautioned and sworn or

affirmed to tell the truth, testified as follows:

* * * * * * *

1              EXAMINATION
2 BY MR. SINCLAIR:
3 Q. My name is Tom Sinclair.  I'm representing Mr.
4 Anthony Gooch.
5         MR. SINCLAIR:  I'd ask that everybody
6 introduce themselves.
7         MR. WILLIAMS:  Clay Williams.  I'm also
8 representing Anthony Gooch.
9         MR. LEVENTHAL:  Markham Leventhal,
10 attorney for the defendants.
11         MR. EDWARDS:  Mark Edwards, inhouse
12 attorney for Life Investors.
13         MR. SIMPSON:  Clay Simpson, inhouse for
14 Life Investors.
15 Q. (BY MR. SINCLAIR)  How are you this morning, Ms.
16 Whitlock?
17 A. Good.
18 Q. I'm sorry to bring you out on a Saturday, but it was
19 the only day we could all agree to, so here we are.  We'll
20 try to get through this as quickly as possible.
21    Have you ever had your deposition taken before?
22 A. Yes.
23 Q. And how many times have you had your deposition
24 taken?
25 A. Two times.

1 Q. When were those depositions taken?  I'm not here to
2 ask about your personal life.  So if it's in a personal
3 matter, you can say one personal matter or two personal
4 matters.  You don't need to tell me the substance of
5 those.  Okay.  The prior two depositions, were they
6 related to your employer?
7 A. Yes.
8 Q. What depositions were those?
9 A. One of those was in regard to a claim probably 18
10 years ago.
11 Q. And the other?
12 A. The other one was in regards to some agent activities
13 about 10 years ago probably.
14 Q. Okay.  So the last time you had your deposition taken
15 was 10 years ago?
16 A. It's probably -- I'm not going to remember exactly.
17 I think it was 10 years, somewhere around there.
18 Q. So in that case, I'll go over the basics.  If you
19 need a break for any reason, you tell me.  Okay.  If I ask
20 a bad question, in other words, a question you don't
21 understand what it is I'm looking for, or what the answer
22 I'm looking for is, you simply tell me.  If you provide a
23 response, I'll be assuming that you understood the
24 question.  Is that fair?
25 A. Uh-huh.

Page 6

1 Q. Have you provided testimony in a court before?

2 A. No.

3 Q. Okay. Have you provided affidavits in relation to

4 your employment with Life Investors before?

5 A. I don't recall.

6 Q. That's fine. I don't want you guessing here today.

7 I don't recall is a fine answer to say. I have trouble

8 remembering what I had for breakfast yesterday. That's

9 fine.

10     MR. SINCLAIR: Let me go ahead and mark

11 as Exhibit 1 your deposition notice.

12     (Deposition Exhibit 1 was marked.)

13 Q. (BY MR. SINCLAIR) As you know, you've been asked to

14 appear on behalf of Life Investors. Let me ask you if you

15 looked at that? Now, there are two parts here, there's

16 one deposition that's going to occur as a result of your

17 signature on a letter Mr. Gooch received, and another

18 that's going to occur with regard to a 30(b)(6) notice

19 that you've been designated for. We're going to segregate

20 these two, so that I know when you're talking on behalf of

21 the company, and when you're talking on your own behalf.

22 Right now we're going to talk about you, Connie Whitlock,

23 what you did at Life Investors, your signature, your role

24 there, okay?

25 A. I'm not sure I understood what you were saying.

Page 7

1     MR. LEVENTHAL: I'm not sure I understand

2 that either. We're objecting to that. I don't know what

3 you're talking about. You're taking one deposition. If

4 you want to ask her about the letter, you can ask her

5 about the letter. You can ask her about 30(b)(6)

6 subjects.

7     MR. SINCLAIR: Okay.

8     MR. LEVENTHAL: Are you saying you're

9 going to start and stop one deposition, and then stop and

10 start another deposition?

11     MR. SINCLAIR: Yes.

12     MR. LEVENTHAL: What's the purpose of

13 that?

14     MR. SINCLAIR: Well, I can ask her

15 questions here today in one role, and assume that every

16 response she gives is speaking on behalf of the company.

17     MR. LEVENTHAL: Which are you planning to

18 start with?

19     MR. SINCLAIR: Her individual deposition.

20     MR. LEVENTHAL: It seems to me that

21 there's a significant overlap between the letter and some

22 of the subject matters in the 30(b)(6). So I don't know

23 how you're going to do that as a practical matter.

24     MR. SINCLAIR: Well, that was one of the

25 questions I had. When she was noticed -- when she was

Page 8

1 designated as the 30(b)(6) representative, her individual

2 deposition and her role as Life Investors 30(b)(6)

3 representative, I can ask her questions, but it's my

4 understanding that we have a very limited scope with

5 regard to the 30(b)(6). And when she speaks on behalf of

6 the company, I want to know that she's speaking on behalf

7 of the company. I don't see any way of segregating those

8 two out, unless we start with the individual, and then at

9 the conclusion of that, I'm going to say, from now you're

10 talking on behalf of the company on these particular

11 narrow topics. And we're going to ask her questions on

12 that.

13     MR. LEVENTHAL: Well, the letter was

14 written by her on behalf of the company.

15     MR. SINCLAIR: Right.

16     MR. LEVENTHAL: So I really don't know

17 what you're talking about.

18     MR. SINCLAIR: Okay.

19     MR. LEVENTHAL: In any event, you could

20 go ahead and start with the letter. Then you could say

21 I'm done with the letter, and now we're going to start

22 with the 30(b)(6), if that's how you want to proceed.

23     MR. SINCLAIR: All right.

24 Q. (BY MR. SINCLAIR) First off, Ms. Whitlock, let me

25 ask you, have you prepared for today's deposition?

Page 9

1 A. Just working with counsel.

2 Q. Okay. Anything that you spoke with about your

3 counsel, I don't want to hear about, that's actually

4 privileged. Okay. You don't need to answer to my

5 questions with, what my lawyer told me. Do you understand

6 that? You're going to have to say yes or no.

7 A. Oh, yes. I'm sorry. I didn't understand what you

8 were asking me.

9 Q. One of the things we need to do is you need to

10 verbalize your responses. It's been 10 years and you may

11 not recall. Nodding heads is very difficult for him to

12 take down, and he'll get mad at us sooner or later, I'm

13 sure. And if you'll let me finish asking the question,

14 I'll let you finish responding before I begin speaking

15 again.

16     Have you prepared for today's deposition, and

17 reviewed any documents in preparation for today's

18 deposition?

19     MR. LEVENTHAL: Object to the form of the

20 question. You can answer the question to the exclusion of

21 any documents that you looked at and were shown by

22 counsel.

23 A. The only thing that I've looked at was what was

24 provided by counsel.

25 Q. So you independently did not go and ask someone to

1 give you documents, so you could review them in
2 preparation for today's testimony?
3 A. No, I did not.
4 Q. The only documents you reviewed were solely provided
5 to you by your counsel?
6 A. Yes.
7 Q. And what documents were those?
8         MR. LEVENTHAL: Objection. Instruct the
9 witness not to answer. That's work product.
10        MR. SINCLAIR: Okay.
11 Q. (BY MR. SINCLAIR) Ms. Whitlock, if you would, tell
12 me who's your employer?
13 A. TransAmerica Life Insurance Company.
14 Q. Does TransAmerica actually pay, is that the entity
15 that pays you?
16 A. Yes.
17 Q. Okay. Is TransAmerica a subsidiary of Life
18 Investors?
19 A. No.
20 Q. Okay. Is TransAmerica a subsidiary of Aegon USA,
21 Inc.?
22 A. They are the holding company.
23 Q. Okay.
24 A. But they only operate Maryland and Iowa.
25 Q. Who only operates in Maryland and Iowa?

1 A. Aegon USA, Incorporated.
2 Q. What do you mean they only operate in Maryland and
3 Iowa?
4 A. That's the only places of operation for Aegon USA,
5 Inc..
6 Q. Places of operation, what does that mean?
7 A. Just what it means. That's the only location, or
8 that's the only locations of operations.
9 Q. Operation centers, is that what you're referring to?
10 A. No. It's the only places they operate.
11 Q. Okay. What do they operate in Maryland and Iowa?
12 A. It's where they have corporate employees.
13 Q. Okay. Do they have corporate employees somewhere
14 else besides Maryland and Iowa that you know of?
15 A. No.
16 Q. You work for TransAmerica, TransAmerica pays you. Do
17 you perform services for any other Aegon USA subsidiary?
18 A. Yes.
19 Q. What other subsidiaries do you perform services for?
20 A. I'm sorry. What was -- you asked me -- can you
21 repeat the original question?
22 Q. Let me rephrase that then. What companies do you
23 perform services for?
24 A. I perform services for Life Investors, TransAmerica
25 Life Insurance Company, TransAmerica Occidental Life

1 Insurance Company, Peoples Benefit Life Insurance Company,
2 Western Reserve Assurance Company of Ohio, and
3 TransAmerica Financial Life Insurance Company.
4 Q. I have that you -- it's my understanding you perform
5 services for Life Investors Insurance Company of America,
6 TransAmerica Life Insurance Company, TransAmerica
7 Occidental Insurance Company, Peoples Benefit Life
8 Insurance Company, Western Reserve Assurance Company of
9 Ohio, and TransAmerica Financial Life Insurance Company.
10 Are there any other companies that you perform services
11 for?
12 A. USA Administration Services, Incorporated. It's a
13 third-party administrator.
14 Q. What do you mean that it's a third-party
15 administrator?
16 A. It's a wholly owned. It's administrative. It's just
17 a -- I don't know.
18 Q. Let me ask the question.
19 A. Sorry. I don't understand your question.
20 Q. That's an excellent response. Let me ask it again.
21 USA Administrative Services, Inc.; is that right?
22 A. Yeah, I think so. The name might be a little bit
23 different than that.
24 Q. Okay. What does USA Administrative Services, Inc.
25 do?

1 A. They are a third-party administrator for -- they do
2 insurance administration for a few other companies.
3 Q. What other companies do they do administrative
4 services for?
5 A. Integrity and New York Life.
6 Q. Okay. Integrity is an Insurance Company?
7 A. Yeah. I'm not sure of the full name.
8 Q. Okay. All right. Any others, any other entities
9 that you perform services for?
10 A. Not that I can think of.
11 Q. Okay. So the only companies that you can recall that
12 you currently perform services for is Life Investors,
13 TransAmerica Life Insurance Company, TransAmerica
14 Occidental Insurance Company, Peoples Benefit Life
15 Insurance Company, Western Reserve Assurance Company of
16 Ohio, TransAmerica Financial Life Insurance Company, and
17 USA Administrative Services, Inc.; is that correct?
18 A. That's all I can remember right now.
19 Q. Okay. Are all of those entities that I've just
20 listed, are all of them subsidiaries of Aegon USA, Inc.?
21        MR. LEVENTHAL: Object to the form. You
22 can answer.
23 A. Aegon USA, Inc. is the holding company for all the
24 statutory insurance companies, not USA Administration.
25 Q. Okay. So Aegon USA, Inc. -- how did you refer to

Page 14

1 them as the holding company?

