## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## COLUMBIA DIVISION

| | | |
|---|---|---|
| ANTHONY E. GOOCH, Individually and on behalf of all similarly situated individuals, | ) ) ) ) | |
| Plaintiff, | ) ) | NO. 1:07-0016<br>JUDGE HAYNES |
| v. | ) ) | |
| LIFE INVESTORS INSURANCE COMPANY OF AMERICA and AEGON USA, INC., | ) ) ) ) | |
| Defendants. | ) | |

## M E M O R A N D U M

Plaintiff, Anthony E. Gooch, filed this action under 28 U.S.C. § 1332, the federal diversity statute individually and on behalf of other similarly situated individuals against the Defendants: Life Investors Insurance Company ("Life Investors") and Aegon USA, Incorporated ("Aegon"). Plaintiff's claims arise from the Defendants' reduction in the amount of benefits under his insurance contract, a Cancer Only Policy with Life Investors, a wholly owned subsidiary of Aegon. Plaintiff asserts claims for breach of contract, breach of implied duty of good faith and fair dealing, bad faith and seeks declaratory judgment and injunctive relief for breach of the Defendants' obligations under this insurance policy.

Before the Court are the following motions: (1) the Plaintiff's motion for a preliminary injunction (Docket Entry No. 35); (2) the Defendant Aegon's motion to dismiss for lack of personal jurisdiction (Docket Entry No. 37); (3) Life Investors's motion to dismiss or for summary judgment (Docket Entry No. 45); (4) Plaintiff's cross motion for partial summary judgment (Docket Entry No. 64); and (5) Plaintiff's motion for class certification under Fed R. Civ. P. 23(b)(2) (Docket Entry No.

66).  Responses have been filed to all of these motions as well as replies.  Of the various motions, the Court addresses first, the Defendant Aegon's motion to dismiss.

### A. Aegon's Motion to Dismiss

### 1. Review of the Record

In its motion to dismiss, Aegon argues that it lacks any specific contact with Tennessee to justify this Court's exercise of jurisdiction over it.  Aegon, an Iowa corporation, asserts that its principal places of business are in Iowa and in Maryland.  (Docket Entry No. 39, Cervens Declaration at ¶ 4).  Aegon is not incorporated nor licensed to do business in Tennessee.  Id. at ¶ 7. Aegon does not have any employees, property, or offices in Tennessee to market, or sell any goods or services in Tennessee.  Id. at ¶¶ 8-9, 14.  Aegon has not signed any contracts in Tennessee nor does it pay taxes in Tennessee.  Id. at ¶¶ 11, 12.  Aegon is not listed on the Plaintiff's policy or the application.

Plaintiff's proof is that in addition to Cedar Rapids, Iowa and Baltimore, Maryland, Aegon has offices in (1) Charlotte, North Carolina; (2) Frazier, Pennsylvania; (3) Little Rock, Arkansas; (4) Los Angeles, California; (5) Louisville, Kentucky; (6) Kansas City, Missouri; (7) Plano, Texas; (8) Purchase, New York; and (9) St. Petersburg, Florida.  See Docket Entry No. 58, Exhibit A thereto, 2005 Aegon Annual Report at p. 66.  Despite its assertion that Defendant has no employees, Plaintiff notes that Aegon has eleven offices throughout the United States.  Life Investors is one subsidiary within Aegon.  (Docket Entry No. 39, Cervens Declaration at ¶¶ 16-20).

Aegon has five operating groups; Agency, Direct Marketing, Services, Financial Markets, Institutional Products and Services and Pension.  See Docket Entry No. 58, Exhibit A thereto, 2005 Aegon Annual Report at p. 66.  The function of the Aegon "Agency Group" is to "offer a wide range

2

of insurance products through agents dedicated to selling Aegon products, as well as independent agents, registered representative, financial advisors and specialized marketing organizations." (Docket Entry No. 58, Exhibit C thereto, 2004 Aegon Annual Report at p. 57). Aegon's group structure is "to manage the organization more efficiently and to identify business synergies, pursue cross-selling opportunities and improve operating efficiencies." Id. Aegon's assigns each subsidiary a function within its system and Aegon's "[c]ompanies in the United States are referred to as Aegon USA." Aegon's annual report reflects that all subsidiaries are viewed as part of the organization and that Aegon controls the organization, including its subsidiaries.

Life Investors is Aegon's wholly owned subsidiary and sells only Aegon's products. See Docket Entry No. 58, Exhibit A thereto, 2005 Aegon Annual Report at p. 69. In its "Waiver of Premium/Waiver of Disability Claim Form" for Plaintiff's policy, Life Investors is listed as a member of the Aegon Insurance Group. See Docket Entry No. 58, Exhibit E thereto, Waiver of Premium Claim Form. Aegon reports Life Investors's revenue as attributable to Aegon in its SEC filings. (Docket Entry No. 58, Exhibit A thereto, 2005 Aegon Annual Report at p. 69).

Aegon employees in Cedar Rapids are generally employed by Life Investors, but carry out Aegon's operations. (Docket Entry No. 58, Exhibit B thereto, Taiber Declaration at ¶ 2 filed January 10, 2006 in McCullough v. AEGON USA, et al, Case No. CV 05-7215 DDP (C.D. Cal.)). In that action, Mary Taiber, director of employee services of Life Investors testified that Aegon uses employees of its wholly owned subsidiaries for Aegon's operational activities. According to Taiber, "Operations [of AEGON USA, Inc.] are carried out through subsidiaries and affiliates, which employ the employees who do the work for the operating companies within the Aegon Group. The employees who work for the companies within the Aegon Group in Cedar Rapids are generally

3

employed by Life Investors." (Docket Entry No. 58, Exhibit B thereto, Taiber Declaration at ¶ 2).

Aegon also formed Aegon Financial Partners "in early 2002 as a new internal service organization to enable the Agency Group to take better advantage of its combined size and strength by integrating the operations, technology and service functions of separate but similar operating groups." (Docket Entry No. 58, Exhibit C thereto, 2004 Aegon Annual Report at p. 57). Aegon Financial Partners is named on almost every correspondence sent to Plaintiff about his policy. See Docket Entry No. 58, Exhibit D thereto, Claim Forms and Instructions. The address and telephone number listed for Life Investors "Claims Department" is identical to the address and telephone number for Aegon Financial Partners. Id. The address of Life Investors "Administrative Office" on its letterhead is identical to the address of Aegon Financial Partners and its "Claims Department." Id. at Exhibits D and F thereto.

### b. Plaintiff's Insurance Policy

According to his complaint, on or about November 24, 1997, Plaintiff applied to Life Investors for a supplemental cancer insurance policy (the "Policy") and his application was approved (Docket Entry No. 1, Complaint, Exhibit A thereto). Plaintiff listed his home address as Athens, Alabama. Id. Plaintiff's application was for a policy from Life Investors. Life Investors issued the Policy to the Plaintiff on or about December 10, 1997. Id. The Policy includes several riders, all of which were effective November 24, 1997. Plaintiff's total initial monthly premium was $41.40. Id. at Exhibit A, Policy at Schedule at p. 2. Plaintiff later moved to Tennessee where he worked.

In 1999, Plaintiff was diagnosed with cancer covered by his "Cancer Only Policy." Plaintiff was told to mail his claim under the policy to Aegon Financial Partners, P.O. Box 36580, Louisville,

4

Kentucky, 40232-6580, telephone number 1-866-242-2806. See Docket Entry No. 58, Exhibit D thereto, Claim Forms and Instructions at p. 2. On each remittance for reimbursement of cancer-related charges or other expenses under his policy, Plaintiff was informed to contact Aegon Financial Partners for any questions about the remittance. See Id., and Docket Entry No. 58, Exhibit E thereto, Waiver of Premium Claim Form at p. 2. The envelopes for these written correspondence reflect "Claims Department, AEGON Financial Partners, P.O. Box 36580, Louisville, Kentucky 40233-6580." See Id.,and Docket Entry No. 58, Exhibit D thereto, Claim Forms and Instructions at p. 1. The Aegon Financial Partners's claims department was "An Administrative Office for: Life Investors Insurance Company of America...Members of the Aegon Insurance Group." Id. Plaintiff's Explanation of Benefits form listed Aegon Financial Partners as having the same address of Life Investors. See Id. at Exhibit H thereto, Explanation of Benefits. Plaintiff's most recent benefit check directs that any questions regarding the payment should be sent to "AEGON Financial Partners." See Id. Exhibit I thereto, Check Dated June 7, 2007.

## B. Conclusions of Law

Upon a motion to dismiss for lack of personal jurisdiction, "[a]s there is no statutory direction for procedure upon an issue of jurisdiction, the mode of its determination is left to the trial court." Serras v. First Tennessee Bank Nat'l Ass'n., 875 F.2d 1212, 1214 (6th Cir. 1989) (quoting Gibbs v. Buck, 307 U.S. 66, 71-72 (1939)). A district court may rely on the submission of affidavits or conduct an evidentiary hearing under Rule 12(d) of the Federal Rules of Civil Procedure. Welsh v. Gibbs, 631 F.2d 436, 438 (6th Cir. 1980). If the court rules on written submissions alone, the plaintiff may not rest on his pleadings to answer the movant's affidavits, but must set forth with, "specific facts, by affidavit or otherwise" showing that the court has jurisdiction. Williams v.

5

Firstplus Home Loan Owner Trust, 310 F.Supp.2d 981, 990 (W.D. Tenn. 2004) (citing Theunissen v. Matthews, 935 F.2d 1454 (6th Cir.1991)). Although the Defendants requested a hearing and each party submitted affidavits, the Court deems a hearing unnecessary given the proof submitted and the limited showing that Plaintiff is required to make.