2 A. Uh-huh.

3 Q. Aegon USA, Inc. is the holding company for Life

4 Investors Insurance Company of America, TransAmerica Life

5 Insurance Company, TransAmerica Occidental Insurance

6 Company, Peoples Benefit Life Insurance Company, Western

7 Reserve Assurance Company of Ohio, and TransAmerica

8 Financial Life Insurance Company; is that correct?

9 A. What was first part you said?

10 Q. Aegon USA, Inc. is the holding company for all of

11 those companies I've just listed?

12 A. Yes.

13 Q. And you perform services today, not today, it's a

14 Saturday, but you perform services currently for those

15 companies, whose parent corporation is Aegon USA, Inc.; is

16 that correct?

17       MR. LEVENTHAL: Object to the form. You

18 can answer.

19 A. They are statutory companies under Aegon USA, Inc. is

20 the holding company.

21 Q. Okay. What do you do for these companies?

22 A. I am the -- I do operations, administration,

23 management of those areas.

24 Q. Okay. Now would be a good time for me to ask you.

25 What is your current title?

Page 15

1 A. For which company?

2 Q. You have title -- various titles with each company?

3 A. I have different titles with different statutory

4 companies.

5 Q. I see. Well, let's go through the list then. Let's

6 start off with Life Investors. What is your title for

7 that company? Before we get there let me ask you. What

8 do you mean what you say statutory company?

9 A. We refer to an insurance company as a statutory

10 insurance company. It's the -- I don't know. Just what

11 we refer -- I refer to it as, which statutory company,

12 which insurance company, whether it's Life Investors or

13 TransAmerica or --

14 Q. What statute are you referring to?

15 A. It's just insurance -- it's what -- it's just

16 statutory. It means a company.

17 Q. Are you referring to the Insurance Company Holding

18 Act?

19 A. I don't know what you're talking about.

20 Q. All right. So when you say, statutory insurance

21 company, you don't know which statute you're referring to,

22 but that's the common usage term when you refer to these

23 other companies?

24 A. Right.

25 Q. Okay. I got it. Let's start off with Life

Page 16

1 Investors. What is the title that you have with Life

2 Investors?

3 A. Senior vice president operations.

4 Q. What about TransAmerica Life Insurance Company?

5 A. Senior vice president operations.

6 Q. TransAmerica Occidental Insurance Company?

7 A. It's either vice president or senior vice president.

8 I don't remember.

9 Q. Peoples Benefit Life Insurance Company?

10 A. It's either vice president or senior vice president.

11 I don't remember.

12 Q. Western Reserve Assurance Company of Ohio?

13 A. Same, senior or vice president. I'm not sure.

14 Q. TransAmerica Financial Life Insurance Company?

15 A. Vice president of operations.

16 Q. USA Administrative Services, Inc.?

17 A. That's not a subsidiary of Aegon USA, Inc..

18 Q. But you're currently performing services for them?

19 A. I am the president of USA Administration, Inc..

20 Q. But that's not -- USA Administrative Services, Inc.

21 is not a subsidiary of Aegon USA, Inc.?

22 A. No. It's one of the insurance companies.

23 Q. Which insurance company is that a subsidiary?

24 A. I don't remember which company it's under. I don't

25 recall.

Page 17

1 Q. Okay.

2 A. I know it's not -- I know it's one of the insurance

3 companies, but I don't remember which one.

4 Q. And you are the president of USA Administrative

5 Services, Inc.?

6 A. Uh-huh.

7 Q. And that is a TPA for Integrity Insurance Company and

8 New York Life Insurance Company?

9 A. Yes.

10 Q. Do they perform any other services besides TPA

11 services for Integrity and New York Life?

12 A. No.

13 Q. So they just handle what type of claims for that

14 group, USA Administrative Services?

15 A. They don't handle claims.

16 Q. What do they do?

17 A. They do customer service type functions.

18 Q. While you're performing services for all of these

19 entities that you've given me here, do they pay you

20 separately?

21       MR. LEVENTHAL: Object to the form. You

22 can answer.

23 A. No.

24 Q. So you are compensated for your services in

25 performing various services for all these entities by your

Page 18

1 paychecks from TransAmerica Life Insurance Company?

2 A. Yes.

3 Q. Okay. Let's start as senior VP of -- before we get

4 there let me back up a little bit and ask you this. I

5 hate asking a woman her age, but I'm going to back you up

6 to high school and ask you when did you graduate from high

7 school?

8 A. 1986.

9 Q. Did you go school here in Little Rock?

10 A. No, I did not.

11 Q. Where did you go to school?

12 A. Louisville, Kentucky.

13 Q. Louisville, that's actually where Life Investors --

14 or Aegon Financial Partners is located, isn't it?

15     MR. LEVENTHAL: Object to the form. You

16 can answer.

17 A. Aegon Financial Partners is not a legal entity. It's

18 just kind of a generic name that is used for an

19 operational or operating units that are in multiple

20 locations.

21 Q. So it's a d/b/a, a designation of doing business as?

22 A. No. It's just a -- it's kind of an internal

23 nickname.

24 Q. Okay. And who is Aegon Financial Partners part of?

25     MR. LEVENTHAL: Object to the form. You

Page 19

1 can answer.

2 A. It's not -- it's not a -- it's not a legal entity. I

3 don't understand the question.

4 Q. Let me see if I can ask a little bit better. Let me

5 ask you. Who is -- who are the employees of Aegon

6 Financial Partners, the employees of other subsidiaries?

7     MR. LEVENTHAL: Object to the form. You

8 can answer.

9 A. There are no employees of Aegon Financial Partners.

10 Q. There are no employees of Aegon Financial Partners?

11 A. Not of that entity.

12 Q. What entity's employees perform services under the

13 Aegon Financial Partners designation?

14 A. They're employees of the various insurance companies,

15 the statutory companies that we went through.

16 Q. I see. So Aegon Financial Partners has a group of

17 employees from those entities that you've already listed

18 out?

19     MR. LEVENTHAL: Object to the form. You

20 can answer.

21 A. I'm not sure I understand what you're asking me.

22 Q. Let me ask it a different way then. Tell me all of

23 the entities that have employees performing services under

24 Aegon Financial Partners?

25 A. It would be --

Page 20

1     MR. LEVENTHAL: Same objection. Go

2 ahead.

3 A. It would be the companies that we listed. Can you be

4 more clear? It's the employees of those companies that we

5 listed there.

6 Q. Okay. So when I ask -- I'm trying to understand who

7 Aegon Financial Partners is. You told me that it's just

8 an internal designation of a group of employees.

9 A. It's an internal operating -- a group of operating

10 operational units. The different people are employees of

11 the insurance companies. They're kind of the group of

12 agent types of business. All the people that process

13 their business are -- they just kind of have a generic

14 internal name.

15 Q. Okay. Sort of like Aegon Insurance Group is actually

16 not a legal entity, but it's got different employees in

17 different places performing under that sort of internal

18 designation?

19 A. Yeah.

20     MR. LEVENTHAL: Object to the form of the

21 question. Go ahead.

22 A. It's another just generic internal name, kind of

23 nickname that's used.

24 Q. Okay. I'm sorry. I got off on a tangent there. You

25 graduated from high school in '86 from Louisville,

Page 21

1 Kentucky. Did you go to school after that or did you go

2 to work?

3 A. I went to college.

4 Q. Where did you go to school?

5 A. Bellarmine University.

6 Q. Where is Bellarmine?

7 A. In Louisville.

8 Q. Did you graduate from there?

9 A. Yes, I did.

10 Q. When did you graduate?

11 A. In -- this is terrible. I went part-time for a

12 while. Maybe '93, '94. I can't remember.

13 Q. Okay.

14 A. It's sad, but I don't.

15 Q. Listen, I really meant it when I said I can't

16 remember what I had for breakfast yesterday.

17   Let me ask you. You said you went part-time. Did

18 you work while you were going to school?

19 A. Yes.

20 Q. Where did you work?

21 A. I worked for the company.

22 Q. Which company?

23 A. I worked for, at that time it would have been

24 Commonwealth Life Insurance Company.

25 Q. You said, the company, and I took it from the way you

Case 1:07-cv-00610 Document 63 Filed 08/03/07 Page 8 of 26 PageID #: 1614

Page 22

1 said that, that Commonwealth later on became a part of
2 Life Investors and the companies you now work for?
3 A. Commonwealth was a company that was purchased and --
4 I mean -- I guess -- I don't know what the entity was that
5 bought it, but it's part of the companies that we work for
6 today. I don't know which entity. I don't know what
7 entity bought it.
8 Q. That's okay.
9 A. Actually I think I thought of another insurance
10 company that I work with.
11 Q. Okay. What other insurance company?
12 A. Monumental. There's a lot of insurance companies. I
13 don't remember them all off the top of my head.
14 Q. Monumental Life Insurance Company?
15 A. Yes.
16 Q. What's your title with Monumental?
17 A. It's either senior VP or VP. I don't know.
18 Q. Any others you can recall?
19 A. No. The only reason I remember that one is because
20 Commonwealth became Monumental. That's the only reason
21 that I didn't say it before.
22 Q. Okay. What did you do as you were working part-time
23 from the '86 to '94 time period with Commonwealth?
24 A. I worked in several of the customer service
25 functions.

Page 23

1 Q. Such as?
2 A. Such as the claims area, the customer service call
3 center area. Do you want every -- I'm sorry.
4 Q. Let me ask it a different way. I want you to tell me
5 all the jobs you had between 1986 and 1994, when you
6 graduated from Bellarmine?
7 A. Okay. I worked in the claims area. I worked in the
8 customer service area. Those were the two areas I worked
9 in until then.
10 Q. Okay. And when you say, claims, what kind of claims?
11 A. Life claims.
12 Q. I'm sorry. What?
13 A. Life claims.
14 Q. And when you say, life claims, you mean life
15 insurance policy claims?
16 A. Yes.
17 Q. Okay. Were you actually a claims handler at that
18 point?
19 A. At one point.
20 Q. Okay. How long between 1986 and 1994 are we talking
21 about, did you do it for a year or two?
22 A. Maybe two years.
23 Q. You did that on a part-time basis while you were
24 going to Bellarmine?
25 A. Yes. Part of that was full-time and going to school

Page 24

1 part-time.
2 Q. Okay. So you were working 40 hours a week and going
3 to school on top of it?
4 A. Yes.
5 Q. Okay. After you graduated Bellarmine in 1994, did
6 you have anymore formal schooling at a university, or any
7 kind of formal schooling after that, excluding company
8 training?
9 A. Not formal schooling.
10 Q. What other schooling did you have after 1994?
11 A. I'm sorry?
12 Q. What other schooling did you have, did you attend
13 let's say MBA courses, or any courses -- outside of
14 company training, we'll get there in a minute?
15 A. Not that I recall.
16 Q. Okay. Now, let's talk about, if we can, company
17 training. Between '86 and '94, do you recall any training
18 that you had in claims handling?
19 A. No.
20 Q. Okay. So in 1994 you graduated from Bellarmine.
21 What was your title with the company, Commonwealth Life
22 Insurance Company, at that point in 1994?
23 A. I don't remember.
24 Q. But you were a claims handler in '94?
25 A. No.