However the court decides the motion, the plaintiff always bears the burden of establishing that jurisdiction exists. McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 189 (1936); Weller v. Cromwell Oil Co., 504 F.2d 927, 929 (6th Cir.1974). Yet, plaintiffs need only make a prima facie showing that jurisdiction exists and all of the party's factual assertions of jurisdictional facts are presumed true and all factual disputes are decided in plaintiff's favor. Nelson v. Park Industries, Inc., 717 F.2d 1120, 1123 (7th Cir. 1983); Welsh, 631 F.2d at 438-39. Here, Plaintiff must make a prima facie showing that the preponderance of the evidence would justify this Court's exercise of personal jurisdiction over Aegon. Welsh, 631 F.2d at 438. If Plaintiff satisfies his burden, "the motion to dismiss should be denied notwithstanding any controverting presentation by the moving party." Serras, 875 F.2d at 1214 (citations omitted). "The defendant may proceed to trial without waiving the defense. A threshold determination that personal jurisdiction exists does not relieve [the plaintiff] . . . at the trial of the case-in-chief from proving the facts upon which jurisdiction is based by the preponderance of the evidence." Id. (citations omitted).

In diversity actions, the jurisdictional reach of the district court is to be determined by the law of the state where the district court sits. Pickens v. Hess, 573 F.2d 380, 385 (6th Cir. 1978); Milan Exp. Inc. v. Missie, Inc., 575 F.Supp. 931 933 (W.D. Tenn. 1983). Tennessee's long arm statute subjects nonresident parties to the jurisdiction of state and federal courts in Tennessee on any claim arising from:

6

(1) The transaction of any business within the state;

* * *

(4) Entering into any contract of insurance, indemnity, or guaranty covering any person, property, or risk located within this state at the time of contracting;

* * *

(6) Any basis not inconsistent with the constitution of this state or of the United States;

* * *

(b) "Person," as used herein, includes corporations and all other entities which would be subject to service of process if present in this state.

(c) Any such person shall be deemed to have submitted to the jurisdiction of this state who acts in the manner above described through an agent or personal representative. (emphasis added).

Tenn. Code. Ann. §§ 20-2-214(a)(1), (4), (6), (b) and (c) (1986) (emphasis added).

The Tennessee long arm statute is construed to grant jurisdiction to the limits of Due Process Clause of the Fourteenth Amendment. Hooks v. Hooks, 771 F.2d 935, 945, n.9 (6th Cir. 1985). The Tennessee Supreme Court has adopted the minimum contact test, under federal case law noting that: "[T]hree primary factors are to be considered in determining whether the requisite minimum contacts [are] present: the quantity of the contacts, their nature and quality, and the source in connection of the cause of action with those contacts." Masada Investment Corp. V. Allen, 697 S.W.2d 332, 334 (Tenn. 1985).

In assessing Aegon's contention that the Court lacks jurisdiction,[1] the Court is guided by the

---

[1]Two types of in personam jurisdiction exist; "specific jurisdiction" and "general jurisdiction." As the Supreme Court noted:

7

Supreme Court's decisions defining the requirements and limits of the Due Process Clause.   In

Asahi Metal Co., Ltd. v. Superior Court of California, Solano County, 480 U.S. 102 (1987), the

Supreme Court concluded that a foreign corporation's placement of a product in stream of commerce

without more was insufficient to satisfy the minimum contacts test for the exercise of in personam

jurisdiction under the Due Process Clause of the Fourteenth Amendment.   The Supreme Court

reiterated that the touchstone determination under the Due Process Clause for the District Court's

exercise of personal jurisdiction over a foreign corporation is whether the foreign corporation

purposefully established minimum contacts in the forum state.   The Supreme Court reaffirmed its

earlier holding in Hanson v. Denckla, 357 U.S. 235, 253 (1958), involving American corporations

that minimum contacts must be established by evidence of some act[2] by which the defendant

purposefully availed itself of the privilege of conducting activities within the forum state, thereby

invoking the benefits and protections of the forum's state laws.   Asahi Metal, 480 U.S. at 105.

---

It has been said that when a Sate exercise personal jurisdiction over a defendant in
a suit arising out of or related to the defendant's contacts with the forum, the State
is exercising "specific jurisdiction" over the defendant. See Von Mehren &
Trautman, Jurisdiction to adjudicate: A Suggested Analysis, 79 Harv. L. Rev.
1121, 1144-1164 (1966).

When a State exercises personal jurisdiction over a defendant in a suit not arising
out of or related to the defendant's contacts with the forum, the State has been
said to e exercising "general jurisdiction" over the defendant. See Brilmayer,
How Contacts Count: Due Process Limitations on State Court Jurisdiction, 1980
S.Ct. Rev. 77, 80-91; Von Mehren & Trautman, 79 Harv. L. Rev., at 1136-1144;
Calder v. Jones, 465 U.S. at 786.

Helicopteros Nacionales de Columbia v. Hall, 466 U.S. 408, 414, nn.8 and 9 (1984).

[2]A single act creating a "substantial connection" with forum state can establish
in personam jurisdiction.  S&S Screw Machine Co. v. Cosa Corp., 647 F.Supp. 600, 607 (M.D.
Tenn. 1986).

8

Further, the Supreme Court emphasized that

> The "substantial connection . . . between the defendant and the forum State necessary for a finding of minimum contacts must come about by **an action of the defendant purposefully directed toward the forum State**.

Id. at 112 (emphasis added in the original and citations omitted).

Given the proof here, a relevant decision is Burger King Corp v. Rudzewicz, 471 U.S. 462, 475 (1985). There, in a commercial contract context, the Supreme Court outlined and defined the factors for determining whether the District Court possesses personal jurisdiction over a foreign corporation. In Burger King, a Florida resident was a defendant in the Florida action arising out of a contractual relationship with a Florida franchisor, for the operation of a food franchise in Minnesota. Upon review, the Supreme Court upheld the District Court's exercise of jurisdiction in Florida because of the evidence of a substantial and continuing relationship between the parties in Florida.

> The Due Process Clause protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he established no meaningful "contacts, ties, or relations." By requiring that individuals have "fair warning that a particular activity may subject [them] to the jurisdiction of a foreign sovereign," the Due Process Clause "gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit.
>
> Where a forum seeks to assert specific jurisdiction over an out-of-state defendant who has not consented to suit there, **this "fair warning" requirement is satisfied if the defendant has "purposefully directed" his activities at residents of the forum, and the litigation results from alleged injuries that "arise out of or relate to" those activities.** . . And with respect to interstate contractual obligations, we have emphasized that parties who "reach out beyond one state and create continuing relationships and obligations with citizens of another state" are subject to regulation and sanctions in the other State for the consequences of their activities.

Burger King at 471-73 (emphasis added and citations omitted).

9

The Supreme Court also observed that the states have in interest in asserting jurisdiction

> where individuals purposefully derive benefit from their interstate activities, it may
> well be unfair to allow them to escape having to account in other States for
> consequences that arise proximately from such activities; the Due Process Clause
> may not readily be wielded as a territorial shield to avoid interstate obligations that
> have been voluntarily assumed.

Id. at 473-74. The Court also noted that the

> [j]urisdiction is proper, however, where the contacts proximately result from actions
> by the defendant himself that create a "substantial connection" with the forum. Thus
> where the defendant "deliberately" has engaged in significant activities within a
> State, or has created "continuing obligations" between himself and residents of the
> forum, he manifestly has availed himself of the privilege of conducting business
> there, and because his activities are shielded by "the benefits and protections" of the
> forum's laws it is presumptively not unreasonable to require him to submit to the
> burdens of litigation in that forum as well.

Id. at 475-76. In this analysis, the parties' prior negotiations, course of dealings and terms of any

agreement are to be considered. S&S Screw Machine Co., 647 F.Supp at 607.

As to Aegon's proof of the absence of offices in Tennessee, in light of the realities of modern

commercial life, physical presence is not required and "[s]o long as a commercial actor's efforts are

'purposefully directed' toward residents of another State, we have consistently rejected the notion

that an absence of physical contacts can defeat personal jurisdiction there." Burger King, 471 U.S.

at 476. (citations omitted)

This Court applied these same basic principles to a corporate parents whose subsidiaries

engaged in business in Tennessee. See Third Nat'l Bank v. WEDGE Group, Inc., 882 F.2d 1087

(6th Cir.1989). In Hi-Fi Corner, Inc. v. Inflight Cinema Intern, Inc., 505 F.Supp. 12 (M.D. Tenn.

1980), a New York parent and its subsidiary were in the distribution of films, but in different

customer markets. In its efforts to garner contracts for films to be delivered in Tennessee, the

10

subsidiary relied upon its relationship with the parents' "reputation and resources". Id. at 14. Under these facts, this Court held that the parent had sufficient minimum contacts with Tennessee to assert in personam jurisdiction over the parent.  Id. at 15.

Here, for the exercise of personal jurisdiction, Plaintiff relies upon Tennessee decisions that allow the contacts of a foreign entity to be attributed to another entity's conduct in Tennessee under principles of conspiracy, agency and alter ego.  Chenault v. Walker, 36 S.W.3d 45, 54-55 (Tenn. 2001) (conspiracy); Williams v. First plus Home Loanowner Trust 1998-4, 310 F.Supp.2d 981, 994 (W.D. Tenn. 2004) (agency); and Boles v. Nat'l Development Co., Inc., 175 S.W.3d 226, 244 (Tenn. App. 2005) (alter ego).  The Tennessee long-arm statute provides: "A court may exercise personal jurisdiction over a person who acts directly or indirectly, as to a claim for relief arising from the person's . . . . [c]ausing tortious injury by an act or omission in this state . . ." Tenn. Code Ann. § 20-2-223(a) and (a)(3).