Page 25

1 Q. What were you doing in 1994?
2 A. I would have been in customer service.
3 Q. Okay. In the call center area?
4 A. Yes.
5 Q. Between '86 and '94, did you have or play any
6 role in drafting claims handling procedures, or dictating
7 claims handling procedures for Commonwealth?
8 A. I don't recall.
9 Q. Okay. Let's talk about when you graduated in '94.
10 Did you change jobs in '94 upon your graduation?
11 A. No.
12 Q. So between -- take me up to the next time you changed
13 jobs. In 1994 you told me that you were working in the
14 customer service area at Commonwealth; is that right?
15 A. Uh-huh. Yes. Sorry.
16 Q. That's okay. How long did you work in the customer
17 service area at Commonwealth, 1994 to when?
18 A. I don't remember the exact amount of time after '94.
19 Q. Do you remember the next job you held?
20 A. Yes. I worked in the financial reporting area.
21 Q. When did you start doing that?
22 A. I don't remember the exact time.
23 Q. Can you --
24 A. It would have been maybe a year after '94. I just
25 don't remember exactly how long.

1 Q. Sometime between 1994 and 1996, you transferred to
2 the financial reporting area?
3 A. It's probably within that time frame.
4 Q. Was this also with Commonwealth?
5 A. Yes.
6 Q. And how long did you work in the financial reporting
7 area at Commonwealth?
8 A. Two or three years, probably two.
9 Q. Do you remember when you stopped working in the
10 financial reporting area at Commonwealth?
11 A. I went back to customer service. I don't remember.
12 It was around two years maybe.
13 Q. In the '97 '98 time period you went from financial
14 reporting to back to customer service; is that right?
15 A. Back to customer service, yes.
16 Q. Was that also at Commonwealth?
17 A. Yeah, it was at Commonwealth, or it could have been
18 changed to Monumental by that time. I'm not sure.
19 Q. Let's talk a little bit about your role in the
20 financial reporting area. What did you do?
21 A. I worked on just staff accounting type functions for
22 our stop loss business.
23 Q. I'm sorry. Your stop loss business, what is that?
24 A. It's a type of -- it's a type of insurance plan. I
25 don't really know a lot about the insurance -- that

1 particular insurance plan. I received the accounting
2 detail from the -- actually it was being administered by a
3 TPA. I received that and I booked those entries.
4 Q. Are you talking about a particular type of policy?
5 A. It's a type of insurance product.
6 Q. Okay. And it's a stop loss insurance product
7 sold --
8 A. Sold to employers.
9 Q. Okay. And you received reports from a TPA and you
10 booked entries?
11 A. Right.
12 Q. What do you mean by, booked the entries?
13 A. I would do entries into our general ledger.
14 Q. Were you working at that point with a title?
15 A. Probably staff accountant.
16 Q. I take it then that you got an accounting degree from
17 Bellarmine?
18 A. Yes, I did.
19 Q. Okay. Do you hold any other degrees?
20 A. No.
21 Q. Have you had any legal training?
22 A. No.
23 Q. Well, let me ask you this. When you graduated in
24 '94, what was the formal degree that you had; did you have
25 a Ph.D. or something like that in accounting? I'm not

1 sure I know the designation.
2 A. Bachelor's in accounting.
3 Q. Okay. So at that point from '95 or '96 you started
4 working as a staff accountant in the financial reporting
5 area for Commonwealth, right?
6 A. Commonwealth or Monumental. I don't know. In '96,
7 I'm sorry, it would have been Commonwealth for sure. When
8 it changed, it was sometime after that.
9 Q. Okay. When you say, book the entries, you got to
10 remember I'm not an accountant, what does that mean?
11 A. Well, it means look at a report, take numbers from a
12 report, and put them onto a spreadsheet, that was then
13 uploaded into our ledger.
14 Q. Okay. So you take the reports from the TPA, the
15 claims paid reports, is that what you're talking about?
16 A. Premiums, claims, there would be premium taxes, that
17 type of thing.
18 Q. Okay. I think we've gotten up to the '97 '98 time
19 period. And if you feel like you need to take a break at
20 any time, you just let me know. I generally stop at about
21 an hour and give the witness a rest. If you need it
22 before then let me know, okay?
23 A. I will.
24 Q. The '97 '98 time period you went back to customer
25 service at either Commonwealth or Monumental. We're not

1 sure when that entity change occurred, right?
2 A. Right.
3 Q. What were you doing in customer service in the '97
4 '98 time period, what job did you move into?
5 A. I was a supervisor in customer service.
6 Q. Were you handling claims?
7 A. Not at that time.
8 Q. Okay.
9 A. Eventually. I'm not sure it was immediate.
10 Q. Okay. When you say, customer service, were you
11 handling relationships with insureds or insurance agents?
12 A. Both.
13 Q. Both. At that point it was either Commonwealth or
14 Monumental?
15 A. Uh-huh.
16 Q. How long did you work as a supervisor in customer
17 service?
18 A. From that point going forward, I progressed up in the
19 customer service operational administration areas. That's
20 just progressive titles since then.
21 Q. Let me -- this could drag out for a while. Let me
22 just ask you. Starting 1998, assuming that's the correct
23 date that you started customer service, supervisor of
24 customer service, I want you to tell me, if you can, the
25 approximate year and title for every job change

Page 30

1 thereafter? Can you do that? Can you walk me through
2 those changes?
3 A. I can walk through the changes, but I'm not going to
4 remember what years and when I got promotions.
5 Q. Walk me through the titles that you've had as you
6 progressed up, as you say?
7 A. It would have been either a supervisor, a team
8 leader, or a title like that, the original promotion. And
9 then I would have gone to manager, director, vice
10 president. And then expanded responsibilities -- probably
11 when I was a director, expanded responsibilities even to
12 larger areas. Manager was a larger area than supervisor
13 and so on. When I was a director I obtained even more
14 responsibilities.
15 Q. Okay. And your current title is VP. Was that what
16 you were referring to when you progressed up to your
17 current title?
18 A. My current title is senior VP.
19 Q. I'm sorry.
20 A. For Live Investors.
21 Q. For Life Investors. Senior VP of operations, right?
22 A. Yes.
23 Q. When you say, VP, is that when you meant?
24 A. Vice president.
25 Q. I'm progressing up. Your current job title is senior

Page 31

1 VP of operations, correct?
2 A. Correct.
3 Q. Was that the VP you were referring to just now when
4 you --
5 A. I was vice president before I was senior vice
6 president.
7 Q. Let's talk about your role as a team leader or
8 supervisor. And was that also for Commonwealth or
9 Monumental?
10 A. Yes, and other companies.
11 Q. So a team leader or supervisor for a list of
12 statutory insurance companies?
13 A. Yes.
14 Q. I said that the right way that time?
15 A. Correct.
16 Q. So in your role as a team leader or supervisor for
17 those statutory companies, what were your daily
18 responsibilities?
19 A. Leading the customer service reps, the premium and
20 billing, processors, the processing for like beneficiary
21 changes, things like that. At some point I was
22 responsible for both underwriting and claims.
23 Q. Okay. In your role as a team leader supervisor you
24 were responsible for underwriting and claims?
25 A. At some point.

Page 32

1 Q. Okay.
2 A. I just don't remember if it was in the very
3 beginning. I don't remember.
4 Q. Okay. Do you remember when you got promoted to
5 manager?
6 A. No, I don't remember when it was.
7 Q. Let me walk backwards. That may jog your memory.
8 Going from your current title of senior VP, how long have
9 you been a senior VP?
10 A. I'm not really sure. Maybe two years.
11 Q. Okay. Before that you were a director, your title
12 was director?
13 A. No. Vice president.
14 Q. I'm sorry. How long were you vice president?
15 A. Again, I don't remember exactly. Maybe another two
16 years.
17 Q. Okay. How long were you a -- how long was your title
18 a director?
19 A. Again, I don't remember specifically. A couple of
20 years maybe.
21 Q. Okay. How long did you serve as manager?
22 A. I have no idea.
23 Q. Okay. So assuming we've got two years for senior VP,
24 two years for VP, and a couple of years. We've gone back
25 to 2001. So was it a year, two years as a manager?

Page 33

1 A. I don't -- it could have been. I don't remember.
2 Q. Okay. All right. Let's talk a little bit about
3 underwriting claims, customer service, premium billing and
4 benefit changes, your role as a manager. What company
5 were you working for at that point, multiple companies I
6 think you indicated; is that right?
7 A. We processed for multiple -- we processed business
8 for multiple statutory companies.
9 Q. Who was your actual employer at that point?
10 A. Peoples Benefit, I believe.
11 Q. Is that PFL?
12 A. No.
13 Q. Who's PFL?
14 A. I don't know. I never worked for PFL. It was an old
15 company that was one of the statutory companies. I never
16 did any work for them. And I don't know anything about
17 them.
18 Q. So you were a manager and your employer was Peoples
19 Benefit?
20 A. That was who paid me.
21 Q. What's the rest of the name, do you remember?
22 A. No. I had to guess, it would be Peoples Benefit Life
23 Insurance Company, but I'm not sure if that's right or
24 not.
25 Q. I won't hold you to --

Page 34

1 A. I don't know that for sure.
2 Q. At some point you went from working for Monumental --
3 you did work for Monumental at some point?
4 A. Yes.
5 Q. Let me say that a different way. You were employed
6 by Monumental at some point?
7 A. Yes.
8 Q. And then you switched over to Peoples Benefit?
9 A. Yes.
10 Q. Do you remember when that change occurred?
11 A. No.
12 Q. Was Peoples Benefit and Monumental a subsidiary of
13 the same company?
14 A. They were two insurance companies. That were part of
15 same company, yes.
16 Q. What company were they a part of?
17 A. Originally Capital Holding.
18 Q. Capital Holding.
19 A. Then it became Providian.
20 Q. It became Providian?
21 A. Capital Holding change its name to Providian.
22 Q. Okay. I thought -- I'm misunderstanding. I'm sorry.
23 Let me ask that question a little bit differently. You
24 were working for Monumental at some point, right?
25 A. Uh-huh.

Page 35

1 Q. And Monumental and Peoples Benefit were part of
2 Capital Holding?
3 A. No. Commonwealth Life Insurance Company and Peoples
4 Benefit Life Insurance Company, if that's the right name,
5 were two statutory insurance companies under Capital
6 Holding.
7 Q. Okay.
8 A. That then changed its name to Providian.
9 Q. I'm trying to make sure you didn't switch employers
10 all together?
11 A. No.
12 Q. You didn't switch employers?
13 A. No.
14 Q. You just got paychecks from a different company?
15 A. Yes.
16 Q. I guess Capital Holding is a holding company, was
17 that what it was?
18 A. Yes.
19 Q. I'm getting it. Statutory insurance companies and
20 holding company?
21 A. Correct.
22 Q. Capital Holding was a holding company that owned --
23 that had a subsidiary that was a statutory insurance
24 company called Peoples Benefit. Did I say that the right
25 way?