In Chenault, the Tennessee Supreme Court stated: "[W]e hold that the conspiracy theory of personal jurisdiction, premised on the basic principle of conspiracy liability fits within the Tennessee long-arm statute and comports with due process." 36 S.W.3d at 54-55.  See also American Copper & Brass, Inc. v. Mueller Europe, Ltd., 452 F.Supp.2d 821, 830 (W.D. Tenn. 2006) ("This Court finds the conceptual framework of applying basic principles of agency and conspiracy law to jurisdictional matters unobjectionable on its face.").

The Tennessee Supreme Court defined Tennessee's conspiracy theory of personal jurisdiction as follows:

> Under [this] doctrine, when (1) two or more individuals conspire to do something;
> (2) that they could reasonably expect to lead to consequences in a particular forum,
> if; (3) one co-conspirator commits overt acts in furtherance of the conspiracy, and (4)

11

those acts are of a type which, if committed by a non-resident, would subject the non-resident to personal jurisdiction under the long-arm statute of the forum state, then those overt acts are attributable to the other co-conspirators, who thus become subject to personal jurisdiction in the forum, even if they have no direct contacts with the forum.

Chenault, 36 S.W.3d at 53 (quoting Cawley v. Bloch, 544 F.Supp. 133, 135 (D. Md. 1982)).

In Chenault, the Tennessee Supreme Court found personal jurisdiction over three defendants that lacked direct contacts with Tennessee, but had business dealings with a co-defendant that was directly involved in the alleged wrongful conduct. Id. at 52. The Chenault plaintiff asserted that each of the out-of-state defendants conspired to induce him fraudently into investing in two hotels by tortiously concealing the hotel's financial instability. The Court held that notwithstanding their lack of direct contacts, personal jurisdiction existed over the out-of-state defendants because those "intertwined relationship" with the defendants over whom the Court had personal jurisdiction established. Id. at 56. The Court also found that the defendants had worked closely together on the transactions at issue. Id. Based on this showing, the Court concluded that the contacts of a Tennessee defendant were imputed to the out-of-state defendants on conspiracy grounds. Id. at 58.

Here, Plaintiff alleges a conspiracy of Aegon and its wholly owned subsidiaries, including Life Investors and Aegon Financial, that sell and administer Cancer Only Policies in Tennessee and other states throughout the country. Plaintiff cites Taiber's declaration that Aegeon's operations are carried out through its subsidiaries. (Docket Entry No. 58, Exhibit B thereto, Taiber Declaration at ¶ 2). According to Taiber, the persons charged with carrying Aegon's operations through Life Investors's employees are carried out from Aegon's Cedar Rapids office. Aegon is on Life Investors correspondence and documents that were sent to the Plaintiff by Life Investors. Id. Aegon benefits from Life Investors' profits that Aegon reports in its filings as part of its profits. See Docket Entry

12

No. 58, Exhibits A and C thereto.

Aegon Financial Partners also has a similar arrangement with Aegon and is a part of its "Agency Group." See Id. at Exhibit A thereto, 2005 Aegon Annual Report at p. 66 and Exhibit C thereto, 2004 Aegon Annual Report at p. 57. Aegon Financial "offer[s] a wide range of insurance products through agents dedicated to selling Aegon products, as well as independent agents, registered representatives, financial advisors and specialized marketing organizations." From the Life Investors's correspondence to Plaintiff, Aegon Financial is clearly involved in administering Plaintiff's Cancer Only Policy with Life Investors. See Id. at Exhibits D, E, F, H and I thereto.

By using Life Investors and Aegon Financial employees to carry out the conduct alleged in the complaint, Plaintiff asserts that Aegon facilitated, enabled, directed and controlled the activities of these entities that deprived Plaintiff, a Tennessee resident, of his contractual rights to benefits under the Policy and in accordance with Life Investor's history of determining benefits.. Thus, Plaintiff contends that he has made a sufficient showing of Aegon's intertwined activity with Life Investors and Aegon Financial to justify personal jurisdiction over Aegon in Tennessee under his conspiracy theory and the Tennessee long-arm statute.

In addition for his conspiracy theory, Williams and Tenn. Code Ann. § 20-2-214(c) are cited as authorization to exercise a jurisdictional relationship based upon a finding of agency of a nonresident of Tennessee with an agent or personal representative in Tennessee.[3] "In determining whether an agency relationship exists, the principal's right to control the action of an agent is an important factor, but that right of control is not necessarily as important as the principal's actual

_____

[3]Tenn. Code Ann. § 20-2-214(b) explains that this section, including subsection (c), applies to "corporations and all other entities which would be subject to service of process if present in this state."

13

exercise of control over the agent." Williams, 310 F.Supp.2d at 994.

In Nixon v. Celotex Corp., et al., 693 F.Supp. 547 (W.D. Mich. 1988) that Court found personal jurisdiction over a parent corporation for the acts of a subsidiary on a plaintiff's employment related claims. There, two of Celotex's managers were employees of another entity and the parent developed and set Coletex's personal manual and employment policies. Id. at 550. The parent paid Coletex's employee salary and pension benefits from the parent's accounts. Id.

Here Aegon utilizes Life Investors's employees to staff its Cedar Rapids office. (Docket Entry No. 58, Exhibit B thereto, Taiber Declaration at ¶ 2). These employees are charged with executing Aegon's operations from that office. Id. at ¶ 1. As evidenced by the Plaintiff's dealings, these employees also handle the underwriting and claims of the Cancer Only Policy at issue. Aegon provides benefits to Life Investors employees and the employees of other subsidiaries. Id. at ¶ 1. Aegon Financial employees who are housed in Aegon's Cedar Rapids office, also handled Plaintiff's claims. Id. at Exhibits D and F thereto. Plaintiff was instructed to submit his claim to Aegon Financial at the same address of Life Investors and Aegon. Id. at Exhibit D thereto at p. 2. Life Investors told Plaintiff to contact Aegon Financial Partners with any questions about his benefits. Id.. Life Investors provided Plaintiff with an envelope to submit his claim. This envelope was self-addressed to Aegon Financial Partners in Louisville, Kentucky, id. another Aegon office. See Id. at Exhibit A thereto, 2005 Aegon Annual Report at p. 66.

In sum, the Court concludes that Plaintiff has made a sufficient prima facie showing of personal jurisdiction based upon conspiracy and agency theories that Aegon conducts its business through its subsidiaries. Aegon's documents reflect that its "[b]usiness operations are conducted through the file insurance subsidiaries of Aegon USA, Inc." Life Investors and Aegon Financial

14

Group gross revenues are reported in collective fashion as Aegon's gross revenue in its SEC filings. In Aegon's annual report, the business operations and earnings of Aegon's subsidiaries are referred to as generated by Aegon. See Docket Entry No. 58, Exhibit A thereto. Life Investors and Aegon Financial Group both sell and manage insurance products for the benefit of their parent company Aegon. Life Investors and Aegon Financial issued and administered Plaintiff's policy and made the decision to change the amount of Plaintiff's benefits under that policy.

Plaintiff's third theory of personal jurisdiction relies on Tennessee alter ego doctrine that in appropriate circumstances, disregards separate corporate existence to establish liability and/or jurisdiction. Boles, 175 S.W.3d at 244. Under this theory, Tennessee courts consider whether one corporate entity is the alter ego of another entity and consider, among other things, their failure to maintain arms length relationships between them. Boles, 175 S.W.3d at 245 (citations omitted). See also Federal Deposit Ins. Corp v. Allen, 584 F. Supp. 386, 397 (E.D. Tenn. 1984).

Other factors are considered, but a plaintiff need not present evidence of such factors for the Court to pierce the corporate veil. See Boles, 175 S.W.3d at 246; (citing In re B & L Laboratories, Inc., 62 B.R. 494, 504 (Bankr. M.D. Tenn. 1986)). Where the evidence shows that "the corporate form is used as an essentially unfair device - when it is used as a sham - courts may act in equity and disregard the usual rules of law in order to avoid an inequitable result" and find personal jurisdiction. Oceanics Schools. Inc. v. Barbour, 112 S.W.3d 135, 144 (Tenn. Ct.App. 2003).

In Flynn v. Greg Anthony Construction Co., Inc., 95 Fed. Appx. 726 (6th Cir. 2003), the Sixth Circuit held that the plaintiff can establish a prima facie showing of personal jurisdiction over corporate defendants under the alter ego theory. Plaintiff there presented evidence that: (1) the corporate defendants were listed with the same address; (2) the corporate defendants shared the same

15

telephone line; (3) one corporate defendants used the other corporate defendant's letterhead for its business memoranda; and (4) one corporate defendant submits its union reports on the other corporate defendant's stationary. Id. at 736-37. The Court held that "[a]lthough Defendants subsequently explained away these accusations, the Defendants' controverting assertions should not be considered when determining whether Plaintiffs presented a prima facie case for personal jurisdiction." Id. at 737.

Construing the facts cited above, in the light most favorable to the Plaintiff, the Court concludes that the Plaintiff has made a prima facie showing of personal jurisdiction over Aegon, under the alter ego doctrine. Thus, Aegon's motion to dismiss should be denied.

### B. Plaintiff's Motion for Class Certification

#### 1. Analysis of the Motion

In this motion, Plaintiff seeks class certification under Fed.R.Civ.P. 23(b) based upon his breach of contract claim.

> Whether under the supplemental cancer policy issued in Life Investors are
> Aegon and/or Life Investors required to pay "actual charges" benefits reflected in the
> amounts of medical bills or under their revised method of calculating benefits as
> reflected in Plaintiff's claims.