Page 36

1 A. You have to say it again for me to be sure.
2 Q. Capital Holding was a holding company; is that right?
3 A. That's correct.
4 Q. That had a subsidiary that was a statutory insurance
5 company called Peoples Benefit?
6 A. Correct.
7 Q. It also had a subsidiary called Monumental?
8 A. No, Commonwealth.
9 Q. Commonwealth?
10 A. Correct.
11 Q. So Providian was the next progression, the legal
12 entity's name?
13 A. No. Capital Holding changed its name to Providian.
14 Q. Was it also the name of the holding company is
15 Providian?
16 A. Correct. It changed its name, so it was the same
17 company, just a different name.
18 Q. Did Providian change its name?
19 A. No.
20 Q. What happened to Providian, are they still in
21 existence, or did they sell the statutory?
22 A. They sold the insurance companies, which then became
23 -- Commonwealth became Monumental, Peoples Benefit became
24 part of the list of companies I gave you earlier.
25 Q. And who did Providian sell the insurance companies

Page 37

1 to?
2 A. I don't know exactly legally how all that works. I
3 just know that we switched to Monumental and so on.
4 Q. Let me put it a different way. The current holding
5 company is Aegon USA, Inc.; is that right?
6 A. Correct.
7 Q. Was there a holding company, between the time period
8 Providian was the holding company and Aegon USA, Inc. was
9 the holding company?
10       MR. LEVENTHAL: Object to the form. Go
11 ahead.
12 A. No.
13 Q. Okay. I'm just trying to make sure I don't know miss
14 one.
15 A. Okay.
16 Q. So let's step back. You were a manager. Your
17 employer was Peoples Benefit. But you performed services
18 across other statutory insurance companies. Did I say
19 that the right way?
20 A. I performed work for policies that were issued under
21 other companies.
22 Q. All right. Now, as a manager, I think you indicated
23 you were responsible for premium billing; is that right?
24 A. That was one of the things.
25 Q. And you were also responsible for customer service

Page 34 - Page 37

1 representatives?

2 A. Yes.

3 Q. Okay. I take it you had multiple direct reports,

4 people who reported to you in the chain of command?

5 A. Yes.

6 Q. And then you were responsible for underwriting and

7 claims; is that right?

8 A. At some point, yes.

9 Q. And then you were responsible for beneficiary

10 changes?

11 A. Uh-huh, yes.

12 Q. Were there any other duties or responsibilities that

13 you had as a manager at that time period?

14 A. I can really only speak generally to it. That's a

15 long time ago.

16 Q. Is that all you can recall?

17 A. Yeah.

18 Q. Okay. You're and accountant, so you were handling

19 the underwriting and claims functions, was that also

20 handling the general ledger entries that as you were

21 talking about earlier?

22 A. No.

23 Q. So what role did you play in underwriting and claims

24 as a manager?

25 A. I supervised the underwriter and claims examiner.

1 Q. What kind of policies?

2 A. There was life policies and annuities. I don't

3 really remember all the different types.

4 Q. Did you handle any cancer policies?

5 A. I don't recall.

6 Q. Did you handle any long-term disability policies or

7 short-term disability policies?

8 A. Not long-term disability. I don't recall if there

9 was any short-term or not.

10 Q. Okay. Was your primary responsibilities dealing with

11 life insurance policies? Let me say that a different way.

12 Was most of your time spent performing functions with

13 regard to life insurance policies?

14 A. No. We had other types of policies.

15 Q. Do you recall any of the other types besides life and

16 annuities?

17 A. Not specifically the specific types.

18 Q. And this was as your role as a manager with Peoples

19 Benefit?

20 A. It could have been the supervisor or the manager

21 or --

22 Q. Okay.

23 A. -- multiple.

24 Q. Let me figure these employers out. You were working

25 for Peoples Benefit as a manager. And then at some point

1 about six years ago you went in with the title of

2 director?

3 A. Uh-huh.

4 Q. Was that with a different company employing you?

5 A. No.

6 Q. So continuing on with Peoples Benefit. You were a

7 director with Peoples Benefit?

8 A. Yes.

9 Q. The next job title about four years ago the change

10 was to VP, right?

11 A. I don't remember the specific time frame, but the

12 next title after director was VP.

13 Q. And was that also with Peoples Benefit?

14 A. Yes.

15 Q. And then at one point or another you went to your

16 employer being Life Investors?

17 A. No. My employer is TransAmerica.

18 Q. So you went from Peoples Benefit employing you to

19 TransAmerica employing you?

20 A. TransAmerica Life Insurance.

21 Q. That was your next employer?

22 A. Yes.

23 Q. All right. I'm sorry. I think I've got it down now.

24 Q. We've been going about on hour. Would you like a break?

25 A. Maybe five more minutes.

1 Q. Okay. The next job title that I've got here was

2 director. And you said you expanded your responsibilities

3 as director. Tell me what you did as director, what were

4 your daily job responsibilities?

5 A. I supervised the supervisors of those functions that

6 we talked about. It was just expanded responsibility in

7 the same areas.

8 Q. Okay. So you just increased the number of direct

9 reports that you had?

10      MR. LEVENTHAL: Object to the form. You

11 can answer.

12 Q. You know what, I know why you're looking down now. I

13 said it a bad way. Let me put it this way. You went to

14 director job title and you started supervising the

15 managers; is that right?

16 A. Yes.

17 Q. Okay. Your next job title was vice president. Was

18 that also with Peoples Benefit?

19 A. Yes.

20 Q. What did you do as a vice president with Peoples

21 Benefit?

22 A. The same thing I did as a director.

23 Q. And then you moved to senior VP as your job title,

24 right?

25 A. Yes.

1 Q. Was that also with Peoples Benefit, or did you change
2 companies at that point?
3 A. I would have been with TransAmerica at that time.
4 Q. Okay. So were you a vice president with TransAmerica
5 at one point?
6 A. Probably in the beginning.
7 Q. Okay.
8 A. These are statutory insurance titles, so when that
9 changes, I don't remember.
10 Q. Okay. I'm trying to understand. Because you're
11 familiar with all those terms. I take it you just know
12 that your paycheck comes from a particular entity; is that
13 right?
14 A. I know that I work for TransAmerica Life Insurance
15 Company.
16 Q. Do you have an employment agreement, a formal
17 contract?
18 A. No.
19 Q. Did you have a formal contract with Peoples Benefit?
20 A. No.
21 Q. Did somebody come down and say, hey, you're changing
22 over to TransAmerica?
23 A. I took on more responsibility.
24 Q. And the job title came with the transfer to a
25 different company?

1 A. Took on additional responsibilities. I don't know if
2 the title changed when I did that. The change to
3 TransAmerica came with the additional responsibilities.
4 Q. As a senior VP, which you currently are with
5 TransAmerica Life Insurance Company --
6 A. And others.
7 Q. You're right. I said that differently. Your
8 employer is TransAmerica Life Insurance Company, right?
9 A. Yes.
10 Q. And as a senior VP with TransAmerica Life Insurance
11 Company, what are your daily job responsibilities?
12          MR. LEVENTHAL: Object to the form. You
13 can answer.
14 A. I oversee all of the operations and administration
15 for the -- for the business here in Little Rock as well as
16 the business that's processed in Louisville.
17 Q. When you say, business, what business are you talking
18 about?
19 A. The insurance policies.
20 Q. Okay. What kind of policies?
21 A. For which location?
22 Q. I'm trying to understand. Just for you, if you tell
23 me you oversee business, and business means policies, I
24 want to know what you are administering in your role as
25 senior VP?

1          MR. LEVENTHAL: Objection to the form of
2 the question. You can answer.
3 A. Life products, annuities, and various health
4 products.
5 Q. What kind of health products?
6 A. Short-term disability, cancer, accident, many medical
7 plans, there are some heart and intensive care policies.
8 There could be a few more. I just -- I can't think of
9 right now the different types.
10 Q. I believe I'm about to start on a line of questioning
11 that may take a few minutes. Would you like to go ahead
12 and take our break now?
13 A. Sure.
14          MR. SINCLAIR: Let's take 15 minutes.
15          (A recess was had.)
16 Q. (BY MR. SINCLAIR) When we took our break, you were
17 describing the policies that you currently have in that
18 block of business you supervise as senior VP for
19 TransAmerica Life Insurance Company. You had listed life
20 insurance policies, annuities and health products as three
21 categories of insurance products that you supervise; is
22 that correct?
23 A. Yes.
24 Q. And then under health products you had listed, can I
25 just say STD, short-term disability?

1 A. I know what that means.
2 Q. Under health products you listed STD, cancer, AD&D
3 policies, medical plans, heart policies and intensive care
4 policies. Are there any other policies that you can
5 recall that would fit within that category of health
6 products, that you currently supervise?
7 A. There could be others that I'm just not thinking of
8 right now.
9 Q. So as senior VP of operations and administration for
10 business in Little Rock and Louisville, you've told me all
11 of the types of policies you currently recall that you
12 have responsibility for?
13 A. That I can remember.
14 Q. Is there some sort of list of your job duties and
15 responsibilities or job description? Have you ever seen
16 one?
17 A. I don't really have a job description, no.
18 Q. Is there anything that lists out the products you're
19 responsible for?
20 A. There's probably something at the office.
21 Q. Have you ever seen it?
22 A. Yeah, I've seen it. Right now that's what -- those
23 are the products I'm thinking of.
24 Q. Okay. There's a document that lists out what you're
25 responsible for?

Case 4:07-cv-00476-JMM Document 59 Filed 03/23/15 Page 14 of 26 PageID #: 1620

Page 46

1 A. No. There's just -- there's materials that show the
2 different products that we have.
3 Q. What materials, is it like just a sheet of this is
4 what Ms. Whitlock supervises?
5 A. No.
6 Q. Okay. As senior VP for operations and administration
7 for business in Little Rock and Louisville, do you have
8 any -- or play any role in connection with, on a daily
9 basis, those employees in Louisville?
10 A. I'm not sure I understand the question.
11 Q. Okay. Let me rephrase it then. Who reports to you
12 from Louisville?
13 A. Neva Curtis.
14 Q. Are there any other employees in Louisville that
15 report directly to you?
16 A. No.
17 Q. Do you have a -- what is Neva's title?
18 A. Director of operations.
19 Q. Does she also work for TransAmerica Life Insurance
20 Company?
21 A. No. She works for Monumental.
22 Q. And she reports directly to you?
23 A. Yes.
24 Q. Are you her supervisor?
25 A. Yes.

Page 47

1 Q. Okay. And Ms. Curtis is the director of operations
2 in the Louisville office?
3 A. Yes.
4 Q. Is there a similar person who directs to you here in
5 Little Rock, who reports to you here in Little Rock, I
6 should say, that is the director of operations for Little
7 Rock?
8 A. No, not the same title.
9 Q. Different title?
10 A. Different roles.
11 Q. Okay. Who reports directly to you here in Little
12 Rock?
13 A. Teralyn Dickey. And she's the vice president of
14 project management.
15 Q. Okay.
16 A. There's a list.
17 Q. Okay. Go ahead.
18 A. Ron Bilello, and he is the vice president of IT,
19 information technology. Next would Scott Grable, he's the
20 vice president of premium and commissions. Richard Hicks,
21 and he is the vice president of organizational
22 development. And these are like their working titles, the
23 depositions that they're --
24 Q. Okay.
25 A. And you have David Louks, he's the vice president of

Page 48

1 customer service. Mark Bradley, he's the vice president
2 of underwriting. You have Mary Wagoner, she's the vice
3 president of new business. You have Debra Alexander,
4 director of claims. Julie Boyd, she is the director of
5 contract and licensing. And Doug Simino, and he is the
6 assistant vice president of product implementation and
7 document management. And that's the list, I think.
8 Q. Okay.
9 A. Other than my -- my admin doesn't report to me, she's
10 shared.
11 Q. Okay. Let me make sure I've got all these right.
12 Those people who report directly to you here in Little
13 Rock are Ms. Dickey, Mr. Bilello, Mr. Grable, Mr. Hicks,
14 Mr. Louks, Mr. Bradley, Ms. Wagoner, Ms. Alexander, Ms.
15 Boyd and Mr. Simino; is that correct?
16 A. Yeah. Go through them one more time. I'm trying to
17 go through the floors and make sure I've counted
18 everybody.
19 Q. Okay.
20 A. If you can do it in the order I gave you.
21 Q. I'll do that. I'm trying to make sure I've got
22 everybody. Ms. Dickey, Mr. Bilello?
23 A. Yes.
24 Q. Mr. Grable, Mr. Hicks, Mr. Louks, Mr. Bradley, Ms.
25 Wagoner, Ms. Alexander, Ms. Boyd and Mr. Simino?