( Docket Entry No. 67, Memorandum at p.6). Plaintiff defines his class as: "[a]ll individuals throughout the United States who are, or between six (6) years from the filing date of this action until the present have been, insured by Cancer Only Policies issued by Life Investors." (Docket Entry No. 66, Motion to Certify Class at p. 1).

According to Plaintiff, the central issue for the class evolves around Life Investors's, policy's promise to pay benefits equal to the "actual charges" for treatments such as the radiation and

16

chemotherapy benefits identified in Parts 11 and 12, respectively, under Part 2, Section E of the Policy. Life Investors contends that its revised "claims procedure" under the Policy is the proper method for determining benefits and that the Policy does not pay benefits based upon the insured's provider's medical billings. Plaintiff asserts that this change results in an across-the-board reduction in benefits historically paid to the putative class members.

Plaintiff contends that the Policy obligates Life Investors to use medical bills as the "actual charges" as benefits because of (1) the manner in which the term "actual charges" is used in the Policy and (2) Life Investors' eight-year course of dealings in construing the calculation of benefits Policy in this manner. Plaintiff's motion for class certification argues that his claim for declaratory and injunctive relief based on the breach of policy contract, is the overarching question of fact and law that equally impacts every member of the putative class affected by this change of Policy interpretation. In this change, Plaintiff contends that the Defendants have "acted or refused to act on grounds generally applicable to the class." Thus, Plaintiff contends that declaratory and/or injunctive relief on the contract claim would benefit "the class as a whole." Fed. R. Civ. P. 23(b)(2).

Plaintiff notes that the Policy is a standard form contract designed to provide insureds with a direct cash benefit for various cancer-related treatments, regardless of whether the insured has other health insurance in place. Plaintiff cites Life Investors' prior course of dealing with him and its current class-wide practices as described in a July 22, 2005, memorandum by Connie Whitlock. (Docket Entry No. 93, Exhibit B thereto, Whitlock Memorandum)[4]. That memorandum reflects that

---

[4] Plaintiffs cite to the Whitlock memorandum as Exhibit B in their appendix to their motion for class certification, (Docket Entry No. 69), but failed to include this document. The Court relies on the Whitlock memorandum dated July 22, 2005 submitted by Defendants as Exhibit B to their reply memorandum in support of its motion to dismiss, or in the alternative, for summary judgment. (Docket Entry No. 93-2).

17

the Defendants historically paid "actual charges" benefits to class members, including Gooch, using medical bills as the applicable contractual index. On or about July 2005, the Defendants switched the benefits index paying lesser amounts based upon what the government and large insurers negotiated with healthcare providers to constitute the accepted fee for a particular service aside from the amount of the provider's bill to the patient.

This change impacted the Plaintiff, who purchased the Policy in November 1997. (Docket Entry No. 69, Exhibit 3 thereto, Gooch Deposition at pp. at 13-16). In 1999, Gooch was diagnosed with non-Hodgkins Lymphoma. Id. at 25. For eight years following that diagnosis, the Defendants paid Gooch "actual charges" benefits using his medical bills as the Policy index. This payment was consistent with the Defendants' instructions to Gooch to file his claim by submitting his "itemized hospital bills, doctor bills (surgery, anesthesia, in-patient attending physician bills), chemotherapy and radiation therapy bills." Id. at 45, 138-140 and Exhibit B thereto (the Cancer Only Policy document having this instruction).

On or about May 2006, the Defendants announced in a computer generated form letter its discontinuance of paying "actual charges" benefits that used medical bills as an index. The Defendants issued this letter to other insureds (Docket Entry No. 69, Exhibit 4 thereto), including Gooch's letter (Exhibit 5).

In October 2006, Gooch submitted another claim for chemotherapy treatment. Id. at pp. 58, 169, 215; and Id. at Exhibit 6 thereto, Gooch Affidavit at ¶ 10). As in the previous eight years since his cancer diagnosis, Gooch submitted his physician's bill for chemotherapy treatments and sought full benefits equal to the amount of the bill. Id. at p. 58. The Defendants refused. Id. Defendants processed the claim on November 1, 2006, and thereafter informed Gooch through a computerized

18

notice that he had improperly submitted his "proof of loss." (Docket Entry No. 69, Exhibit 6 thereto, Gooch Affidavit at ¶ 11). This statement instructed Plaintiff to re-file his proof of loss attaching either (1) a summary notice from Medicare or Medicaid; (2) an Explanation of Benefits (EOB) from whatever other medical care coverage he may have had in place; or (3) a statement from his healthcare provider showing the amount actually paid for the services rendered, irrespective of the actual charges indicated in the medical provider billing statement. Id.

On November 10, 2006, Plaintiff re-submitted his claim and attached an EOB provided by Blue Cross/Blue Shield showing Blue Cross/Blue Shield had paid only a portion of the amount charged and noting that the Blue Cross payment did not relieve him of his obligation on the unpaid balance of the bill. Id. at ¶ 12.[5] Defendants' records reveal Defendants categorized $2,351.00 of the claim as "chemotherapy treatment" as that term is used in the Policy. See Gooch Aff. and Exhibit F thereto. Defendants only paid $1582.72 of the chemotherapy charges. Id. Therefore, on this claim for benefits related to a single day of chemotherapy, Mr. Gooch received approximately $768.00 less than the amount to which he was entitled if the Defendants had paid in conformity with the Policy and their course of dealings over the prior eight years. Id.

Plaintiff has since submitted additional claims for benefits for chemotherapy that Defendants continue to cut his in accordance with the May 2006 form letter that was sent to all putative class members.

### B. Conclusions of Law

Class actions "vindicat[e] the rights of individuals who otherwise ought not consider it worth the candle to embark on litigation in which the optimum result might be more than consumed by the

---

[5]See supra at p. 30.

19

cost." Gulf Oil Co. v. Bernard, 452 U.S. 89, 99 n.11 (1981) (quoting Deposit Guar. Nat'l Bank v. Roper, 445 U.S. 326, 338 (1980)). A class action concentrates the litigation in one forum and avoids inconsistent adjudications, thereby advancing "the efficiency and economy of litigation which is a principal purpose of the procedure." Am. Pipe & Constr. Co. v. Utah, 414 U.S. 538, 553 (1974). Any judgment in such an action operates as res judicata against the claims of any other class member. Duncan v. State of Tenn., 84 F.R.D. 21, 27 (M.D. Tenn. 1979).

To meet the requirements for class certification, Plaintiff must first demonstrate his compliance with Rule 23(a) of the Federal Rules of Civil Procedure, applicable to all class actions, and thereafter demonstrate that class certification is proper under one of the enumerated categories of Rule 23(b). "In determining the propriety of a class action, the question is not whether the plaintiff or the plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." Eisen v. Carlisle & Jacquelin, 412 U.S. 156, 178 (1974) (quoting Miller v. Mackey Int'l, Inc., 452 F.2d 424, 427 (5th Cir, 1971)). Accord Weathers v. Peters Realty Corp., 499 F.2d 1197, 1201 (6th Cir. 1974). In evaluating Plaintiff's compliance with these rules, the Court must "carefully scrutinize [their] allegations to insure the requisites of Rule 23(a) and (b) have been met." Duncan, 84 F.R.D. at 27. Moreover, it is Plaintiff's burden "to show the Court that the requirements of Rule 23 are met." Id. Mere recitation of the statutory language contained in Rule 23 will not satisfy the requirements of these rules. Sims v. Parke Davis Co., 334 F. Supp. 774 (E.D. Mich. 1971), aff'd, 453 F.2d 1259 (6th Cir. 1971).

Plaintiff bears the burden of persuasion that "[a]s a preliminary matter [the plaintiff] must satisfy all four of the prerequisites contained in Rule 23(a) and then demonstrate that the class he seeks to represent falls within one of the subcategories under Rule 23(b)." Steelman v. Strickland,

20

78 F.R.D. 187, 189 (E.D. Tenn. 1977) (Neese, D.J.) (quoting Senter v. Gen. Motors Corp., 532 F.2d 511, 522 (6th Cir. 1976)). This burden is not by a preponderance of the evidence, as that standard applies only to proving the existence of the class at the time of trial. See Paxton v. Union Nat'l Bank, 519 F. Supp. 136, 37, 171 (E.D. Ark. 1981), rev'd in part on other grounds, 688 F.2d 552 (8th Cir. 1982). Albeit in a different type of legal claim, in Coleman v. General Motors Acceptance Corp., 196 F.R.D. 315, 318 (M.D. Tenn. 2000), vacated on other grounds, 296 F.3d 443 (6th Cir 2002) the Court stated that: "The Court takes the allegations of the plaintiff as true and any doubts as to certifying the class should be resolved in the plaintiff's favor."(citing Cross v. Nat'l Trust Life Ins. Co., 553 F.2d 1026, 1029 (6th Cir. 1977)).

In reaching this determination, preliminary hearings on the merits are disfavored. Eisen, 417 U.S. at 177-78; Duncan, 84 F.R.D. at 28. The Supreme Court, however, counsels that in determining class action issues, "[s]ometimes the issues are plain enough from the pleadings to determine whether the interests of the absent parties are fairly encompassed within the named plaintiff's claim, and sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." Gen. Tel. Co. of S.W. v. Falcon, 457 U.S. 147, 160 (1982) (emphasis added). A limited factual inquiry into the class allegations, including the deposition of the named plaintiff, is appropriate for actions involving complex claims. See, e.g., Kirkpatrick v. J.C. Bradford, 827 F.2d 718, 723 (11th Cir. 1987) (securities action).

Here, the parties submitted affidavits and exhibits that the Court deems sufficient for the limited factual analysis required. The Court's task is to determine only if a sufficient factual showing is made to support the scope of the class sought to be certified.