Page 49

1 A. That's correct.
2 Q. Are there any others who report directly to you?
3 A. No.
4 Q. Okay. The first question. Why are there so many
5 more here in Little Rock that report to you and only one
6 in Louisville?
7 A. It's a larger operation here. So each of the
8 departments -- Neva in Louisville has responsibility for
9 similar functions, it's just smaller grouped. So it
10 doesn't require that level of employee here. It's more
11 employees in each department.
12 Q. Okay. So Ms. Curtis in Louisville would supervise
13 these --
14 A. Types of functions.
15 Q. -- types of functions, but she reports to you?
16 A. Correct.
17 Q. Okay. Did all of these employees here in Little Rock
18 that you've listed for me that report to you, are they all
19 employed by TransAmerica Life Insurance Company?
20 A. The ones in Little Rock, yes.
21 Q. So all of the employees that you've listed for us
22 that report directly to you here in Little Rock are
23 employees of TransAmerica Life Insurance Company?
24 A. Yes.
25 Q. And do they perform services across the same block of

Page 46 - Page 49

1 business that you've listed for me earlier?

2 A. Not all of them.

3 Q. Some of them are specific to particular blocks of

4 business?

5 A. Some of them are only in Louisville. The Little Rock

6 only has some of those companies, some of those statutory

7 companies.

8 Q. Okay. Maybe we better break down Louisville and

9 Little Rock first, so I won't get them confused. What

10 book of business is supervised in Louisville, what

11 companies' business?

12 A. If you can read back that list. Louisville is every

13 one of the original list. Read them to me and I can

14 double check them in my mind.

15 Q. Let me do that. Does Louisville supervise the block

16 of business -- handle the -- let me start over. Is the

17 Live Investors' block of business handled in Louisville?

18 A. Yes.

19 Q. Is it also handled in Little Rock?

20 A. Some policies, yes.

21 Q. Particular policies?

22 A. They're the same types of policies, some policies are

23 in Louisville and some policies are here in Little Rock.

24 Q. Is it broken apart geographically?

25 A. No.

1 Q. Is it broken apart -- how is it broken part?

2 A. It's broken apart by I think agents.

3 Q. Okay. So originating agents send their business to

4 either -- Live Investors business -- to either Louisville

5 or Little Rock; is that right?

6 A. Which Life Investors policies are we talking about?

7 Q. That's part of the problem. I'm trying to figure all

8 that out. In Louisville, what particular type of Life

9 Investors policies are handled in Louisville?

10 A. We have cancer. We have STD, to use your word. We

11 have heart, intensive care, accident, and then there's

12 probably some life policies on Life Investors there as

13 well.

14 Q. Okay.

15 A. And some annuities.

16 Q. So the Life Investors' block of business is also

17 handled here in Little Rock to some extent?

18 A. Yes.

19 Q. Same policies that you just listed out for me?

20 A. Yes, except for annuities.

21 Q. Annuities are not handled here in Little Rock?

22 A. Correct.

23 Q. And the way that that book of business for Life

24 Investors is broken apart, as to whether it goes to Little

25 Rock or Louisville, that's based upon originating agent?

1 A. Yes.

2 Q. Are the originating agents broken apart

3 geographically?

4 A. No.

5 Q. How are they assigned to a particular office?

6       MR. LEVENTHAL: Object to the form. You

7 can answer.

8 A. I'm not sure I know how they decided to separate the

9 agents. That's just how it was -- I don't know if there's

10 a particular way they did it.

11 Q. Okay. Let's move on then to the TransAmerica Life

12 Insurance Company block of business. Is that handled in

13 both places as well, Louisville and Little Rock?

14 A. Yes.

15 Q. Okay. TransAmerica Occidental Insurance Company

16 handled in both places?

17 A. Yes.

18 Q. Peoples Benefit Life Insurance Company handled --

19 A. No. Only in Louisville.

20 Q. Western Reserve Assurance Company of Ohio book of

21 business?

22 A. Only in Louisville.

23 Q. TransAmerica Financial Life Insurance Company book of

24 business?

25 A. Both.

1 Q. And both being Louisville and Little Rock?

2 A. Louisville and Little Rock.

3 Q. Monumental Life Insurance Company book of business?

4 A. Louisville and Little Rock.

5 Q. USA Administrative Services, Inc. is not a statutory

6 company that issues insurance policies, right?

7 A. Correct.

8 Q. But that's based here in Little Rock?

9 A. No, it's in Louisville.

10 Q. It is in Louisville?

11 A. There's no employees of that.

12 Q. Except --

13 A. USA Administrative is just a d/b/a name.

14 Q. Okay. But you are -- the services for that company

15 are performed by employees of other companies?

16 A. In Louisville.

17 Q. Okay. Let me figure out the chain of command here.

18 Who do you report to?

19 A. Brenda Clancy.

20 Q. And what is her title?

21 A. Executive vice president of Life Investors.

22 Q. Is she a Life Investors employee?

23 A. I believe her payroll -- her paycheck is by Life

24 Investors.

25 Q. Okay. All the people here in Little Rock that you've

Page 54

1 listed that report to you, they are all TransAmerica Life
2 Insurance Company employees?
3 A. Did you say Little Rock?
4 Q. Yes.
5 A. Yes.
6 Q. The blocks of business that are broken apart into
7 different offices, when you went through those lists of
8 various statutory companies, are their blocks broken apart
9 similarly by originating agent?
10        MR. LEVENTHAL: Objection to the form.
11 You can answer.
12 A. I'm not sure I understand the question.
13 Q. Sure. Let me put it a little bit differently then.
14 Like TransAmerica Life Insurence Company, is their
15 business, which is handled here in Little Rock and
16 Louisville, correct?
17 A. Yes.
18 Q. Is their business split up across different lines, do
19 they have life insurance and cancer policies and heart and
20 so forth?
21        MR. LEVENTHAL: Objection to the form.
22 You can answer.
23 A. Is this -- are you asking for Little Rock or
24 Louisville?
25 Q. That's what I'm trying to understand. I think I

Page 55

1 understand that the Life Investors block of business is
2 broken apart based on originating agent, right?
3 A. Yes.
4 Q. As to which --
5 A. There's other Life Investors policies that are in
6 Louisville as well, not just -- there's Life Investors
7 policies that were split by agent, and there's others that
8 just were in Louisville.
9 Q. Like the annuities?
10 A. Correct.
11 Q. Okay. So when we come to TransAmerica Life Insurance
12 Company policies --
13 A. Uh-huh.
14 Q. -- those go to both Louisville and Little Rock?
15 A. Yes.
16 Q. And does TransAmerica Life Insurance Company issue a
17 cancer policy?
18 A. It does today, yes.
19 Q. And is that handled in Louisville or in Little Rock
20 or in both?
21 A. In both.
22 Q. Okay.
23 A. It's also broken by agent.
24 Q. That was my question. TransAmerica Life Insurance
25 Company business is broken apart by agent as to which

Page 56

1 office handles the claims and policies?
2 A. Not always. Just in certain -- in certain
3 situations.
4 Q. Okay.
5 A. You asked me about TransAmerica.
6 Q. Let me try to do it this way. TransAmerica Life
7 Insurance Company issues a cancer policy?
8 A. Yes.
9 Q. Does TransAmerica Occidental Insurance Company issue
10 a cancer policy?
11 A. No.
12 Q. Does Peoples Benefit Life Insurance Company issue a
13 cancer policy?
14 A. No, not that I'm aware of in Louisville.
15 Q. I better specify a time. I'm talking currently issue
16 cancer policies?
17 A. Again, my statement would be the same. Not that I'm
18 aware of in Louisville. There are other locations that
19 use that name, that statutory company.
20 Q. The other locations that use Peoples Benefit Life
21 Insurance Company?
22 A. That use all of those.
23 Q. Besides Louisville and Little Rock?
24 A. Yes, other divisions.
25 Q. Division, what division are you in?

Page 57

1        MR. LEVENTHAL: Object to the form of the
2 question. You can answer.
3 A. I work for TransAmerica Life Insurance Company.
4 Q. I've seen reference to like SID supplemental
5 insurance?
6 A. That's an old generic name they used to use.
7 Q. You said there's other divisions --
8 A. Other locations. I'm sorry. I used the wrong word,
9 other locations.
10 Q. That's okay. Other locations that use these various
11 statutory entities that you've previously listed for me?
12 A. Yes.
13 Q. What other locations use these statutory entities?
14        MR. LEVENTHAL: Are we talking about
15 cancer policies?
16        MR. SINCLAIR: Yeah.
17        MR. LEVENTHAL: Just cancer policies.
18 A. I don't know.
19 Q. (BY MR. SINCLAIR) You don't know?
20 A. I don't know if they issue cancer policies. I don't
21 know what they issue.
22 Q. Let me -- I'm asking the question badly. Let me try
23 again. Life Investors statutory entities is used by the
24 office here in Little Rock and the office in Louisville,
25 correct?

Page 54 - Page 57

1 A. Correct.

2 Q. What other office uses Life Investors statutory

3 entity?

4          MR. LEVENTHAL: For what purpose?

5          MR. SINCLAIR: I'm trying to narrow it

6 down.

7          MR. LEVENTHAL: Cancer policies or

8 anything?

9          MR. SINCLAIR: Just anything.

10 Q. (BY MR. SINCLAIR) What other office?

11 A. Cedar Rapids. There could be others. I don't know.

12 Q. Let me try it this way. Is Brenda Clancy based here

13 in Little Rock?

14 A. No.

15 Q. Where is she based?

16 A. In Cedar Rapids.

17 Q. And she's a Life Investors employee?

18 A. Yes.

19 Q. Who is her boss?

20 A. Pat Baird.

21 Q. Is it Mr. or Ms. Baird?

22 A. Mr. Baird.

23 Q. Where is Mr. Baird based?

24 A. In Cedar Rapids.

25 Q. Is he also a Life Investors employee?

1 A. I don't know.

2 Q. What is his title?

3 A. I don't know his official title.

4 Q. And who's his boss?

5 A. I guess it would be Don Shepherd.

6 Q. Don Shepherd is Mr. Baird's boss. Is Mr. Shepherd

7 also based in Cedar Rapids?

8 A. No.

9 Q. Where is Mr. Shepherd based?

10 A. I think he's -- I don't really know if he has a -- I

11 don't know where he's 100 percent based. I don't know.

12 Q. Well, what do you mean, you don't know where his

13 office is?

14 A. He has multiple offices. I don't know. I don't know

15 where he's based.

16 Q. I'm sorry. I see what you're saying. Where are his

17 offices?

18 A. In the Netherlands.

19 Q. I'm sorry. Where?

20 A. In the Netherlands.

21 Q. Is Mr. Shepherd with Aegon, NV?

22 A. Yes.

23 Q. The Netherlands threw me for a second. So Mr. Baird

24 is based in Cedar Rapids, and his boss is Don Shepherd,

25 who is in the Netherlands?