### 1. Rule 23(a) Prerequisites

21

The threshold requirements for a class action are as follows:

One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

### a. Numerosity and Joinder

As to numerosity, "[t]here is no strict numerical test for determining impracticability of joinder." In re Am. Med. Sys., Inc., 75 F.3d 1069, 1079 (6th Cir. 1996) (citing Senter, 532 F.2d at 523 n.24). "Rather, '[t]he numerosity requirement requires examination of the specific facts of each case and imposes no absolute limitations.' " Id. (quoting Gen. Tel. Co. v. EEOC, 446 U.S. 318, 330 (1980)). While no specific number is determinative, several courts have certified classes that involved substantially smaller classes of one hundred members or less. See, e.g., Korn v. Franchard Corp., 456 F.2d 1206 (2d Cir. 1972) (class of 70 investors sufficient); Cypress v. Newport News Gen. & Nonsectarian Hosp. Ass'n, 375 F.2d 648 (4th Cir. 1967) (eighteen persons could comprise a class). However, as a general rule, the "sheer number of potential litigants in a class, especially if it is more than several hundred, can be the only factor needed to satisfy Rule 23(a)(1)." Bacon v. Honda Am. Mfg., Inc., 370 F.3d 565, 570 (6th 2004).

Here, Plaintiff proposes a class of Life Investors's current and past policy-holders within the last six years throughout the United States. Given Life Investor's multi-state operations, the Court is satisfied that the putative class is sufficiently numerous and that joinder of putative class members would be impracticable. Thus, the Court concludes that Plaintiff has met the numerosity

22

requirement of Rule 23(a)(1).

### b. Typicality and Commonality

Rules 23(a)(2) and (3) require that the class representative's claim must be typical of all putative class members' claims. In a word, there must be common questions of law or fact between all members of the putative class. There is substantial congruity between the concepts of commonality under Rule 23(a)(2) and typicality under Rule 23(a)(3) as both requirements "tend to merge". Falcon, 457 U.S. at 157 n.13. As the Supreme Court explained: "[b]oth serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." Id. The Supreme Court explained that class certification can be appropriate where the plaintiff's claim involves a defendant's policy. Id. at 159 n.15. The core requirement is that "a class representative must be part of the class and possess the same interest and suffer the same injury as the class members." Id. at 156 (quotation and citations omitted).

In the Sixth Circuit, to satisfy typicality, the plaintiff "must be a member of the class he claims to represent . . . [or] [s]tated another way, the plaintiff must have standing to represent the class." Reid v. White Motor Corp., 886 F.2d 1462, 1471 (6th Cir. 1989). In determining the predominance issue, the Third Circuit observed that the inquiry involves, "at a minimum, the identification of the legal and factual issues, common and diverse, and an identification of the class members to which those relate." Katz v. Carte Blanche Corp., 496 F.2d 747, 756 (3d Cir. 1974) (en banc).

Here, Plaintiff seeks to certify a class of all current and past policy holders within the last six

23

years who were subjected to the Defendants' policy that altered Life Investor's prior practice in calculating benefits for supplemental cancer coverage to those policy holders.

The Court concludes that the Defendants' change of policy administration and calculation of benefits under a standard contract presents common questions of law and fact among putative class members and satisfies the typicality and commonality requirements of Rule 23(a)(2) and (3).

### c. Adequacy of Representation

As to whether the named Plaintiffs are adequate representatives of the class, in <u>Falcon</u>, the Supreme Court reiterated its core requirement that "a class representative must be part of the class and possess the same interest and suffer the same injury as the class members." 457 U.S. at 156 (citations and quotation omitted). The Sixth Circuit has enunciated two criteria for the Court's determination: "(1) [t]he representative must have common interests with unnamed members of the class, and (2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel." <u>Senter v. Gen. Motors Corp.</u>, 532 F.2d 511, 525 (6th Cir. 1976) (citing <u>Gonzales v. Cassidy</u>, 474 F.2d 67, 73 (6th Cir. 1973)). The Sixth Circuit has observed further that the adequacy of representation prerequisite overlaps with the typicality requirement because "in the absence of typical claims, the class representative has no incentives to pursue the claims of the other class members." <u>In re Am. Med. Sys., Inc.</u>, 75 F.3d 1079, 1083 (6th Cir. 1996). Absolute identity of claims among class members, however, is not required, <u>Like v. Carter</u>, 448 F.2d 798, 802 (8th Cir. 1971), particularly as to the amount of damages. <u>Weathers v. Peters Realty Corp.</u>, 499 F.2d 1197, 1200-01 (6th Cir. 1974).

Given that this Court has found Plaintiff has established that Plaintiff 's claim is common and typical of members of the proposed class and that Plaintiff primarily seeks declaratory and

24

injunctive relief for the class, the Court concludes that the named Plaintiff shares common interests with the members of the putative class.

Adequate representation requires that "class counsel are qualified, experienced, and generally able to conduct the litigation." Stout v. J.D. Byrider, 228 F.3d 709, 717 (6th Cir. 2000). Here, Plaintiff's counsel and their firms have substantial litigation experience. From the papers filed in this action, the Court concludes that Plaintiff's counsel are well qualified to conduct this litigation. For these reasons, the Court concludes that Plaintiffs have met the adequacy requirement of Rule 23(a)(4).

### 2. Plaintiffs' Rule 23(b)(2) Claims

To obtain certification of this action, Plaintiff must also satisfy the requirements of Rule 23(b)(2)), namely that: "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed. R. Civ. P. 23(b)(2)-(3). Rule 23(b)(2) "is intended to reach situations where a party has taken action or refused to take action with respect to a class, and final relief of an injunctive nature or of a corresponding declaratory nature, settling the legality of the behavior with respect to the class as a whole, is appropriate." Fed. R. Civ. P. 23 advisory committee's note. Conversely, Rule 23(b)(2) "does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages." Id.

Here, as to class claims, Plaintiff primarily seeks a declaratory judgment and injunctive relief on the Defendants' interpretation of their Supplemental Cancer Only Policy in the calculating benefits for all similarly situated policy holders. The Defendants' challenged practice on calculating benefits impacts all class members in a similar fashion, i.e., reduction of benefits. To avoid undue

25

repetition of the evidence cited on class certification, the Court concludes that Plaintiffs' class certification under Rule 23(b)(2) is warranted given the declaratory and injunctive relief sought by the Plaintiff on his breach of contract claim.

### C. Plaintiff's Motion for Preliminary Injunction and the Parties' Cross-Motions for Summary Judgment[6]

### 1. Findings of Fact[7]

On or about November 24, 1997, Plaintiff applied to Life Investors for a supplemental cancer insurance policy (the "Policy") and his application was approved (Docket Entry No. 1, Complaint, Exhibit A thereto). Plaintiff listed his home address as Athens, Alabama. Id. Plaintiff's application was for a policy from Life Investors. Life Investors issued the Policy to the Plaintiff on or about December 10, 1997. Id. The Policy includes several riders, all of which were effective November 24, 1997. Plaintiff's total initial monthly premium was $41.40. Id. at Exhibit A thereto, Policy at p. 5. Plaintiff later moved to Tennessee where he worked.

The terms "actual expenses" and "actual charges" are used interchangeably in the Benefits section of Plaintiff's policy, but "actual charges" is used more often:

---

[6] This section addresses Plaintiff's motion for partial summary judgment and motion for a preliminary injunction both of which present only his breach of contract claim. The Court also considers Life Investors's motion for summary judgment on Plaintiff's breach of contract claim.

[7] Upon a motion for summary judgment, the factual contentions are viewed in the light most favorable to the party opposing the motion for summary judgment. Duchon v. Cajon Co., 791 F.2d 43, 46 (6th Cir. 1986). As discussed infra, upon the filing of a motion for summary judgment, the opposing party must come forth with sufficient evidence to withstand a motion for directed verdict, Anderson v. Liberty Lobby, 477 U.S. 242, 247-52 (1986), particularly where there has been an opportunity for discovery. Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986). The Court concludes that there are not any material factual disputes on Plaintiff's breach of contract claim that is based principally upon the terms of the Policy and that presents a question of law. Thus, this section constitutes finding of facts under Fed. R. Civ. P. 56(d). These findings of fact, however, are limited to Plaintiff's breach of contract claim.

26

## 11. RADIATION THERAPY

    (a)    Treatments - we will <u>pay the actual charges</u> up to the calendar year maximum shown in the Policy Schedule for radiation therapy treatments authorized and administered by a Radiation Therapist......

    (b)    Associated Expenses - we will <u>pay the actual charges</u> not to exceed $250 per calendar year for the following radiation therapy relates expenses.....

    (c)    Alopecia - we will <u>pay the actual expenses</u> for a wig or hairpiece not to exceed a lifetime maximum of $75 if you experience hair loss as a result of your chemotherapy treatments.....

## 12. CHEMOTHERAPY

    (a)    Treatments - we will <u>pay the actual charges</u> up to the calendar year maximum shown in the Policy Schedule for cancercidal chemical substances including their administration.....

    (b)    Associated Expenses - we will <u>pay the actual charges</u> not to exceed $250 per calendar year for the following chemotherapy relates expenses.....

    (c)    Alopecia - we will <u>pay the actual expenses</u> for a wig or hairpiece not to exceed a lifetime maximum of $75 if you experience hair loss as a result of your radiation therapy treatment.....

## 14. BLOOD, PLASMA, AND BLOOD COMPONENTS

<u>We will pay the actual</u> charges up to the calendar year maximum shown in the Policy Schedule. . .