1          MR. LEVENTHAL: Objection to the form.

2 You can answer.

3 Q. Is that right?

4 A. I think he works in the Netherlands and in the U.S..

5 Q. Where are his offices? You said he had multiple

6 offices. I take it --

7 A. He works in both places. I don't know. He's in both

8 countries. I don't know where all of his offices are.

9 Q. What is his title?

10 A. I don't know his specific official title.

11 Q. Okay. Let's back up to Mr. Baird then. Is he like

12 president of Cedar Rapids or president of Life Investors,

13 I should say?

14          MR. LEVENTHAL: Objection to the form.

15 You can answer if you know.

16 A. I don't know his specific title.

17 Q. Brenda Clancy is executive vice president of Life

18 Investors though?

19 A. Yes.

20 Q. All right. Cedar Rapids is the office that you

21 referred to that also uses the statutory entity Life

22 Investors. Are there any other offices besides

23 Louisville, Little Rock or Cedar Rapids that use that

24 statutory Life Investors entity?

25 A. I don't know for sure.

1 Q. Okay. I'm sorry. Let's step back if we can to these

2 people who report to you in Little Rock. The first that

3 you listed was Teralyn. And she's the vice president of

4 project management. What is that?

5 A. She oversees projects, implementation of new

6 products, new systems, new -- just any kind of project,

7 large project that's going on with the company.

8 Q. Are those projects assigned to her by you?

9 A. Yes.

10 Q. Okay. So you tell her what projects she needs to

11 work on and that's --

12 A. She has staff.

13 Q. Okay. But you assign her what projects?

14 A. Correct. I give her direction.

15 Q. You're the boss?

16 A. Yes.

17 Q. If Teralyn Dickey is the vice president of project

18 management, did she have any role in the cancer policies?

19 Did you assign her projects in relation to cancer

20 policies?

21          MR. LEVENTHAL: Objection to the form.

22 You can answer.

23 A. She is responsible for developing and managing new

24 product roll-outs. When we develop a new product one of

25 her staff would be the project manager or oversee the

Page 62

1 implementation of that new product.

2 Q. Okay. I better step back. I just realized. We were

3 talking previously about what entity currently issues

4 cancer policies. Does Life Investors currently issue

5 cancer policies?

6 A. I can't speak for everywhere that it's used, but not

7 in -- but not here today.

8 Q. Not in Little Rock?

9 A. No.

10 Q. Does it issue cancer policies out of the Louisville

11 office?

12 A. No, not today.

13 Q. You're not aware of any office that uses the Life

14 Investors statutory entity to issue cancer policies?

15 A. I don't know. I don't know if they do or not.

16 Q. Okay. In the past the Life Investors entity has been

17 used to issue cancer policies that you're aware of though?

18 A. In Little Rock.

19 Q. Okay. Well like, for example, Mr. Gooch's policy,

20 was that issued through the Little Rock office?

21 A. Yes, it was originally.

22 Q. Okay. How about TransAmerica Life Insurance Company,

23 is it currently issuing cancer policies?

24 A. Yes.

25 Q. Through the Little Rock office?

Page 63

1 A. Yes.

2 Q. And through the Louisville office?

3 A. Yes.

4 Q. How about the TransAmerica Occidental Insurance

5 Company, is it currently issuing or having policies issued

6 through that entity?

7 A. What kind of policies?

8 Q. Cancer policies.

9 A. Not cancer policies.

10 Q. Okay.

11 A. Through Little Rock or Louisville.

12 Q. And are you aware of any other offices that are

13 using --

14 A. I wouldn't know.

15 Q. Are you aware of any offices that are using the

16 Peoples Benefit Life Insurance Company to currently issue

17 cancer policies?

18 A. Are you asking me about Little Rock and Louisville?

19 Q. Yes.

20 A. No, we're not under that statutory company.

21 Q. Are you aware of any other locations that are using

22 that statutory company?

23 A. I don't know.

24 Q. Okay. Well, has Peoples Benefit Life Insurance

25 Company issued cancer policies in the past?

Page 64

1 A. I don't know.

2 Q. How about TransAmerica Occidental Insurance Company,

3 have they issued policies in the past for cancer?

4 A. No, they haven't.

5 Q. Okay. Western Reserve Assurance Company of Ohio, are

6 you aware of any offices that are currently using that

7 statutory entity to issue cancer policies?

8 A. I'm not aware.

9 Q. Are you aware of any offices which used that

10 statutory entity to issue cancer policies in the past?

11 A. I'm not aware.

12 Q. Same question with regard to TransAmerica Financial

13 Life Insurance Company?

14 A. No, they're not.

15 Q. And they have not in the past?

16 A. No.

17 Q. And how about Monumental Life Insurance Company, have

18 they issued cancer policies in the past?

19 A. In the past?

20 Q. Yes.

21 A. Yes.

22 Q. Was that out of the Little Rock office here?

23 A. No.

24 Q. Kentucky?

25 A. I don't know. That office was in Kentucky. And they

Page 65

1 had people in Kentucky before, but not in my Louisville

2 office.

3 Q. Are they currently issuing cancer policies that

4 you're aware of?

5 A. Yes.

6 Q. Monumental is?

7 A. Yes.

8 Q. But they're not doing that through the offices that

9 you supervise?

10 A. That's correct.

11 Q. Let me -- let me step back to Teralyn Dickey, if we

12 can then. She's currently developing new products to roll

13 out, is that what project you've assigned her?

14 A. She has multiple. There's probably 10 or 15 projects

15 that she's working on.

16 Q. Is she currently working on any cancer product

17 projects?

18 A. Yes.

19 Q. What projects is she working on with regard to cancer

20 products?

21 A. Development of a new cancer policy.

22 Q. She is developing a new cancer policy?

23 A. She is overseeing -- she has staff that are working

24 on a project to develop a new cancer product.

25 Q. And you assigned her to that role?

Page 62 - Page 65

**Page 66**

1 A. That's her role in the company. So yes, I would have
2 assigned it to her.
3 Q. You assigned her that project?
4 A. There are other people involved, but yes, she has
5 staff that was working on that project.
6 Q. Okay. I'm sorry. I may have misunderstood. Is
7 there anybody else that assigns Ms. Dickey projects?
8 A. No.
9 Q. So if she's working on developing a new cancer
10 product, that would be a project you assigned her?
11 A. The word developing is what I don't understand.
12 She's not developing. She is the project manager. They
13 oversee projects.
14 Q. I think I took product development, and I may have
15 made a mistake there. She's not developing a new cancer
16 policy, she is implementing a new product?
17 A. She is overseeing the implementation. Her staff is
18 overseeing the implementation of a new product as well as
19 other projects.
20 Q. What statutory entity is going to be issuing this new
21 cancer product?
22 A. TransAmerica Life Insurance Company.
23 Q. Okay. Are there any other entities, statutory
24 entities that are going to be issuing this new product,
25 new cancer product?

**Page 67**

1 A. I'm not sure I understand the question.
2 Q. Let me ask it a different way. Is that new cancer
3 product currently being sold?
4 A. No, not yet.
5 Q. It's in development?
6 A. Yes.
7 Q. It will be sold under the TransAmerica Life Insurance
8 Company statutory entity?
9 A. Yes.
10 Q. What other statutory entities will this new product
11 be sold under?
12 A. No other ones.
13 Q. Just TransAmerica?
14 A. Right.
15 Q. And currently there are no policies being issued
16 under TransAmerica related to this new cancer product?
17 Let me ask that again. This new cancer product has not
18 been sold anywhere, right?
19 A. We have not issued any yet.
20 Q. Okay. Let me ask you this. TransAmerica Life
21 Insurance Company has issued cancer products in the past?
22 A. Yes.
23 Q. Is TransAmerica Life Insurance Company currently
24 issuing cancer policies?
25 A. Yes.

**Page 68**

1 Q. But it's planning on rolling out a new one?
2 A. Yes.
3 Q. What changes are being made?
4       MR. LEVENTHAL: Hold on. We've been
5 going now for about two hours. So far we've covered
6 virtually nothing about Ms. Whitlock's letter, or about
7 the five subject matters that the court allowed this
8 deposition to cover.
9     Now you're starting to go into a new cancer policy
10 written by a company that's not even involved in the
11 lawsuit. I've been giving you a lot of leeway for
12 background information. But at some point we have to
13 start covering what the court designated the deposition to
14 cover.
15 Q. (BY MR. SINCLAIR) Maybe I can ask questions a
16 different way that will help you see why I think it's
17 related. You currently work for TransAmerica Life
18 Insurance Company, right?
19 A. Yes.
20 Q. You're their employee?
21 A. I work for other companies as well.
22 Q. But you're a TransAmerica Life Insurance Company
23 employee?
24 A. Yes.
25 Q. Okay. And you oversee the handling of cancer

**Page 69**

1 policies issued by Life Investors Insurance Company; is
2 that right?
3 A. Yes.
4 Q. Is the Life Investors Insurance Company cancer policy
5 currently being issued?
6       MR. LEVENTHAL: Objection to the form.
7 Go ahead and answer if you can.
8 A. It may be in one or two states.
9 Q. Okay.
10       MR. SINCLAIR: Maybe this would be a good
11 time to go ahead and mark this as Exhibit 2.
12       (Deposition Exhibit 2 was marked.)
13 Q. (BY MR. SINCLAIR) I'm going to ask you if you can
14 identify that for us, please?
15 A. Yes.
16 Q. What is that, which I've marked as Exhibit 2?
17 A. It's a copy of the policy that was mailed to Mr.
18 Gooch in 1997.
19 Q. Did you say it was mailed to Mr. Gooch?
20 A. Yes.
21 Q. Is Mr. Gooch's address on that front page there?
22 A. No, not on the front page.
23 Q. It's actually correspondence dated December 17, 1997;
24 is that right?
25 A. Yes, it says that.

1 Q. That is the cancer policy that was issued to Mr.
2 Gooch. What series is that, do you have a series
3 designation for that policy?
4 A. I don't understand the question.
5     MR. LEVENTHAL: Objection to the form.
6 Q. Let me ask it in a little bit different way. Do you
7 refer to that particular cancer policy as a particular
8 series of policy?
9 A. No, I don't refer to it that way.
10 Q. Do you have designations or commonly used phrases for
11 different versions of a policy?
12     MR. LEVENTHAL: Objection to the form.
13 Go ahead.
14 A. No. We would always refer to it as a cancer policy.
15 And then it would go back to whatever the original form
16 was.
17 Q. What form is that?
18 A. It is LPC01TN.
19 Q. Let me ask you, you just referred to a page of
20 Exhibit 2. Show me that page that you're referring to, if
21 you can?
22 A. (Indicating).
23 Q. I see. You're looking at the 5th page back of
24 Exhibit 2; is that right?
25 A. Yes.