* * *

## 17. BONE MARROW DONOR'S EXPENSES

If you undergo a bone marrow transplant we will <u>pay the following expenses</u> incurred by your donor:

    (a) <u>The actual expense of roundtrip transportation</u> by Common Carrier to the Hospital where the transplant is performed; and

    (b) <u>the actual charge not to exceed $1,000 for medical expenses,</u>

27

including any Hospital charges, directly related to the transplant; and

(c) the actual expenses for lodging and meals not to exceed $75 per day when the donor is asked to remain near the Hospital after the transplant for the possible donation of additional blood components.

\* \* \*

**23. AMBULANCE**

We will pay the actual charges by a licensed professional ambulance service up to $2,000 per trip. . .

Id. at Exhibit A, Cancer Only Policy, Section E, Part 2 at pp. 7,8, 9 (emphasis added).

In 1999, Plaintiff was diagnosed with non-Hodgkins Lymphoma. (Docket Entry No. 69, Exhibit 6 thereto, Gooch Affidavit at ¶ 4). After his diagnosis, Plaintiff and his wife asked Life Investors how to submit claims for benefits under the Policy. Id. at ¶ 7. At that time, Plaintiff was instructed as follows:

Cancer Specified Disease, Hospital & Heart. Submit the completed [claim] form along with your itemized hospital bills, doctor bills (surgery, anesthesia, inpatient attending physician bills), chemotherapy and radiation therapy bills. On claims for cancer and specified disease, submit the first pathology report diagnosing your condition.

Id. at ¶ 7 and Exhibit 12 thereto (emphasis added).[8]

Beginning 1999, Plaintiff submitted his medical bills under the Policy. Id. at ¶¶ 6, 7 and 8. Plaintiff's submission of the billing statements of his healthcare providers for his chemotherapy

---

[8] The "calendar year maximum" establishes the benefits ceiling for the insured, but varies depending upon how much coverage the insured has purchased through riders. This ceiling - and the riders that establish them - do not affect either the insured's eligibility for benefits in the first instance nor the dollar-for-dollar basis on which the insured is to be paid. Rather, it only provides the ceiling on whatever benefits become payable.

28

treatments reflects their "actual charges" as his "proof of loss". Id. at ¶ 8. For approximately eight years, Life Investors consistently paid the actual charges based upon the Plaintiff's health care providers' bills. Under the Policy, absent assignment by Plaintiff, these benefits are payable directly to him regardless of other health insurance coverage.

In May 2006, Life Investors sent a computer-generated form letter that payment of benefits "for certain kinds of medical services, such as radiation therapy and chemotherapy" would no longer be indexed to medical bills effective July 1, 2006. ( Docket Entry No. 69, Exhibit 6 thereto, Gooch Affidavit at ¶ 9 and Exhibit 4 thereto (the Form Letter). Plaintiff's policy's benefits were cut to the amounts that his healthcare providers agreed with Blue Cross/Blue Shield to accept as payments for that service or treatment Id. Defendants have since continued this underpayment of Plaintiff's claims. Id. at ¶¶ 12, 13 and 15.

As an example of this change, October 2006, Plaintiff submitted a "proof of loss" to the Defendants for his chemotherapy treatment. Id. at ¶10 and Exhibit E attached thereto. Plaintiff's physician charged $2,857.00, (Docket Entry No. 93, Exhibit D thereto), but the Defendants refused to pay the charge of $2,857.00 Life Investors characterized $2,521.93 as the benefits payable for "chemotherapy treatments". On November 1, 2006, Plaintiff was informed by computerized notice that this "proof loss" was improperly submitted. Id. at Exhibit F thereto and Docket Entry No. 69, Gooch Affidavit at ¶ 11. This letter instructed him to re-file his proof of loss and attach either (1) a summary notice from Medicare or Medicaid; (2) an Explanation of Benefits (EOB) from any other medical care coverage in effect; or (3) a statement from his healthcare provider of the amount actually paid for the services rendered, notwithstanding the actual charges in the medical providers billing statement. Id.

29

Plaintiffs medical bills from Vanderbilt University Medical Center, which Life Investors included in its Initial Disclosures, has the following statement prominently displayed:

> \*INSURANCE CLAIMS ARE FILED AS A COURTESY. YOUR POLICY IS AN AGREEMENT BETWEEN YOU AND YOUR INSURANCE COMPANY AND **DOES NOT RELIEVE YOU OF TIMELY PAYMENT OF THIS ACCOUNT. THESE ARE THE AMOUNTS EXPECTED TO BE PAID BY YOUR INSURANCE COMPANY BASED ON OUR BEST INFORMATION.**

(Docket Entry No. 85, Plaintiffs Supplemental Response at Exhibit 15 thereto).

On November 10, 2006, Gooch re-submitted his "proof of loss", with an EOB from Blue Cross/Blue Shield that paid only a portion of the amount charged. (Docket Entry No. 69, Exhibit 6 thereto, Gooch Affidavit at ¶ 12). Defendants' records reveal Defendants categorized $2351.00 of the claim as "chemotherapy treatment" as that term is used in the Policy. See Gooch Affidavit and Exhibit F thereto. Defendants only paid $1582.72 of the chemotherapy charges. Id. Therefore, on this claim for benefits related to a single day of chemotherapy, Plaintiff received approximately $768.00 less than the if the Defendants paid in conformity with the Policy and their prior course of dealings over the preceding years. Id. Despite Plaintiff's submission of numerous additional claims for chemotherapy, Defendants continued to pay his benefits at a reduced rate in accordance with the May 2006 Form Letter. (Docket Entry No. 69, Exhibit 6 thereto, Gooch Affidavit at ¶ 16).

Plaintiff can on longer work since his diagnosis in 1997. Plaintiff had to quit his automobile mechanic job in Pulaski, Tennessee and is unable to support his wife without the payments under the Policy. Id. at ¶¶ 14, 15 and 16. Defendants' alternation of benefits also has caused Plaintiff's wife a great deal of stress. Plaintiff's wife now regularly works overtime to meet the family's financial obligations. Id. at ¶ 15. This overtime work limits her ability to assist Plaintiff in meeting

30

his daily needs and provide emotional support.  Id.

Plaintiff's cancer has not responded to less drastic treatments and  currently, Plaintiff is undergoing more intensive chemotherapy treatments.  Id. at ¶ 18. Plaintiff 's current chemotherapy causes loss of vision for up to two weeks after each session, requiring his wife to take off work to care for him.  Id..  Plaintiff has experienced renal failure due to tumors on each of his kidneys. Id..  Stents were inserted to keep his kidney functioning.  Id.  Plaintiff has been told at least once that his cancer is terminal.

Given his health condition, Plaintiff seeks a preliminary injunction and partial summary judgment to restore his loss of benefits of the unpaid portions of the total bills of his health care providers for radiation therapy, chemotherapy and other treatment received during the time of  his policy with the Defendants is in force. This restoration would be in accord with the Defendants' prior method of calculating his benefits for these service.

### B.  Conclusions of Law

"The grant or denial of a preliminary injunction... is within the sound judicial discretion of the trial court  reviewable only for contrariness to rules of equity or for abuse of discretion." Tree Pub. Co., Inc. v. Warner Bros. Records, a Div. of Time-Warner, Inc., 785 F. Supp 1272, 1274 (M.D.Tenn.1991),

> [T]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held. Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. A party thus is not required to prove his case in full at a preliminary injunction hearing.

Six Clinics Holding Corp., II v. Cafcomp Systems, Inc., 119 F.3d 393, 400 (6th Cir.1997) (citing

31

University of Texas v. Camenisch, 451 U.S. 390, 395 (1981)).

For a preliminary injunction, Plaintiffs must show: (1) a likelihood of success on the merits; (2) irreparable injury should the court decline to grant the injunction; (3) whether a preliminary injunction would cause substantial harm to others and (4) whether a preliminary injunction would be in the public interest. Samuel v. Herrick Memorial Hosp., 201 F.3d 830, 833 (6th Cir. 2000) (citing Glover v. Johnson, 855 F.2d 277, 282 (6th Cir.1988)). "These four factors, however, are elements to be balanced and not prerequisites that must be met." Tree Pub. Co., Inc., 785 F. Supp at 1274 (citing In re Delorean Motor Co., 755 F.2d 1223, 1229 (6th Cir.1985)).

As to a motion for summary judgment, "[t]he very reason of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Advisory Committee Notes on Rule 56, Federal Civil Judicial Procedure and Rules (West Ed. 1989). Moreover, "district courts are widely acknowledged to possess the power to enter summary judgment sua sponte, so long as the opposing party was on notice that she had to come forward with all of her evidence." Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986). Accord, Routman v. Automatic Data Processing, Inc., 873 F.2d 970, 971 (6th Cir. 1989).

In Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986), the United States Supreme Court explained the nature of a motion for summary judgment:

> Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment `shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.

32

> As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

Id. at 247-48 (emphasis in the original and added in part). Earlier the Supreme Court defined a material fact for Rule 56 purposes as "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no `genuine issue for trial.'" Matsushita Electrical Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citations omitted).

A motion for summary judgment is to be considered after adequate time for discovery. Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986). Where there has been a reasonable opportunity for discovery, the party opposing the motion must make an affirmative showing of the need for additional discovery after the filing of a motion for summary judgment. Emmons v. McLaughlin, 874 F.2d 351, 355-57 (6th Cir. 1989). But see Routman v. Automatic Data Processing, Inc., 873 F.2d 970, 971 (6th Cir. 1989).

There is a certain framework in considering a summary judgment motion as to the required showing of the respective parties as described by the Court in Celotex

> Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. . . . [W]e find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim.

Celotex, 477 U.S. at 323 (emphasis deleted).