1 Q. And that's got the heading, Life Investors Insurance
2 Company of America. Where are you finding that policy
3 form number that you're using?
4 A. In the bottom left-hand corner.
5 Q. Okay. Tell me what does that stand for?
6 A. That's the form number when it was filed with the
7 State Department of Insurance.
8 Q. What does LPC mean?
9 A. It's just the codes that were used internally. It
10 doesn't really mean anything. It's just a code.
11 Q. I thought perhaps it might mean Life Investors
12 product cancer. It doesn't have any specific -- it's not
13 an acronym for anything?
14     MR. LEVENTHAL: Objection to the form.
15 Go ahead.
16 A. It doesn't mean anything specific. I mean -- the L
17 probably would have stood for Life Investors.
18 Q. But you're not familiar with the rest of what that
19 form designation means?
20 A. I'm familiar with the process of filing products,
21 because I oversee that and I review and approve. And we
22 assign this information when we build it in our system, so
23 we can track the policies, and attach to which policy form
24 needs to print out.
25 Q. So your system tracks which particular form has been

1 assigned?
2 A. Yes.
3 Q. What state was this filed with?
4 A. It was filed with almost all states.
5 Q. Okay. This is not a specific policy with a
6 particular state?
7 A. This is a state variation.
8 Q. What state --
9 A. This is the Tennessee State variation.
10 Q. Do the terms of the policy vary across different
11 states?
12 A. Yes, they definitely can and do.
13 Q. With regard to this particular policy that was filed
14 with the State of Tennessee?
15 A. It is a state specific variation, so there are
16 differences in this policy from other states.
17 Q. What would be different?
18     MR. LEVENTHAL: Objection to the form of
19 the question. And also object to how this ties into what
20 I raised earlier, which is Ms. Whitlock's letter, or any
21 of the five subject matters that the court designated for
22 deposition today.
23 Q. Go ahead.
24 A. If you'll repeat the question?
25 Q. Sure. What would be different in this policy in

1 Tennessee specifically?
2     MR. LEVENTHAL: Objection to the form,
3 compound, impossible to answer. If you can, go ahead.
4 A. I'm prepared to testify for the record, because I
5 have experience in the forms, but I don't know
6 specifically on every state variation what the differences
7 are.
8 Q. Let me ask it this way then, if I can. With regard
9 to this particular policy, Exhibit 2, Mr. Gooch's policy,
10 at the top of that first page of Exhibit 2 it's got,
11 Bankers United Life Insurance Company. Did you ever work
12 for Bankers United Life Insurance Company?
13 A. No.
14 Q. It's got Life Investors Insurance Company of America.
15 Did you ever work for Life Investors?
16 A. No, I've never worked for Life Investors, from the
17 standpoint of that was the legal entity that employed me.
18 But I worked on their policies and managed their policies.
19 Q. Have you ever worked for PFL Life Insurance Company?
20 A. No.
21 Q. Have you ever managed their book of business?
22 A. Not when it was PFL.
23 Q. Okay. What is it now?
24 A. It merged into one of the companies. I believe it
25 merged into Life Investors, but I'm not 100 percent sure.

1 Q. Now, this particular form, was this the same form
2 that's being used by any -- or was this form used by any
3 of the other entities that you've told me issued cancer
4 policies?
5 A. I don't understand the question.
6 Q. Was this particular form that I've got as Exhibit 2,
7 this form of policy, was this used by any other statutory
8 entity?
9 A. At anytime?
10 Q. Yes.
11      MR. LEVENTHAL: Objection to the form.
12 You can answer if you know.
13 A. I don't know for sure. I can't speak for years ago.
14 Q. Okay. Let me back up. Let me go to Exhibit 2 then.
15 It says down at the bottom on the first page, Supplemental
16 Insurance Division. You said I think earlier that that's
17 an old designation, that that's not a legal entity?
18 A. No, never was.
19 Q. What division -- what company is that a division of?
20 A. It's just a generic internal name that was used to --
21 they worked -- they used several insurance companies. So
22 they just kind of had a -- it was more just a generic
23 internal name to know where they were located.
24 Q. So Supplemental Insurance Division was located in
25 Little Rock?

1 A. It was, yes.
2 Q. Was it located somewhere else?
3 A. I don't think so. I don't know.
4 Q. Was it staffed by Life Investors employees, or was it
5 staffed by PFL employees or --
6      MR. LEVENTHAL: Objection to the form.
7 You can answer.
8 A. I don't -- I know it would have been one of the
9 insurance companies, but I don't know which one
10 specifically.
11 Q. Let me back up and ask you. When you said that Ms.
12 Dickey is developing a new product, is she using as a
13 template this particular form, which I've identified as
14 Exhibit 2?
15      MR. LEVENTHAL: Objection to the form.
16 A. She's not developing a new product.
17 Q. I'm sorry. Ms. Dickey is overseeing implementation
18 of a new cancer product, right?
19 A. Yes.
20 Q. Is that new cancer product based upon what I've
21 marked as Exhibit 2?
22      MR. LEVENTHAL: Same objection.
23 A. It's a -- it's not. I wouldn't say it's specifically
24 off of this, no. Probably not. I'm not sure I understand
25 what you're asking me.

1 Q. Okay. When you assign Ms. Dickey the project of
2 overseeing implementation of a new cancer product, was it
3 to replace what I've identified as Exhibit 2?
4 A. No.
5 Q. It was not intended to replace Exhibit 2?
6      MR. LEVENTHAL: Objection to the form of
7 the question. You can answer if you know.
8 A. It wasn't specifically to replace Exhibit 2. We roll
9 out new products. We're an Insurance Company and that's
10 what we do.
11 Q. When was the last time that you rolled out a new
12 cancer product?
13 A. I don't know the specific year.
14 Q. Was the last time that you had a new cancer product
15 this particular product which we've identified as Exhibit
16 2?
17      MR. LEVENTHAL: Objection to the form of
18 the question. You can answer if you know the answer.
19 A. I do not know for sure that this was the version
20 right before that. I think there was probably something
21 in between.
22 Q. Do you know when that particular product was rolled
23 out?
24 A. No.
25 Q. Is Ms. Dickey's project in any way connected to

1 changing the definition of actual charges?
2      MR. LEVENTHAL: Objection to the form of
3 the question. You can answer if you know.
4 A. We've never changed the definition of actual charges.
5 Q. Okay. Let me rephrase the question. Is this new
6 cancer product, which Ms. Dickey is overseeing
7 implementation of, is this new cancer product drafted
8 differently from the product which I've identified as
9 Exhibit 2?
10      MR. LEVENTHAL: Objection to the form of
11 the question. Instruct the witness not to answer, because
12 this is way outside what the judge allowed.
13 Q. Do you understand you've been instructed not to
14 respond?
15 A. Yes, I understand.
16 Q. Okay. We'll come back to that. Is there any other
17 project that Ms. Dickey is currently overseeing with
18 regard to any cancer policies?
19 A. No.
20 Q. Okay.
21 A. Let me -- she's working on a lot of other projects
22 and policies on the system, system conversions and things
23 like that. They're going to -- all policies would be
24 involved in that.
25 Q. I'm sorry?

Page 78

1 A. Systems projects.

2 Q. Systems projects, what do you mean by systems
3 projects?

4 A. Like update of our system, update of our computer
5 system. That would involve all products. It would
6 involve everything because it's an updating of the system.

7 Q. It would involve cancer products?

8 A. It would involve every policy that's on the system,
9 because it's updating the system.

10 Q. And I'm not sure I understand what you mean by
11 updating?

12 A. We have a policy system that keeps records. And
13 we're updating that system. So every policy on the system
14 would be involved, because it involves all systems, all
15 products.

16 Q. Do you mean like the -- like the records related to
17 Mr. Gooch's cancer policy are being transferred to a new
18 computer or something?

19 A. No, just updating them.

20 Q. I'm not sure I understand what you mean by updating.
21 Are you talking about software or something?

22 A. Yes.

23 Q. I'm sorry.

24 A. We're talking about computer software.

25 Q. Computer software. So Mr. Gooch's policy information

Page 79

1 was stored on what computer software?

2 A. It's in Louisville. His policy is in Louisville on a
3 system called Cyberlife, or CK4 is what we use for the
4 short name.

5 Q. And this policy information for Mr. Gooch is
6 currently being transferred to a new computer software?

7 A. No.

8 Q. It's not?

9 A. No. You were asking me about Ms. Dickey. She's
10 involved in other projects that involve all policies.

11 Q. Okay. With regard to Mr. Gooch's policy information,
12 is that going to be on a new system now?

13 A. No.

14 Q. It's not?

15 A. That's in Louisville.

16 Q. I see. Are they doing the same sort of update
17 through Ms. Curtis in Louisville?

18 A. No.

19 Q. So in Louisville Mr. Gooch's information is going to
20 be contained on the CK4 system?

21 A. Yes.

22 Q. And you have a different system here in Little Rock?

23 A. Upgraded.

24 Q. Upgraded.

25 A. Same system, same system, just newer.

Page 80

1 Q. You're just talking about changes in version of
2 software?

3 A. Yes.

4 Q. So is there anything else that Ms. Dickey is involved
5 in that would be connected to the cancer product?

6 A. I don't think so.

7 Q. Okay. Ron Bilello, vice president of IT, what is his
8 job responsibility?

9 A. He is the manager of all the IT, all the computer
10 systems.

11 Q. So would he be responsible for -- he's here in Little
12 Rock?

13 A. Uh-huh.

14 Q. I think I see what you're getting at. He's not in
15 charge of the information technology systems that store
16 Mr. Gooch's policy information?

17 A. Yes, he is.

18 Q. Okay. I'm going to show you what's been produced to
19 us, and I can only carry one copy, so perhaps we can share
20 with your attorney here as well, of the documents that
21 were produced to us on Wednesday, Bates number LIICA 1
22 through LIICA 1033. These were provided as the initial
23 disclosures of Life Investors on Wednesday. Have you seen
24 these documents before?

25      MR. LEVENTHAL: You can answer the

Page 81

1 question yes or no.

2 A. Yes.

3 Q. Okay. Let me turn, if I can, to what's been Bates
4 numbered LIICA, is that Life Investors Insurance Company
5 of America, is that their acronym, LIICA?

6 A. Yes.

7 Q. LIICA 1032 to 1033. And ask you to take a look at
8 that document, if you would, please.

9      (A pause was taken.)

10 Q. First off let me ask you, do you recall writing that
11 correspondence?

12 A. Yes.

13 Q. Okay.

14      MR. LEVENTHAL: Is this an exhibit?

15      MR. SINCLAIR: I can attach it as an

16 exhibit if you'd like?

17      MR. LEVENTHAL: It's up to you.

18      MR. SINCLAIR: I mean, it's -- for

19 documents like this, I just prefer to attach by reference.

20 But if you'd like me to mark it as an exhibit, we can do

21 that.

22    Let me go ahead and mark LIICA 1032 and 1033 as

23 Exhibit 3. There you are.

24      (Deposition Exhibit 3 was marked.)

25 Q. (BY MR. SINCLAIR) Now, first off let me ask you, do

Page 82

1 you recall authoring this inter-company correspondence?
2 A. Yes.
3 Q. Okay. And it says actually up at the top from Connie
4 Whitlock. That's you?
5 A. That's me.
6 Q. Okay. To Deborah Alexander. Who is Deborah
7 Alexander?
8 A. She's my director of claims here in Little Rock.
9 Q. Okay. And also to Mr. James Byrne. Did I pronounce
10 that correctly?
11 A. Yes.
12 Q. Okay. Who is Mr. Byrne?
13 A. He is the director of claims analysis in Louisville.
14 Q. Okay. So you also cc.ed at the bottom of that second
15 page Ms. Neva Curtis. Do you see that?
16 A. Yes.
17 Q. All right. So rather than interacting through Ms.
18 Curtis, you went directly to Mr. Byrne with this memo?
19 A. He reported to me at that time.
20 Q. Oh, he did. Okay.
21   At the time you authored this memo, what was your
22 title?
23 A. Either vice president or senior vice president.
24 Q. Okay.
25 A. I don't remember the specific time it changed.