As the Court of Appeals explained, "[t]he moving party bears the burden of satisfying Rule 56(c) standards." Martin v. Kelley, 803 F.2d 236, 239, n. 4 (6th Cir. 1986). The moving party's

33

burden is to show "clearly and convincingly" the absence of any genuine issues of material fact. Sims v. Memphis Processors, Inc., 926 F.2d 524, 526 (6th Cir. 1991)(quoting Kochins v. Linden-Alimak, Inc., 799 F.2d 1128, 1133 (6th Cir. 1986)). "So long as the movant has met its initial burden of 'demonstrating the absence of a genuine issue of material fact,' the nonmoving party then 'must set forth specific facts showing that there is a genuine issue for trial.'" Emmons v. McLaughlin, 874 F.2d 351, 353 (6th Cir. 1989) (quoting Celotex and Rule 56(e)).

Once the moving party meets its initial burden, the Court of Appeals warned that "[t]he respondent must adduce more than a scintilla of evidence to overcome the motion [and]. . . must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989)(quoting Liberty Lobby). Moreover, the Court of Appeals explained that

> The respondent must 'do more than simply show that there is some metaphysical doubt as to the material facts.' Further, '[w]here the record taken as a whole could not lead a rational trier of fact to find' for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is 'implausible.'

Street, 886 F.2d at 1480 (citations omitted). See also Hutt v. Gibson Fiber Glass Products, 914 F.2d 790, 792 (6th Cir. 1990) ("A court deciding a motion for summary judgment must determine 'whether the evidence presents a sufficient disagreement to require a submission to the jury or whether it is so one-sided that one party must prevail as a matter of law" (quoting Liberty Lobby)).

If both parties make their respective showings, the Court then determines if the material factual dispute is genuine, applying the governing law.

> More important for present purposes, summary judgment will not lie if the dispute about a material fact is 'genuine' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.

34

* * *

      Progressing to the specific issue in this case, we are convinced that <u>the inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits</u>. If the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, <u>the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented</u>. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. <u>The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict -- `whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed</u>.'

<u>Liberty Lobby</u>, 477 U.S. at 248, 252 (citation omitted and emphasis added).

      It is likewise true that

[I]n ruling on a motion for summary judgment, the court must construe the evidence in its most favorable light in favor of the party opposing the motion and against the movant. Further, the papers supporting the movant are closely scrutinized, whereas the opponent's are indulgently treated. It has been stated that: `The purpose of the hearing on the motion for such a judgment is not to resolve factual issues. It is to determine whether there is any genuine issue of material fact in dispute. . . .'

<u>Bohn Aluminum & Brass Corp. v. Storm King Corp.</u>, 303 F.2d 425, 427 (6th Cir. 1962) (citation omitted). As the Court of Appeals stated, "[a]ll facts and inferences to be drawn therefrom must be read in a light most favorable to the party opposing the motion." <u>Duchon v. Cajon Company</u>, 791 F.2d 43, 46 (6th Cir. 1986) <u>app.</u> 840 F.2d 16 (6th Cir. 1988) (unpublished opinion) (citation omitted).

      The Sixth Circuit further explained the district court's role in evaluating the proof on a summary judgment motion

35

A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim. Rule 56 contemplates a limited marshalling of evidence by the nonmoving party sufficient to establishing a genuine issue of material fact for trial. This marshalling of evidence, however, does not require the nonmoving party to "designate" facts by citing specific page numbers. Designate means simply "to point out the location of." Webster's Third New InterNational Dictionary (1986).

Of course, the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the nonmoving party relies; but that need for specificity must be balanced against a party's need to be fairly apprised of how much specificity the district court requires. This notice can be adequately accomplished through a local court rule or a pretrial order.

InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989). Here, the parties have given some references to the proof upon which they rely. Local Rule 56 requires a showing of undisputed and disputed facts.

In Street, the Court of Appeals discussed the trilogy of leading Supreme Court decisions, and other authorities on summary judgment and synthesized ten rules in the "new era" on summary judgment motions

1.   Complex cases are not necessarily inappropriate for summary judgment.

2.   Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

3.   The movant must meet the initial burden of showing `the absence of a genuine issue of material fact' as to an essential element of the non-movant's case.

4.   This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

5.   A court should apply a federal directed verdict standard in ruling on a motion for summary judgment. The inquiry on a summary judgment motion or a directed verdict motion is the same: `whether the evidence presents a sufficient

36

disagreement to require submission to a jury or whether it is so one-sided that the party must prevail as a matter of law.'

6.      As on federal directed verdict motions, the `scintilla rule' applies, i.e., the respondent must adduce more than a scintilla of evidence to overcome the motion.

7.      The substantive law governing the case will determine what issues of fact are material, and any heightened burden of proof required by the substantive law for an element of the respondent's case, such as proof by clear and convincing evidence, must be satisfied by the respondent.

8.      The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must `present affirmative evidence in order to defeat a properly supported motion for summary judgment.'

9.      The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

10.     The trial court has more discretion than in the `old era' in evaluating the respondent's evidence.  The respondent must `do more than simply show that there is some metaphysical doubt as to the material facts.'  Further, `[w]here the record taken as a whole could not lead a rational trier of fact to find' for the respondent, the motion should be granted.  The trial court has at least some discretion to determine whether the respondent's claim is `implausible.

Street, 886 F.2d at 1479-80.

The Court has distilled from these collective holdings four issues that are to be addressed upon a motion for summary judgment:  (1) has the moving party "clearly and convincingly" established the absence of material facts?;  (2) if so, does the plaintiff present sufficient facts to establish all the elements of the asserted claim or defense?; (3) if factual support is presented by the nonmoving party, are those facts sufficiently plausible to support a jury verdict or judgment under the applicable law?; and (4) are there any genuine factual issues with respect to those material facts under the governing law?

In a diversity action, such as this one, the District Court is obliged to apply the law of the

37

forum. Erie Railroad Co. v. Thompkins, 304 U.S. 64 (1938). In addition, the conflict law of the forum determines which state's substantive law shall apply. Klaxton Co. v. Stentor Electric Mfg., 313 U.S. 487 (1941). With these principles in mind, an examination of Tennessee's choice of law principles on the parties' claim is necessary.

Plaintiff's breach of contract claim is based upon a written insurance policy contract. Under Tennessee law, the validity of a contract and the substantive rights of the parties thereunder, are governed by the law which the parties intended to govern their relations with the legal presumption that absent a contrary intent, the parties intended the law of the place of making the contract. Goodwin Bros. Leasing, Inc. v. H. & B., Inc., 597 S.W.2d 303, 306-07 (Tenn. 1980); Deaton v. Vise, 186 Tenn. 364, 372, 210 S.W.2d 665 (1948). See also Moody v. Bass, 357 F.2d 730, 732 (6th Cir. 1966); and American Training Serv. v. Commerce Union Bank, 415 F. Supp. 1101, 1104, n. 3 (M.D. Tenn. 1976), aff'd mem., 612 F.2d 580 (6th Cir. 1979).

Here, when the initial contract was executed, Plaintiff resided in Alabama, but for the time period at issue, Plaintiff has since resided in Tennessee where he worked. The Defendants changed the policy while Plaintiff was in Tennessee. Life Investors has continued the imposition of its altered policy determinations of benefits while Plaintiff resides in Tennessee that impacts Tennessee's commerce. This Court applies Tennessee law and Alabama law on insurance contracts.

Under Tennessee law, in a contract action, "[t]he ascertainment of the intention of the parties to a written contract is a question of law or judicial function for the court to perform when the language is plain, simple and unambiguous." Forde v. Fisk Univ., 661 S.W.2d 883, 886 (Tenn. Ct. App.1983) (citing Petty v. Sloan, 197 Tenn. 630, 277 S.W.2d 355 (1955)), "[b]ut, where the writing is not plain and unambiguous, and is such as to require the aid of parol evidence, and the parol

38

evidence is conflicting or such as admits of more than one conclusion, it is not error to submit the doubtful parts under the proper instructions to the jury." Forde, 661 S.W.2d at 886.

Yet, as this Court observed, ambiguity as to a contract's term is not created because the parties disagree as to its meaning. Oman Constr. Co. v. Tennessee Valley Auth., 486 F. Supp. 375, 382 (M.D. Tenn. 1979). One party's view of the contract does not necessarily mean that such provisions are part of the contract. In re D.L. Bouldin Constr. Co., 6 Bankr. 288 (Bankr. E.D. Tenn. 1980). Tennessee law generally allows enforcement of the parties' contract as written without questioning the wisdom of the contract or the harshness of its enforcement absent some public policy consideration. Metro. Life Ins. Co. v. Humphrey, 167 Tenn. 421, 425-26, 70 S.W.2d 361, 362 (1934); Wilson v. Scott, 672 S.W.2d 782, 786 (Tenn. Ct. App. 1984). See also In re Dynamic Enterprises, 32 Bankr. 509, 518 (Bankr. M.D. Tenn. 1983).

Under Alabama law, "[t]he primary source for deciding whether a contract is clear is the test of the document itself. It is well established in Alabama that when an instrument is unambiguous its construction and legal effect will be based upon what is found within its four corners. Southland Qualify Homes, Inc. v. Williams, 781 So. 2d 949, 953 (Ala. 2000) (quoting Austin v. Cox, 523 So.2d 376, 379 (Ala. 1988).