Page 83

1 Q. Okay. Well, let me ask you, did you have -- this is
2 where I was going with this. You have listed all of those
3 people in Little Rock who currently report to you, and
4 rather than going through every one of those like we've
5 been doing with Ms. Dickey, were any of those people that
6 you've listed for me currently reporting to you in Little
7 Rock involved in authoring this memo, Exhibit 3?
8 A. No.
9 Q. Okay. This was done on your initiative?
10     MR. LEVENTHAL: Objection to the form.
11 You can answer.
12 A. I authored that memo with the assistance of counsel.
13 Q. Okay. Let me back up. Did Ms. Clancy tell you to
14 write this memo?
15 A. No.
16 Q. Did someone tell you specifically to write this memo?
17 A. No, I -- I -- no.
18 Q. Whose idea was it to write this memo?
19 A. Mine.
20 Q. Okay. But you did so with the assistance of counsel?
21 A. Yes.
22 Q. Was that at your initiative?
23 A. Yes.
24 Q. Okay. The reason I'm asking is, I understand we're
25 going to be talking about a change. Now, whether that's a

Page 84

1 change in benefits or a change in forms required to
2 receive benefits is at dispute a bit. But let's refer to
3 this as a memo regarding a change in the way that you are
4 going to process claims. Fair enough? The question I'm
5 going to pose to you is, whose idea was it that this
6 change be implemented?
7     MR. LEVENTHAL: I'm not sure if that's a
8 question. Objection to the form. Is there a question?
9 Q. (BY MR. SINCLAIR) Yes.
10 A. What -- I'm sorry. What's the question?
11 Q. Does this memo, dated July 22, 2005, identified as
12 Exhibit 3.
13 A. Uh-huh.
14 Q. Does it reflect your idea or someone else's idea?
15 A. My idea and -- my idea.
16 Q. And --
17 A. And others.
18 Q. Who's the others?
19     MR. LEVENTHAL: Objection to the form of
20 the question. You can answer if you understand the
21 question.
22 A. I mean, you need to be more specific or -- I don't
23 understand.
24 Q. Sure. You said there were others. Your idea and
25 others. Who are the others?

Page 85

1 A. Steve Gwin.
2 Q. I'm sorry. Could you spell his last name?
3 A. G-W-I-N.
4 Q. Okay. Who else?
5 A. Kelly Adams.
6 Q. And who else?
7 A. Counsel, Mark Edwards.
8 Q. Okay. Is Steve Gwin an attorney?
9 A. No.
10 Q. What does Mr. Gwin do?
11 A. He's an actuary responsible for rate increases.
12 Q. Okay. Did he report directly to you?
13 A. No.
14 Q. Who did he report to?
15 A. Kelly Adams.
16 Q. And who does Mr. Gwin work for? Who's his employer?
17 A. Today?
18 Q. I'm sorry. As of July 22, 2005.
19 A. Peoples Benefit.
20 Q. I'm sorry. When I asked earlier that -- okay. All
21 right.
22   Kelly Adams. Who does Kelly Adams work for?
23 A. He works for Monumental.
24 Q. I'm sorry. That's a he?
25 A. He.

Page 86

1 Q. Okay. And what does he do? What's his title?

2 A. Director of financial reporting.

3 Q. Okay. And Mark Edwards is counsel.

4 So let's go back to my original question, which was,

5 was this your idea? And you said it was said yours and

6 others. Have you told me all the others whose idea this

7 was?

8 MR. LEVENTHAL: Objection to the form.

9 I'm not sure what the idea is that we're talking about.

10 Q. Do you know what idea we're talking about?

11 A. No.

12 Q. Okay. When you look at Exhibit 3.

13 A. Uh-huh.

14 Q. Are you proposing a change --

15 A. No.

16 Q. -- in Exhibit 3? You're not?

17 A. No.

18 Q. You're not proposing any sort of change in this

19 memorandum?

20 A. We're proposing -- we're proposing that we're

21 correcting procedures and some of the forms and things

22 that we use.

23 Q. Okay. When you were proposing correcting the

24 procedures in this July 22nd memorandum, was -- have you

25 given me everyone else whose idea this was to make this

Page 87

1 change?

2 MR. LEVENTHAL: Same objection to the

3 form of the question. You can answer.

4 A. I'm not sure. I still don't know -- I mean, to write

5 the memo was -- was -- was my idea.

6 Q. Okay. But you had Steve Gwin and Kelly Adams. What

7 did they do; did they provide you input?

8 A. They were -- yeah, they provided me input.

9 Q. Okay.

10 A. Not in the -- not for the memo. But they provided me

11 information about what the -- the error that we were

12 making.

13 Q. Okay. Anybody else provide you input with regard to

14 what you call an error that you used in authorizing this

15 July 22nd memorandum?

16 A. I'm not sure directly. Not directly.

17 Q. Anybody indirectly?

18 A. Steve had talked to the claims department.

19 Q. Okay. But when it came to people that you spoke

20 with, it was Steve Gwin, Kelly Adams and Mark Edwards.

21 Were there any others?

22 A. I don't recall anyone else.

23 Q. Okay. And that perhaps will save us from going

24 through the list of all your direct reports in Little

25 Rock.

Page 88

1 MR. SINCLAIR: And I think we're at a

2 good stopping point before I start on the next line.

3 Let's go ahead and take a break.

4 (A recess was had.)

5 Q. (BY MR. SINCLAIR) All right. Let's turn back, if we

6 can, to Exhibit 3, which you have before you.

7 Let me begin by asking you, did you actually type

8 this memorandum up?

9 A. Yes.

10 Q. Okay. So you did this on your computer?

11 A. Yes.

12 Q. Okay. Did anyone else have a hand in drafting this

13 document? In other words, did they make any revisions or

14 corrections, anyone besides you?

15 A. No.

16 Q. Okay. Were there previous versions of Exhibit 3?

17 A. No. I mean, I don't recall. I mean, no. No.

18 Q. Let's start off if we can then by talking about the

19 first sentence, which reads, quote, "As you know, we have

20 been examining the issue of whether we are collecting the

21 necessary information." Let's stop there half through

22 that first sentence.

23 I take it from the wording there that, did you

24 actually speak to Ms. Alexander and Mr. Byrne about this

25 topic before you authored this memo?

Page 89

1 A. I don't recall if I ever spoke to them directly about

2 it.

3 Q. Who did you mean by we?

4 A. Steve and Kelly and Mark.

5 Q. Okay. Any other persons besides Steve, Kelly and

6 Mark?

7 A. No.

8 Q. Okay. What prompted you to begin that examination?

9 A. Steve --

10 MR. LEVENTHAL: Object to the form. You

11 can answer.

12 A. Steve Gwin was brought in as a new actuary to do the

13 rate increases. And he was concerned about continuing to

14 do -- continuing rate increases. And so he brought to the

15 attention of his manager that, you know, we're going to

16 have to do more rate increases, and we ought to

17 understand, you know, if there's any reason why that that

18 -- that we'd have -- you know, that would be causing that

19 to be greater. So they asked some questions of claims

20 just to understand the process.

21 Q. Okay. So Steve Gwin was the actuary responsible for

22 rate increases; is that right?

23 A. Correct.

24 Q. Okay. All right. And Steve Gwin was concerned about

25 rate increases, and he communicated this concern to you?

Page 90

1 A. To his boss.

2 Q. To Kelly Adams?

3 A. Yes.

4 Q. Did she then communicate that to you?

5 A. Yes. Yes.

6 Q. I mean, did it come -- did that communication come

7 from someone else?

8 A. No, it came from -- I just -- it came from either

9 Kelly and Steve together or just Kelly.

10 Q. Then Mr. Gwin's concern about rate increases, we're

11 talking about the cancer policies?

12 A. Yes.

13 Q. Okay. Mr. Gwin's concern about rate increases then

14 led, you said, to a discussion with the claims department?

15 A. Yes.

16 Q. Okay. Was that discussion related solely to Life

17 Investors' cancer policies?

18 A. I don't know.

19 Q. Okay. Because the reason I'm asking here is the

20 subject line says, supplemental -- well, let me ask you.

21 What does the term in that subject line, supplemental,

22 what is it a supplement to?

23 A. Supplemental means -- it means it supplements any

24 other -- you know, it's a supplemental cancer policy.

25 It's not major med.

Page 91

1 Q. Okay. I mean, is it intended to supplement

2 somebody's Blue Cross coverage?

3       MR. LEVENTHAL: Objection to the form.

4 You can answer.

5 A. I don't -- I don't know if it's -- I mean, there's no

6 specific thing it's to supplement. It's just to

7 supplement. You know, it's to provide supplemental

8 coverage.

9 Q. All right. So it's just additional coverage?

10 A. Additional coverage, yeah.

11 Q. Okay.

12 A. I mean, in some -- yeah.

13 Q. All right. In the subject line, it doesn't say Life

14 Investors cancer policies. Was this memo directed solely

15 to the processing of claims for Life Investors Insurance's

16 cancer policies?

17 A. At that time that was the majority of the cancer

18 policies. So I don't think that it was talking about Life

19 Investors, but it would have been any other cancer

20 policies. If they were -- if it was on TransAmerica, it

21 would have been -- it would have been any of those.

22 Q. Okay. So it would have been --

23 A. It says in the text of the letter Life Investors and

24 TransAmerica. So -- I mean, my memo is talking about

25 both.

Page 92

1 Q. Right. And I saw that in the text of that first

2 page. But in the subject line it didn't have Life

3 Investors. And so I wanted to make sure we're talking

4 about --

5 A. It's an internal memo.

6 Q. Okay. It's talking about Life Investors' cancer

7 policies and TransAmerica's cancer policies?

8 A. I'm sorry. I wasn't --

9 Q. Were there any other entities' cancer policies that

10 this memo was talking about?

11 A. No, because that's all that we have on -- that's

12 cancer.

13 Q. I thought Monumental also had cancer policies?

14 A. Not in Louisville.

15 Q. Okay. So this was just directed to the Louisville

16 operation?

17 A. These are what I'm responsible for. I'm not

18 responsible for the Monumental cancer policies.

19 Q. Okay. That's right. I think that -- Monumental is

20 not used in Louisville or in Little Rock, right? That

21 statutory entity is not used in Louisville or Little Rock?

22 A. It is used.

23 Q. It is?

24 A. Yes.

25 Q. At which office?

Page 93

1 A. In Louisville and Little Rock.

2 Q. But their cancer policies aren't issued from

3 Louisville or Little Rock?

4 A. No.

5 Q. Okay. Now, was Mr. Gwin an actuary responsible for

6 rate increases over Life Investors and TransAmerica

7 policies?

8 A. Yes.

9 Q. You know what, I wasn't specific enough. Life

10 Investors and TransAmerica cancer policies, he's the rate

11 increase actuary for those two policies, right?

12 A. Yes.

13 Q. Did he have any other policies that he was the

14 actuary responsible for rate increases on?

15 A. Not that I'm aware of.

16 Q. Okay. All right. Now, let's go on through the first

17 sentence then, if we can.

18     You reference collecting the necessary information to

19 pay claims accurately.

20     Let me ask you, in there what information are you

21 referring to when it comes to paying claims accurately?

22 A. I'm sorry. Where are you?

23 Q. You say -- I'm sorry.

24 A. Where are you in the memo?

25 Q. Let me go to the first line there.