Under either Tennessee or Alabama law, for insurance contracts, "[p]olicy language should be given its plain meaning." Harrell v. Minnesota Mut. Life Ins. Co., 937 S.W.2d 809, 814 (Tenn. 1996). " Insurance contracts, like other contracts, are construed so as to give effect to the intention of the parties, and, to determine this intent, a court must examine more than an isolated sentence or term; it must read each phrase in the context of all other provisions." Attorneys Ins. Mut. of Ala. v. Smith, Blocker, & Lowther, P.C., 703 So.2d 866, 870 (Ala.1996)

39

Under Alabama law, for insurance contract, "an ambiguity exists where a term is reasonably subject to more than one interpretation. Cannon by and through Cannon v. State Farm Mutual Ins. Co., 590 So.2d 191, 194 (Ala. 1991) and as a matter of law, the ambiguity is to be resolved by the Court. Charles H. McCauley Associates, Inc. v. Shook, Ala., 339 So.2d 1011 (Ala. 1976). When there are "two possible reasonable contract interpretations, the agreement's construction is a matter of law appropriate for the court's deliberations. Wiregrass Construction Co., Inc. v. Tallapoosa River Elec. Cooperative, Inc., 365 So.2d 95, 98 (Ala. Civ. App. 1978).

Moreover, " [w]here the terms of the contract are of doubtful meaning or the language of a contract is ambiguous, pre-contract negotiations and conduct of the parties may be looked to by the trier of fact as an aid in interpreting the contract." Universal Development Corp. v. Shader, 382 So.2d 1115, 1117 (Ala. 1980). " Other writings, or matters contained therein, which are referred to in a written contract may be regarded as incorporated by the reference as part of the contract and[,] therefore, may properly be considered in the construction of the contract.'" Ex parte Dan Tucker Auto Sales, Inc. v. Dan Tucker Auto Sales, Inc., et al., 718 So.2d 33, 36 (Ala. 1998) (quoting 17A Am.Jur.2d Contracts, § 400 (1991)).

Under Alabama law, ambiguous contracts also are construed more strongly against the party that drafted them. Jewell v. Jackson & Whitsitt Cotton Co., 294 Ala. 112, 313 So.2d 157 (1975). In Alabama, "insurance contracts are subject to the same general rules applicable to other written contracts, specifically, in case of doubt or uncertainty as to a policy's meaning, the terms of the policy are to be interpreted against the party that drafted them." American and Foreign Ins. Co. v. Tee Jays Manufacturing Co., Inc., 699 So.2d 1226, 1229 (Ala.1997) (citing Home Indemnity Co. v. Employers Nat'l Ins. Corp., 564 So.2d 945 (Ala.1990)).

40

Tennessee law also requires an insurance policy to be construed against the insurer and in favor of the insured. In Palmer v. State Farm Mut. Ins. Co., 614 S.W.2d 788, 789 (Tenn. 1981), the Tennessee Supreme Court stated that "in construing contracts of insurance, we attempt to ascertain the intent of the contracting parties and, since the policy was drafted by the insurance company we must resolve all ambiguity ad doubt in favor of the insured. We need not abandon common sense, indeed, we are required to exercise common sense in construing these policies." Any ambiguity is construed in favor of the insured. "When there is doubt or ambiguity as to its meaning, an insurance contract must be construed favorably to provide coverage to the insured." Naifeh v. Valley Forge Life Ins. Co., 204 S.W.3d 758, 768 (Tenn. 2006)

Here, the Defendants' Policy refers to its benefits as the payment of "actual charges" and "actual expenses," but does not define either term. "Actual charges" is used more frequently with the policy. Supra at pp. 27-28. For years, Life Investors paid benefits under this Policy based upon the physician's bill without reduction for what the physician agreed to accept from another insuror. The contractual terms "actual charges" and "actual expenses," coupled with the Defendant Life Investors 's course of equating these terms with the amount of the health providers' bills, lead the Court to conclude that Life Investors's current interpretation of these terms of this policy is at complete variance with its earlier interpretation.

The Defendants' current interpretation defines "actual charges' and "actual expenses" to be the amount that the health care provider agreed to accept from the primary insuror. This interpretation runs counter to the plain purpose of the parties' contract, namely, to provide *supplemental* coverage. According to the medical bills, Plaintiff remains liable for the balance notwithstanding what amount the physicians agreed to accept from the primary insuror for the

41

medical services.[9]  The Defendants' interpretation nullifies the purpose of the policy to provide supplemental coverage that is in addition to what the primary insurors agreed to pay. In the Defendants' scenario, Defendants accept premiums without any meaningful contractual obligations to pay benefits.  The Court concludes that Plaintiff should prevail on his breach of contract claim.

Here, Life Investors argues that medical bills do not reflect either "normal" or "reasonable" charges because Plaintiff's bills are inflated "list prices."  Yet, Connie Whitlock, Life Investors' designated representative on its obligations under the policy testified that "actual charges" means "Whatever the doctors are showing that they expect from payment." (Docket Entry No. 84, Exhibit L thereto  Whitlock Dep. at 126).  As to the authorities relied upon by the Defendants, "actual charges" is materially different from than other ambiguous insurance terms such as "usual and customary" charges

Defendants rely on Claybrook v. Central United Life Ins. Co., 387 F. Supp. 2d 119 (M.D. Ala. 2005) and Ward v. Dixie National Life Ins. Co., 2006 WL 1529398 (D.S.C. 2006). In Claybrook and Ward the term "actual charges" was not to be deemed ambiguous and was given its dictionary meaning. Claybrook,  387 F. Supp. 2d at 1203-04 (discussing actual charges in the context of a policy that did not use any other term to describe other forms of benefits); Ward, 2006 WL 1529398

---

[9]Plaintiffs medical bills from Vanderbilt University Medical Center, which Life Investors included in its Initial Disclosures, has the following statement prominently displayed:

*INSURANCE CLAIMS ARE FILED AS A COURTESY. YOUR POLICY IS AN AGREEMENT BETWEEN YOU AND YOUR INSURANCE COMPANY AND DOES NOT RELIEVE YOU OF TIMELY PAYMENT OF THIS ACCOUNT. THESE ARE THE AMOUNTS EXPECTED TO BE PAID BY YOUR INSURANCE COMPANY BASED ON OUR BEST INFORMATION.

(previously filed as Exhibit 15 attached to Plaintiffs Supp. Resp.)

at *4. Claybrook concluded that this term "actual charges is not ambiguous.

This Court respectfully disagrees with Claybrook's interpretation of federal law. First, a district court's reading of state law is not controlling. See Salve Regina College v. Russell, 499 U.S. 225, 238-39 (1991). Moreover, under Alabama law, if a contract has more than one interpretation, the contract is ambiguous. Ex parte Harris, 837 So.2d 283, 290 (Ala. 2002). Here the Defendants' prior interpretation of "actual charges" is the total opposite of its current interpretation. This fact establishes more than one interpretation of the meaning of "actual" charges" under the Policy and creates an ambiguity under Alabama law. Therefore, Claybrook is not persuasive. Moreover, Ward was reversed on appeal. Ward v. Dixie National, 2007 WL 29149541 at **3-4 (4th Cir. 2007).

Other district courts hold the term "actual charges" to be ambiguous in this contractual setting. Conner v. American Public Life Ins. Co., 448 F. Supp. 2d 762 (N.D. Miss. 2006). The Conner court rejected a similar contention, and concluded "this argument does not defeat or assuage the inherent ambiguity in the undefined term 'actual charges'". Id. at 766. . Conner held that "actual charges," was ambiguous and when read in conjunction with "expenses" created ambiguity on the amount of benefits the policyholder's medical insurer paid. Id. at 765. In Metzger v. American Fidelity Assurance Co., 2006 WL 2792435 (W.D. Okla. Sept. 26, 2006), the insurer argued that phrase "actual charges", when read in conjunction with the term "expenses incurred", referred to the post-negotiation amount actually paid. Metzger, 2006 WL 2792435, at *4. The Metzger Court rejected this argument and granted summary judgment for the Plaintiff based on the fact the insurer had previously paid "actual charges" benefits equal to the Plaintiffs medical bills. Id. at *5.

Finally, the Defendants argue that their change in the "actual charges" index does not change any policy terms, but only changes the "claims procedure." Yet Whitlock testified that under the new

43

"actual charges" definition, an insured that lacks healthcare coverage and is unable to pay the balance of a medical bill does not have any possibility of receiving benefits. (Docket Entry No. 89-2, Whitlock Deposition at pp. 125-26). Accordingly, the Defendants' new definition results in illusory supplemental coverage.

Plaintiff has clearly shown that he will suffer irreparable harm if the injunction is not issued because he is terminally ill and likely will not live to see the resolution of this action. The Defendants' contention that the Plaintiff can wait until the conclusion of this case to obtain relief is unreasonable given Plaintiff's serious medical condition and his reliance on his wife to manage the family finances, and to attend personally to his duty needs.

There is not any substantial harm to the Defendant Life Investors to restore Plaintiff's benefits in accordance with its earlier administration of this Policy. Enforcement of the parties' contract is in the public's interest. See Yolton v. El Paso Tennessee Pipeline Co., 435 F.3d 571,584 (6th Cir. 2006) holding that despite a substantial financial impact on corporate defendant, the harm incurred by individual plaintiffs as a result of defendants' continued refusal to pay benefits due under health insurance policies warrants injunctive relief.

For these additional reasons, the Court concludes that Plaintiff's motion for a preliminary injunction and his motion for partial summary judgment on his breach of claims should be granted. Life Investors's motion for summary judgment on Plaintiff's breach of contract claim should be denied.

As to Life Investor's motion for summary judgment on Plaintiff's other claims, that motion should be denied for material factual disputes about the extent of Aegon's role and control over Life Investors's benefits decisions.

44

An appropriate Order is filed herewith.

**ENTERED** this the ___5th___ day of March, 2008.

WILLIAM J. HAYNES, JR.
United States District Judge

**IN THE UNITED STATES DISTRICT COURT**

45